UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

YUROK TRIBE, ET AL.,
*Plaintiffs - Appellees*,

HOOPA VALLEY TRIBE,
*Intervenor - Plaintiff - Appellee*
v.

UNITED STATES OF AMERICA, ET AL.,
*Defendants - Cross-Claimants - Appellees*,

KLAMATH TRIBES,
*Defendant - Intervenor - Appellee*,
v.

KLAMATH WATER USERS ASSOCIATION,
*Intervenor – Defendant - Counter-Claimant - Appellant*,

KLAMATH IRRIGATION DISTRICT,
*Intervenor - Defendant - Appellant*,

OREGON WATER RESOURCES DEPARTMENT,
*Defendant - Appellee.*

---

Appeal from the United States District Court for the Northern District of California
No. 3:19-cv-4405-WHO (Hon. William H. Orrick)

---

**ANSWERING BRIEF FOR THE FEDERAL APPELLEES**

---

Of counsel:

LANCE C. WENGER
Solicitor's Office
U.S. Department of the Interior

MEGAN J. WALLINE
Office of General Counsel
National Oceanic and
    Atmospheric Administration

TODD KIM
*Assistant Attorney General*

THOMAS K. SNODGRASS
ROBERT P. WILLIAMS
KEVIN MCARDLE
JOHN L. SMELTZER
Environment & Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, DC 20044
(202) 305-0343
john.smeltzer@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................iv

GLOSSARY OF ACRONYMS AND ABBREVIATIONS...................xi

INTRODUCTION .............................................................................1

STATEMENT OF JURISDICTION........................................................3

STATEMENT OF THE ISSUE ...........................................................4

PERTINENT STATUTES AND REGULATIONS .................................4

STATEMENT OF THE CASE............................................................4

    A.    Factual and Legal Background.......................................4

        1.    Klamath Project............................................4

        2.    Project Water Rights .....................................7

        3.    Project Contracts .......................................10

        4.    ESA Compliance........................................13

    B.    Course of Proceedings.................................................22

        1.    Complaint, Interventions, and Stay.............22

        2.    KID's suits ................................................23

        3.    United States' cross-complaint ...................25

        4.    Decision below..........................................26

        5.    Rule 54(b) judgment .................................27

SUMMARY OF ARGUMENT .........................................................28

    A.    Applicability of the ESA ...............................................28

    B.    Remaining Issues.......................................................30

STANDARD OF REVIEW ...................................................................32

ARGUMENT ....................................................................................32

I.    The ESA applies to Klamath Project operations. ..........................32

    A.    *Patterson* holds that operating the Klamath Project is "agency action" subject to ESA Section 7. .......................32

    B.    *Home Builders* did not alter *Patterson*. ...............................34

    C.    The Reclamation Act imposes no specific nondiscretionary mandates. ...............................................37

    D.    Reclamation's obligation to comply with state water law does not impact its ESA duties. ......................................41

    E.    *Babbitt* and *EPIC* are distinguishable. ...............................45

    F.    The Project contracts are conditioned on water availability. ................................................................49

    G.    The Van Brimmer contract is not at issue. ..........................53

    H.    The contracts do not relinquish Reclamation's storage and water supply authorities. ...............................56

    I.    Enforcement of state water law is preempted by the ESA in the event of a conflict. .......................................59

II.    KID and KWUA's remaining arguments are meritless. ...............60

    A.    There was no judicial taking. .............................................60

    B.    KID's jurisdictional arguments are meritless. .....................61

        1.    The KBA court has no jurisdiction over Reclamation's crossclaim. .....................................62

        2.    The abstention doctrine does not apply. ...................64

    C.    There are no genuine issues of material fact. ......................65

    D.      The tribal water rights are not before this Court. ................................68

CONCLUSION ..........................................................................................69

ADDENDUM

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Alaska Wilderness League v. Jewell,*
   788 F.3d 1212 (9th Cir. 2015) ..............................................40

*American Postal Workers Union ALFC-CIO v. USPS,*
   682 F.2d 1280 (9th Cir 1982) ..............................................58

*Arizona v. California,*
   373 U.S. 546 (1963)..............................................................8

*Arizona v. United States,*
   567 U.S. 387 (2012)............................................................59

*Baley v. United States,*
   134 Fed. Cl. 619 (Fed. Cl. 2017) .................................... 11-13, 50, 52

*Baley v. United States,*
   942 F.3d 1312 (Fed. Cir. 2019) ...............................5, 8-10, 17-19, 43,
                                              57, 61, 66, 68

*Bennett v. Spear,*
   520 U.S. 154 (1997)............................................................16

*California v. United States,*
   438 U.S. 645 (1978)........................................ 4, 41, 44, 55

*Cappaert v. United States,*
   426 U.S. 128 (1976)......................................................... 7-8

*Chevron U.S.A. Inc. v. Natural Resources Defense Council,*
   Inc., 456 U.S. 837 (1984)...................................................35

*Colorado River Water Conservation District v. United States,*
   424 U.S. 800 (1976)........................................................9, 64

*Department of Transportation v. Public Citizen,*
   541 U.S. 752 (2004)............................................................36

iv

*Environmental Protection Information Center v. Simpson Timber Co.,* 255 F.3d 1073 (9th Cir. 2001) ................................................. 47-48

*Freeman v. Hittle,* 747 F.2d 1299 (9th Cir. 1984) ............................................................. 3

*Friends of Animals v. U.S. Fish and Wildlife Service,* 28 F.4th 19 (9th Cir. 2022) .................................................................. 32

*Hawkins v. Haaland,* 991 F.3d 216 (D.C. Cir. 2021) ...................................................... 9, 63

*In re Klamath Irrigation District,* 69 F.4th 934 (9th Cir. 2023) ........................................... 10, 24, 62, 64

*Klamath Irrigation District v. Oregon Water Resources Department,* 518 P.3d 970 (Or. App. 2022) ........................................ 24, 27-28

*Klamath Irrigation District v. U.S. Bureau of Reclamation,* 48 F.4th 934 (9th Cir. 2022) ................................................................. 23

*Klamath Irrigation District v. United States Bureau of Reclamation,* --- S.Ct. ----, 2024 WL 71931 (2024) ........................................ 24

*Klamath Irrigation District v. United States Bureau of Reclamation,* 144 S.Ct. 342 (2023) .................................................................. 23

*Klamath Irrigation District v. United States,* 227 P.3d 1145 (Or. 2010) .................................... 7, 41, 42, 55, 63, 64

*Klamath Irrigation District v. United States,* 635 F.3d 505 (Fed. Cir. 2011) ............................................ 37, 64, 67

*Klamath Water Users Protective Association v. Patterson,* 204 F.3d 1206 (9th Cir. 1999) ...................................... 10, 18, 33-34, 36-37, 45, 49, 53, 55, 56, 59, 68

*Klamath Water Users Protective Association,* 15 F.Supp.2d 990 (D.Or. 1998) .................................................. 33, 49

*Lakeshore Gardens Drainage District v. California Oregon Power Co.*, 90 P.2d 1038 (Or. 1939) ....................................................6

*Merion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982)...........................................................34

*Modesto Irrigation District v. Gutierrez*, 619 F.3d 1024 (9th Cir. 2010) .................................... 16, 17

*National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007)......................................34-36, 39-41, 45

*National Wildlife Federation v. NMFS*, 524 F.3d 917 (9th Cir. 2008) ......................................... 29, 38, 41, 54

*NRDC v. Bernhardt*, 2020 WL 6449197 (E.D. Cal. 2020)...................................48

*NRDC v. Houston*, 146 F.3d 1118 (9th Cir. 1998) .................................... 49, 53

*O'Neill v. United States*, 50 F.3d 677 (9th Cir. 1995) ................................ 34, 37, 49, 52, 53, 56

*Parravano v. Babbitt*, 70 F.3d 539 (9th Cir. 1995) .............................................17

*Ramsey v. Kantor*, 96 F.3d 434 (9th Cir. 1996) ......................................... 16, 59

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984)...........................................................61

*San Luis & Delta-Mendota Water Authority v. Haugrud*, 848 F.3d 1216 (9th Cir. 2017) .......................................48

*San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581 (9th Cir. 2014) ....................................... 38, 54

*San Luis Obispo Coastkeeper v. Santa Maria Valley Water Conservation District*, 49 F.4th 1242 (9th Cir. 2022) ............................ 38, 39, 45

*Sierra Club v. Babbitt*,
65 F.3d 1502 (9th Cir. 1995) ............................................................ 36, 45, 46, 48

*Stop the Beach Renourishment, Inc. v. Florida Dept. of Environmental Protection*, 560 U.S. 702 (2010) .................................................. 60

*Tennessee Valley Authority v. Hill*,
437 U.S. 153 (1978) ............................................................................. 39

*Turtle Island Restoration Network v. National Marine Fisheries Service*, 340 F.3d 969 (9th Cir. 2003) ...................................................... 36

*U.S. v. Winstar Corp.*,
518 U.S. 839 (1996) ............................................................................. 37

*United States v. Adair*,
723 F.2d 1394 (9th Cir. 1983) ........................................................... 8, 43

*United States v. Klamath Drainage District*,
2023 WL 5899910, (D. Or. 2023) ....................................................... 40

*United States v. Oregon*,
44 F.3d 758 (9th Cir. 1994) ............................................................... 9, 63

*United States v. Truckee-Carson Irrigation Dist.*,
649 F.2d 1286 (9th Cir. 1981) ........................................................... 43

*WildEarth Guardians v. United States Army Corps of Engineers*, 947 F.3d 635 (10th Cir. 2020) .................................................. 39-40, 49

*Winters v. United States*,
207 U.S. 564 (1908) ............................................................................. 8

*Yurok Tribe v. U.S. Bureau of Reclamation*,
231 F. Supp. 3d 450 (N.D. Cal. 2017) ................................................ 19

## Federal Statutes

16 U.S.C. § 662 .......................................................................................39

16 U.S.C. § 663 .......................................................................................39

Endangered Species Act

    16 U.S.C. § 1533(d) ...................................................................... 14, 46

    16 U.S.C. § 1536 ..............................................................3, Add. 1

    16 U.S.C. § 1536(a)(2).................................... 14, 29, 32, 42, 46, 47, 58

    16 U.S.C. § 1536(b)(3)(A) .............................................. 15, 65

    16 U.S.C. § 1536(b)(4) .................................................. 15, 58

    16 U.S.C. § 1536(c)(1) ...............................................................14

    16 U.S.C. § 1536(o)(2) ................................................... 15, 58

    16 U.S.C. § 1538.......................................... 14, 46, 58, Add. 14

    16 U.S.C. § 1539.............................. 16, 46, 47, 58, Add. 16

    16 U.S.C. § 1540...................................................................46

28 U.S.C. § 1291 .......................................................................................3

28 U.S.C. § 1292(a)(1) ............................................................................3

28 U.S.C. § 1331 .......................................................................................3

28 U.S.C. § 1345 .......................................................................................3

28 U.S.C. § 2201 .......................................................................................3

Clean Water Act

    33 U.S.C. § 1342(b) ..............................................................................35

Reclamation Statutes

    43 U.S.C. § 373 ...................................................................40, Add. 19

    43 U.S.C. § 383 ......................................... 5, 41, 45, 54, 55, Add. 19

    43 U.S.C. § 411 ...................................................................38, Add. 20

    43 U.S.C. § 423d ............................................. 11, 45, 53, Add. 20

    43 U.S.C. § 423e .............................................................. 11, 45, 53

    43 U.S.C. § 491 ...................................................................38, Add. 21

    43 U.S.C. § 523 ......................................... 12, 13, 53, Add. 21

    43 U.S.C. § 524 .........................................................................12

McCarran Amendment

    43 U.S.C. § 666(a) ...................................................9, 63, Add. 22

**Federal Session Laws**

Act of June 17, 1902, ch. 1093, 32 Stat. 388 ............................ 4-5

Act of Feb. 9, 1905, ch. 567, 33 Stat. 714 ...........................5, 39, Add. 23

Act of Feb. 21, 1911, ch.141, §§ 1-2, 36 Stat. 925-926 ..........................12

**Federal Rules & Regulations**

Fed. R. App. P. 4(a)(1)(B)(iii) ...................................................................3

Fed. R. Civ. P. 19 ...................................................................23

Fed. R. Civ. P. 54(b) ........................................................... 3, 27-28

Endangered Species Act Regulations

    50 C.F.R. § 17.21(c)...............................................................14

    50 C.F.R. § 17.31(a)............................................................ 14, 46

    50 C.F.R. § 402.01(b) ...........................................................14

50 C.F.R. § 402.03 ............................................................... 35-36

50 C.F.R. § 402.14 ....................................................................15

50 C.F.R. § 402.14(h)(2) ...........................................................15

50 C.F.R. § 402.14(i)(1)(i) .........................................................15

50 C.F.R. § 402.14(i)(4) .............................................................15

50 C.F.R. § 402.16 ............................................................... 47, 48

## Federal Register

53 Fed. Reg. 27,130 (July 18, 1988).........................................16

62 Fed. Reg. 24,588 (May 6, 1997) ...........................................17

64 Fed. Reg. 24,049 (May 5, 1999) ...........................................17

70 Fed. Reg. 69,903 (Nov. 18, 2005).........................................17

77 Fed. Reg. 73,740 (Dec. 11, 2012) .........................................16

## Other

USGS, *Groundwater Hydrology of the Upper Klamath Basin,
    Oregon and California* 1-2 (2010),
    https://pubs.usgs.gov/sir/2007/5050/ ...................................................5

# GLOSSARY OF ACRONYMS AND ABBREVIATIONS

APA ........................................................ Administrative Procedure Act

ACFFOD............. Amended and Corrected Findings of Fact and Order
of Determination in Klamath Basin Adjudication

ESA ................................................................ Endangered Species Act

FWS .............................................................. Fish and Wildlife Service

KBA ........................................................ Klamath Basin Adjudication

KID .......................................................... Klamath Irrigation District

KID-ER ................................KID's Excerpts of Record (Oct. 16, 2023)

KWUA ............................................ Klamath Water Users Association

KWUA-ER ................... KWUA's Excerpts of Record (Oct. 16, 2023)

NMFS................................................ National Marine Fisheries Service

OWRD ........................................ Oregon Water Resources Department

Reclamation ....................................................... Bureau of Reclamation

SER .......................... Supplemental Excerpts of Record (Jan. 16, 2024)

UKL ..................................................................... Upper Klamath Lake

# INTRODUCTION

This appeal concerns a crossclaim for declaratory relief by the United States to confirm the authority and obligation of the Bureau of Reclamation ("Reclamation") to operate the Klamath Project in accordance with the Endangered Species Act ("ESA").

The Project's principal reservoir is Upper Klamath Lake ("UKL"), a natural lake at the headwaters of the Klamath River. UKL provides habitat for endangered suckers, and its downstream flows provide habitat for threatened salmon and salmon that are essential prey for the endangered Southern Resident killer whale. The Project diverts UKL and river water to irrigation canals that serve farmers and ranchers in southern Oregon and northern California. In consultation with the U.S. Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS"), Reclamation develops operating plans to minimize the incidental take of listed species from Project operations and to ensure that Project operations are not likely to jeopardize the continued existence of such species or adversely modify or destroy their critical habitat. The plans determine available water supplies for the Project, provide for minimum lake levels in UKL to protect listed suckers, and provide for specified releases from UKL to the Klamath River downstream to protect listed salmon.

Appellants the Klamath Water Users Association ("KWUA") and the Klamath Irrigation District ("KID") contend that the ESA does not apply to overall Project operations, and that water in UKL generally may not be released for non-Project purposes. In a parallel state-court action (to which the federal agencies were not parties), KID obtained an injunction against the Oregon Water Resources Department ("OWRD"), requiring OWRD to take charge of UKL and to prevent the release of stored water for non-Project purposes. The United States filed its crossclaim in federal district court to enjoin enforcement action by OWRD, and to obtain a declaratory judgment that Reclamation's Project operations are subject to ESA Section 7. KWUA and KID appeal from the district court's grant of summary judgment for the United States.

For reasons explained herein, this Court should affirm the district court's holding that the ESA applies to Project operations and thus obligates Reclamation to manage UKL water levels and the release of water to the Klamath River as necessary to minimize incidental take of and to avoid jeopardy to listed species or adverse modification of their critical habitat.

# STATEMENT OF JURISDICTION

(a)     The district court had jurisdiction under 28 U.S.C. §§ 1331, 1345, and 2201 because the proceedings below concerned a crossclaim by the United States as plaintiff for a declaratory judgment concerning federal obligations under the ESA, 16 U.S.C. § 1536.

(b)     This Court has jurisdiction under 28 U.S.C. § 1291 because the district court's judgment completely resolved the crossclaim and because the district court certified the judgment final under Fed. R. Civ. P. 54(b) after finding no just reason for delay.  1-KWUA-ER_5.

(c)     The district court entered summary judgment on February 6, 2023. 1-KWUA-ER_43.  KWUA and KID filed timely notices of appeal.  12-KWUA-ER_2833-39 (Apr. 4 and Apr. 6, 2023); *see also* Fed. R. App. P. 4(a)(1)(B)(iii). The notices cited 28 U.S.C. § 1292(a)(1), 12-KWUA-ER_2834, 2838, which authorizes appeals from injunctive orders.  OWRD has since withdrawn the order that was the subject of the court's injunction.  *See* 1-KWUA-ER_5 (n.3).  But KWUA thereafter moved under Fed. R. Civ. P. 54(b) for a final judgment on the district court's grant of declaratory relief.  *See* 1-KWUA-ER_8.  The district court granted that motion, 1-KWUA-ER_9, and entered final judgment on August 15, 2023, 1-KWUA-ER_6, providing a jurisdictional basis for the earlier-noticed appeals.  *See Freeman v. Hittle*, 747 F.2d 1299, 1302 (9th Cir. 1984).

## STATEMENT OF THE ISSUE

Whether the district court correctly determined that the ESA applies to Reclamation's operation of the Klamath Project and obligates Reclamation to manage water levels within UKL and releases to the Klamath River to avoid jeopardizing listed species or adversely modifying their critical habitat.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the addendum following this brief.

## STATEMENT OF THE CASE

### A.    Factual and Legal Background

### 1.    Klamath Project

Through the Reclamation Act of 1902, Congress authorized the Secretary of the Interior to construct "massive projects" for the development of arid and semi-arid lands of the western states that otherwise could not be settled.  *California v. United States*, 438 U.S. 645, 663 (1978).  The Act authorized the Secretary: (a) to withdraw from public entry lands suitable for irrigation and project works; (b) to construct project works; (c) to reopen project lands to homesteading, subject to water charges and other terms; (d) to designate private lands (if any) to be served by the project; and (e) to impose charges upon homesteaders and private landowners to recover construction, operation, and maintenance costs.  Act of June 17, 1902, ch. 1093, §§ 2-4, 32 Stat. 388, 388-89.  The Act did not reserve water

rights. Rather, Congress directed the Secretary to "proceed in conformity with [state] laws" concerning the "control, appropriation, use, or distribution of water used in irrigation." *Id.* § 8, 32 Stat. at 390; 43 U.S.C. § 383.

In 1905, the United States provided notice in accordance with Oregon law of its intent to appropriate for the Klamath Project "[a]ll of the waters of the Klamath Basin in Oregon, constituting the entire drainage basin[] of the Klamath River." *Baley v. United States*, 942 F.3d 1312, 1320 (Fed. Cir. 2019). The United States provided similar notice to appropriate waters of the Lost River in California. 13-KID-ER_3011. Reclamation constructed the Project in stages over the next several decades. *See* 13-KID-ER_3016-17.

Before Project development, the Upper Klamath River was dominated by three large shallow lakes and a wetland complex spanning hundreds of square miles. *See* USGS, *Groundwater Hydrology of the Upper Klamath Basin, Oregon and California* 1-2 (2010), https://pubs.usgs.gov/sir/2007/5050/. To create arable lands, Reclamation drained vast areas of wetlands and nearly all of two of those lakes: Lower Klamath Lake and Tule Lake. *Id.*; *see also* Act of Feb. 9, 1905, ch. 567, 33 Stat. 714. Reclamation constructed an extensive network of dams, reservoirs, canals, laterals, and drains to regulate surface flows for delivery to the reclaimed lands and other designated lands. *See* 13-KID-ER_3008-10.

In so doing, Reclamation reconfigured UKL, the largest of the lakes, to serve as the Project's principal storage reservoir. 1-SER_261. UKL is formed by a natural reef that impounds the waters of several tributaries. 1-SER_97-98, 261. Water from the lake formerly overtopped the reef into Link River, a 1.5-mile stream that empties into Lake Ewauna, which forms the headwaters of the Klamath River. 1-SER_98.

In 1917, the United States authorized a public utility company (now PacifiCorp) to blast a notch in the reef and to construct a hydroelectric dam in its place (Link River Dam). 1-SER_259, 261; *see also Lakeshore Gardens Drainage District v. California Oregon Power Co.*, 90 P.2d 1038, 1039 (Or. 1939). These changes enabled operators to regulate flows through UKL and to lower the lake below natural levels. Historically, lake elevations ranged from approximately 4,140 to 4,143 feet above sea level. 1-SER_98. Following the changes, lake levels could be controlled at elevations between 4,136 feet and 4,143.3 feet, providing an active storage capacity of approximately 562,000 acre-feet. *Id.*

Water is delivered for Project use through the A-Canal, which diverts from UKL just above Link River Dam, and through diversion structures on the Klamath River in Oregon below Link River Dam. 13-KID-ER_3052-53; 1-SER_85. These diversions serve approximately 200,000 acres of cultivated land, including leased lands on two national wildlife refuges established on remnants of Lower Klamath

and Tule Lakes.  13-KID-ER_3015-17 3052-53; 1-SER_83-85.  Klamath River waters not diverted for Project or other consumptive use flow downstream into California and ultimately to the Pacific Ocean.  1-SER_97.

Annual inflows to UKL average around 1,200,000 acre-feet (more than double UKL's active storage capacity) but vary widely, from around 500,000 acre-feet to around 2,500,000 acre-feet.  1-SER_98.  Due to its shallowness, UKL lacks significant capacity to provide carry-over storage from one year to the next. 1-SER-123.  The water available for annual irrigation (and for fish and wildlife) depends principally on annual precipitation.  *Id.*

## 2.     Project Water Rights

Under the law of most western states, including Oregon, water rights are determined by the doctrine of prior appropriation.  *See Klamath Irrigation District v. United States*, 227 P.3d 1145, 1150 (Or. 2010).  Under this doctrine, any person who appropriates water from a public stream for a beneficial use acquires a water right against subsequent appropriators, which must be maintained by use, and which is enforced in priority based on the date of appropriation or of a published notice of intent to appropriate.  *Id.* at 1150.

This doctrine is subject, however, to an important exception.  Under federal law, the establishment of an Indian or other federal reservation impliedly reserves "then unappropriated" water "to the extent needed to accomplish the purpose of the

reservation." *Cappaert v. United States*, 426 U.S. 128, 138 (1976) (citing *Winters v. United States*, 207 U.S. 564, 576-77 (1908)). These reserved water rights ("*Winters* rights") vest no later than the date of the reservation and are "superior to the rights of future appropriators." *Cappaert*, 426 U.S. at 138; *see also Arizona v. California*, 373 U.S. 546, 597-601 (1963); *United States v. Adair*, 723 F.2d 1394, 1408-14 (9th Cir. 1983).

In the present case, the development of the Klamath Project and beneficial use of Project water perfected water rights under Oregon law with a priority date of 1905, the date of the United States' notice of appropriation. *See Baley*, 942 F.3d at 1320-21. But these Project water rights were (and are) subject to preexisting rights reserved for Klamath Basin Indian tribes, including instream or "non-consumptive" rights for tribal fisheries, *id.* at 1321-23, i.e., rights "to prevent [junior] appropriators from depleting the streams waters below a protected level," *see id.* at 1322 (citing *Adair*, 723 F.2d at 1408-11). The Klamath Tribes, a federally recognized confederation of tribes in Oregon, hold senior instream water rights for tribal fisheries in UKL and in its upstream tributaries. *Id.*; *Baley*, 942 F.3d at 1335-39. The Yurok and Hoopa Valley Tribes, federally recognized tribes with reservations on the Klamath River in California, hold senior instream rights for tribal fisheries in the Klamath River in California. *Baley*, 942 F.3d at 1338-39.

The relative rights of all users of Klamath Basin waters in Oregon are being adjudicated in the Klamath Basin Adjudication ("KBA"), a general adjudication initiated by OWRD in 1975. *See United States v. Oregon*, 44 F.3d 758, 762-64 (9th Cir. 1994). The United States was joined as a party pursuant to the McCarran Amendment, *id.* at 763-70, which waives federal sovereign immunity and grants consent to join the United States to a "suit for the adjudication[s] of rights to the use of a river system or other source," 43 U.S.C. § 666(a), including *Winters* rights impliedly reserved for Indians. *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 809-13 (1976). In February 2014, OWRD issued its "Amended and Corrected Findings of Fact and Order of Determination" ("ACFFOD"), which provisionally determined the rights of all claimants. *Baley*, 942 F.3d at 1321; *see also Oregon*, 44 F.3d at 764.

The ACFFOD confirmed the United States' right to store up to 486,830 acre-feet of water in UKL for irrigation and other beneficial use with a priority date of 1905, 9-KID-ER_1869-72, 1892-93, and declared that Project irrigators own the rights to beneficially use such water, 9-KID-ER_1884-91. The ACFFOD also confirmed instream *Winters* rights on behalf of the Klamath Tribes in UKL and its upstream tributaries, with a priority date of "time immemorial." *See Hawkins v. Haaland*, 991 F.3d 216, 221 (D.C. Cir. 2021). The ACFFOD is subject to judicial review proceedings in the Klamath County Circuit Court, Case No.

WA1300001, which are ongoing. *See* Or. Rev. Stat. §§ 539.130(1), 539.150.

During such review, the ACFFOD is in "full force and effect." Or. Rev. Stat. §

539.130(4); *see also* Or. Rev. Stat. § 539.170.

The United States did not assert *Winters* rights in the KBA on behalf of the

California-based Yurok or Hoopa Valley Tribes. *See Baley*, 942 F.3d at 1341.

Nor did the Yurok or Hoopa Valley Tribes participate in the KBA. As this Court

recently affirmed, Oregon lacks jurisdiction to adjudicate those tribes' California-

based water rights, and the adjudication of such rights as against Oregon water

users would go beyond the scope of the McCarran Amendment's sovereign-

immunity waiver. *In re Klamath Irrigation District*, 69 F.4th 934, 941-42 (9th Cir.

2023) (citing *Baley*, 942 F.3d at 1341). But this Court and the Federal Circuit have

recognized that the tribes' rights are senior to Klamath Project rights, *Klamath*

*Water Users Protective Association v. Patterson*, 204 F.3d 1206, 1213-14 (9th Cir.

1999); *Baley*, 942 F.3d at 1335-41, and at least coextensive to water flows needed

to avoid jeopardy to listed salmon, *Baley*, 942 F.3d at 1335-41.

### 3. Project Contracts

The ACFFOD also did not determine the relative rights and priorities to

Klamath Project water among Project water users. Rather, such rights are

governed by federal contracts, which specify the terms and conditions for the

supply of Project water, including repayment obligations for construction,

maintenance, and operations costs. *See generally Baley v. United States*, 134 Fed. Cl. 619, 627-33 (Fed. Cl. 2017). Apart from one settlement contract, the contracts do not specify amounts of water to be delivered to irrigation districts or individual users but instead provide terms for the equitable allocation of available water. *Id.* The contracts fall into four categories.

*First*, Reclamation entered repayment contracts under the Reclamation Act with KID and with the Tulelake Irrigation District ("TID"), the principal Project beneficiaries. *Id.* at 629-30; *see also* 43 U.S.C. §§ 423d-423e. The United States entered an amendatory contract with KID in 1954, 11-KWUA-ER_2641-72, which transferred the A-Canal and other specified works to KID for "care and operation and maintenance," 11-KWUA-ER_2644 (¶ 4). KID assumed the responsibility to deliver Project-supplied water to its own members, and to make deliveries through the transferred works to other districts that have contracted with the United States. 11-KWUA-ER_2650-53 (¶ 13). Title to the transferred works remains in the United States. *Id.* KID must deliver water

> in full compliance with the reclamation laws as they now exist or hereafter may be amended, [and] the regulations of the Secretary now in force or hereafter promulgated . . .

11-KWUA-ER 2646 (¶ 6).

The 1954 contract further specifies that KID may not make deliveries when Reclamation notifies KID that contracting parties are not entitled to water due to

nonpayment or for "other reasons." 11-KWUA_2652 (¶ 13(f)). The contract specifies that due to

> drought or other causes, there may occur at times a shortage in the quantity of water available in Project reservoirs and, while the United States will use all reasonable means to guard against such shortage, in no event shall any liability accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom . . .

11-KWUA-ER_2666 (¶ 26). The United States entered a contract with TID in 1956, 11-KWUA-ER_2595-2635, which contains an identical shortage provision. 11-KWUA-ER_2627 (¶ 26). It authorizes Reclamation to "deliver" water as needed for "beneficial irrigation" and to "apportion the available [water] supply among the [Tulelake] District and others having rights of priority equal to the rights of the District" in the event of shortages "as a result of drought or other unavoidable causes." 11-KWUA-ER_2630-31 (¶¶ 33(a), (c)).

*Second*, Reclamation entered water-delivery and repayment contracts with more than a dozen smaller irrigation districts, as well as some individuals, under the 1911 Warren Act. *See Baley*, 134 Fed. Cl. at 630-32. That Act enabled Reclamation to contract to supply water to lands not initially included within an approved project, if Reclamation determined that the project possessed "excess" "storage or carrying capacity." Act of Feb. 21, 1911, Ch. 141, §§ 1-2, 36 Stat. 925-926; 43 U.S.C. §§ 523-24. Water rights developed under the Warren Act are

subject to the "first priority" rights reserved for the original "lands and entrymen." *See* 43 U.S.C. § 523.

*Third*, the United States entered a settlement contract in 1909 with the Van Brimmer Ditch Company, a private ditch company. *See Baley*, 134 Fed. Cl. at 632. To compensate for impairing the company's preexisting right to divert a specified amount of water from Lower Klamath Lake (which was to be drained by the Project), the United States agreed to deliver the same amount of water to the company's ditch via Project works. *Id.*

*Fourth*, the United States leases land within the Lower Klamath and Tule Lake National Wildlife Refuges for agricultural use. *See Baley*, 134 Fed. Cl. at 632. The leases specify that the United States "shall not be held liable for damages" if "irrigation water is not available." *Id.* (standard lease).

### 4. ESA Compliance

#### a. Statutory Mandates

Consistent with the terms of the Project contracts and basic contract law, Reclamation has long understood that its contractual duties "to deliver water" are "subject to the availability of water," and that water may be unavailable for contract purposes due to the need for "compliance with . . . federal laws such as the

Endangered Species Act." 8-KWUA-ER_1983-85 (1995 Regional Solicitor's

memorandum); *see also* 8-KWUA-ER_1998-2006 (1997 memoranda).[1]

Specifically, under ESA Section 7(a)(2), any federal agency must ensure—

"in consultation" with NMFS and/or FWS, the agencies responsible for

administering the Act—that "any action authorized, funded, or carried out by" the

action agency "is not likely to jeopardize the continued existence of any

endangered species or threatened species or result in the destruction or adverse

modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2); 50

C.F.R. § 402.01(b). In addition, under ESA Section 9 and implementing

regulations, no federal agency or any other person may "take" a listed species

except as permitted under the Act. *See* 16 U.S.C. § 1538(a)(1)(B); 50 C.F.R.

§ 17.21(c); *see also* 16 U.S.C. § 1533(d); 50 C.F.R. § 17.31(a).

If an agency determines, through a "biological assessment," that a proposed

action is "likely to adversely affect" listed species or designated critical habitat in

an action area, *see* 16 U.S.C. § 1536(c)(1)—or if NMFS or FWS make such a

---

[1] As KWUA observes (Brief at 19-21), in January 2021, just before the change in Administrations, Interior adopted a different view of Reclamation's obligations under the Klamath Project contracts. *See* 8-KWUA-ER_1936-63 (Solicitor's memo and supporting documents). But in April 2021, Secretary Haaland withdrew that memo and supporting documents due to a lack of consultation with affected tribes and because the documents "conflict with longstanding Departmental positions and interpretations of governing law." 8-KWUA-ER_1882-83.

finding—the relevant consulting agency must prepare a biological opinion. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14. If NMFS or FWS thereby determines that the action is likely to result in "jeopardy" to the species or "destruction or adverse modification" of its critical habitat, such agency must suggest "reasonable and prudent alternatives," if any, for avoiding such impacts. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. 402.14(h)(2).

If NMFS or FWS determines that an agency action is likely to result in an individual taking or takings, but is not likely to *jeopardize* the species or adversely modify its critical habitat, the consulting agency "shall provide" an "incidental take statement" describing: (a) the extent of the taking, (b) reasonable and prudent measures necessary to minimize such impact, and (c) "terms and conditions that must be complied with by the [action] agency" to ensure that the take-minimizing measures are carried out. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(i). If the action agency proceeds in compliance with such terms and conditions— including to reinitiate consultation if the action results in a take exceeding the identified impact, 50 C.F.R. § 402.14(i)(4)—any resulting incidental takings of the subject species are exempt from takings liability. 16 U.S.C. § 1536(o)(2). This exemption protects the agency and associated persons or entities whose actions are "contemplated by an incidental take statement" and "conducted in compliance with [its] requirements." *Ramsey v. Kantor*, 96 F.3d 434, 440-42 (9th Cir. 1996).

Similarly, in cases without federal action, a private applicant may obtain an "incidental take permit" for takings "incidental to" an "otherwise lawful activity," if the applicant adopts a conservation plan to mitigate impacts, and the consulting agency determines, among other requirements, that actions consistent with the plan "will not appreciably reduce the likelihood of the survival and recovery of the species in the wild." 16 U.S.C. § 1539(a). Persons who take listed species without the safe harbor of an incidental take statement or incidental take permit do so at their "own peril . . . subject to substantial civil and criminal penalties, including imprisonment." *Bennett v. Spear*, 520 U.S. 154, 170 (1997).

### b. Protected species

FWS exercises ESA jurisdiction over terrestrial species and predominantly freshwater fish. *Modesto Irrigation District v. Gutierrez*, 619 F.3d 1024, 1027-28 (9th Cir. 2010). In 1988, FWS listed the Lost River sucker and shortnose sucker as endangered. 53 Fed. Reg. 27,130 (July 18, 1988). Both species are found only in UKL and surrounding Klamath Basin waters. *Id.* The draining of wetlands and damming of rivers reduced the species' range and population by more than 95 percent. *Id.*; *see also* 17-KID-ER_4123-25. FWS designated UKL and other waters within the Klamath Project as critical habitat for the suckers. 77 Fed. Reg. 73,740, 73,762-68 (Dec. 11, 2012).

NMFS exercises jurisdiction over marine and anadromous species. *Modesto Irrigation District*, 619 F.3d at 1028. In 1997, NMFS listed the Southern Oregon/Northern California coho salmon ("SONCC coho") as threatened. 62 Fed. Reg. 24,588 (May 6, 1997). Coho salmon are anadromous fish that develop as juveniles in Pacific coast rivers, spend two years in the ocean, then return to the rivers in fall migrations to spawn and die. *Id.* In the 1940s, spawning populations ranged up to 400,000. *Id.* Due to altered stream flows and reduced spawning habitat, that number dropped to approximately 10,000 at the time of listing, *id.* at 24,592-93, and populations remain in decline, 1-SER_156-65. Most of the Klamath River in California is now designated as critical habitat for SONCC coho. 64 Fed. Reg. 24,049 (May 5, 1999).

The Klamath River also provides spawning habitat for chinook salmon. *See Parravano v. Babbitt*, 70 F.3d 539, 542 (9th Cir. 1995). While these salmon are not ESA-listed, their population has declined in response to the same threats impacting coho. *Baley*, 942 F.3d at 1336. Chinook are also the primary prey of the Southern Resident killer whale, 1-SER_231, which NMFS listed as endangered in 2005. *See* 70 Fed. Reg. 69,903 (Nov. 18, 2005).

### c. Initial consultation

Reclamation began consulting with FWS and NMFS on operating plans for the Klamath Project after the listing of the two suckers and SONCC coho salmon.

*See Patterson*, 204 F.3d at 1209-10.  Thereafter, KWUA sued PacifiCorp, the

contract operator of Link River Dam, alleging that PacifiCorp was contractually

obligated to operate the dam for Project irrigation purposes in disregard of

Reclamation's operating plan.  *Id.* at 1213.  This Court held in *Patterson* that

Reclamation has the authority and responsibility to "tak[e] control of the Dam as

necessary to meet the requirements of the ESA" (and to operate consistently with

federal reserved rights for basin tribes) and that such requirements "override the

water rights of [Project] irrigators."  *Id.* at 1213-14.

In early 2001, Reclamation forecast a "critical dry" year for the Upper

Klamath Basin.  *See Baley*, 942 F.3d at 1323.  In consultations over the 2001

operating plan, FWS and NMFS issued biological opinions finding, respectively,

that planned Project operations were likely to jeopardize the continued existence of

the UKL suckers and the SONCC coho salmon.  *Id.* at 1324-25.  The consulting

agencies identified reasonable and prudent alternatives that called upon

Reclamation to maintain specified minimum levels in UKL and in the Klamath

River downstream.  *Id.* at 1325.

To meet its ESA requirements and to operate consistently with the *Winters*

rights of Klamath Basin tribes, Reclamation implemented the ESA-prescribed

alternatives, which resulted in no irrigation deliveries for most of the irrigation

season.  *Id.*  Project water users then sued the United States in the Court of Federal

Claims seeking compensation for the alleged taking of Project water rights. *Id.* at 1316-18. The Federal Circuit affirmed the trial court's judgment that no taking had occurred, holding that Project rights are "subordinate to the Tribes' federal reserved rights," which are "at least equal" in amount to the water "needed to satisfy . . . Reclamation's ESA obligation." *Id.* at 1337-42.

### d.    Present plan and consultation

Reclamation has since periodically revised Project operations in response to changed circumstances and new information. In 2017, the district court below faulted Reclamation for delaying renewed ESA consultation in response to consecutive years of higher than anticipated disease rates among Klamath River salmon. *See Yurok Tribe v. U.S. Bureau of Reclamation*, 231 F.Supp. 3d 450, 490 (N.D. Cal. 2017). In 2019, Reclamation completed consultation for proposed Project operations through 2024. *See* 1-SER_77. Drawing on prior experience, Reclamation developed a plan that aims to: (1) maintain UKL levels necessary to protect sucker habitat, (2) provide downstream flows necessary to protect salmon spawning habitat in the Klamath River, and (3) maximize irrigation deliveries consistent with those obligations, all based on sophisticated flow monitoring, modeling, and forecasting. *See* 1-SER_77-78, 81-97.

The plan provides a maximum of 350,000 acre-feet of water for Project irrigation, in any year when the "UKL Supply" is projected to be at or above

1,035,000 acre-feet. 13-KID-ER_3062-64; 1-SER_95-96. The plan dedicates a separate amount of the UKL Supply, not less than 400,000 acre-feet, to an annual "Environmental Water Account" to be used to meet downstream habitat requirements. 13-KID-ER_3064-71; 1-SER_85, 93. The plan establishes complex formulas for Reclamation to determine, at the beginning of the irrigation season and on an ongoing basis, the annual Project Supply and the Environmental Water Account. 13-KID-ER_3053-71; 1-SER_92-97.

In their biological opinions, FWS and NMFS determined that Project operations under the 2019 plan are not likely to jeopardize listed species or to adversely modify their critical habitat but will result in takings. 17-KID-ER_4214-29; 1-SER_234-48. With respect to suckers, the delivery of UKL water to Project use reduces lake habitat for suckers at all life stages and contributes to entrainment in Project facilities, resulting in lethal and nonlethal injuries. 17-KID-ER_4149-4166, 4194, 4201-03. FWS's incidental take statement prescribes numerous terms and conditions to minimize these impacts, including minimum lake levels for different times and time periods. 17-KID-ER_4227-33.

With respect to SONCC coho salmon and chinook salmon critical to the Southern Resident killer whale, Klamath Project operations adversely impact habitat conditions in the Klamath River by reducing annual flow volume, rates, and variability, and by changing flow timing. 1-SER_215. Under the natural flow

regime, peak river flows from snowmelt and Spring precipitation occur in late April, and the river returns to low or "base" flows in September. 1-SER_199-201. In contrast, the storage and diversion of UKL water for irrigation advances peak flows to early March and causes a return to "base" flows by July. *Id.* This provides "less spring discharge for smolt outmigration," 1-SER_216, and reduces the inundation of "floodplains and side channels" that provide "important rearing habitat." *Id.* In addition, by stabilizing flows, Project operations diminish high-volume "flushing flows" necessary for disturbing river sediments and interrupting the growth of *C. shasta*, a parasite responsible for significant salmon disease. 1-SER_183-190, 211-16. These Project-caused changes to the natural flow regime result in takings of SONCC coho salmon and Southern Resident killer whales. 1-SER_234-47.

Reclamation uses the Environmental Water Account established in its 2019 operating plan to minimize these impacts by providing minimum stream flows in the Klamath River and periodic "flushing flows." *See* 1-SER_138-47; 13-KID-ER_3067-71. NMFS's incidental take statement provides that the Environmental Water Account must be "spent" within specified parameters. 1-SER_248-49.

### B. Course of Proceedings

#### 1. Complaint, Interventions, and Stay

The Yurok Tribe, along with Co-Plaintiffs the Pacific Coast Federation of Fishermen's Associations and the Institute for Fisheries Resources (collectively, "Yurok Plaintiffs"), initiated this case in July 2019, shortly after Reclamation completed the above consultation. 1-KID-ER_39. The complaint challenged NMFS's biological opinion and determination that the proposed operations would not jeopardize SONCC coho salmon. *Id.* KWUA was granted leave to intervene. *See* 12-KWUA-ER_2846 (Doc. 32). The Yurok Plaintiffs moved for a preliminary injunction. 12-KWUA-ER_2845 (Doc. 27). In March 2020, the district court granted the parties' joint request for a stay through September 2022, subject to a stipulation that Reclamation would operate the Project under a modified "Interim Plan" and would engage in specified further ESA consultation. 9-KWUA-ER_2066-73.

The Yurok Plaintiffs subsequently moved to lift the stay and for a temporary restraining order, alleging that Reclamation failed to properly implement the Interim Plan. *See* 2-SER_365. The Klamath Tribes were granted leave to intervene. 12-KWUA-ER_2883 (Docs. 911-12). The district court found no deviation from the Interim Plan and declined to lift the stay or grant the requested relief. 2-SER_373.

## 2.    KID's suits

Around the same time, KID brought multiple suits seeking injunctive relief with respect to Klamath Project operations.

### a.    Suit in the District of Oregon

In March 2019, KID sued Reclamation in federal district court in Oregon, alleging that Reclamation's 2019 operating plan is contrary to law because it allows releases from UKL to enhance Klamath River flows for ESA compliance purposes, without decreed instream water rights for such purposes. *See Klamath Irrigation District v. U.S. Bureau of Reclamation*, 48 F.4th 934, 942 (9th Cir. 2022). Citing federal reserved rights and related interests, the Hoopa Valley Tribe and the Klamath Tribes moved to intervene and to dismiss, arguing that the tribes were required parties that could not be joined due to tribal sovereign immunity. *Id.* (citing Fed. R. Civ. P. 19). The district court granted the tribes' motions and this Court affirmed. *Id.* at 948. The Supreme Court denied KID's petition for writ of certiorari. *Klamath Irrigation District v. United States Bureau of Reclamation*, 144 S.Ct. 342 (2023).

### b.    Motion in KBA and removal

In 2021, KID moved in Klamath County Circuit Court, the Oregon state court hearing the KBA, for a preliminary injunction against Reclamation's operation of UKL. *See In re KID*, 69 F.4th at 940. KID asked that court, as part of

its jurisdiction over the KBA, to enjoin non-Project releases of stored water from UKL. *Id.* After the United States removed the action to federal district court, KID petitioned this Court for a writ of mandamus to compel a remand on the theory that the state court's McCarran Amendment jurisdiction gave it "prior exclusive jurisdiction" to adjudicate KID's complaint about the use of UKL stored water for non-Project purposes. *Id.* at 940-45. This Court rejected that argument and denied mandamus relief. *Id.* KID's petition for a writ of certiorari was again denied. *Klamath Irrigation District v. United States Bureau of Reclamation*, --- S.Ct. ----, 2024 WL 71931 (2024). KID's action for injunctive relief remains pending in the U.S. District Court in Oregon.

### c. *KID v. OWRD*

In May 2020, KID filed suit in the Marion County Circuit Court to compel OWRD to "take charge" of UKL under state law and to enjoin the release of stored water for non-Project purposes. *See Klamath Irrigation District v. Oregon Water Resources Department*, 518 P.3d 970, 975 (Or. App. 2022). This time, KID did not name federal parties, *id.* at 977, and the State court granted KID's requested injunction, *id.* at 975. In response, on April 6, 2021, OWRD issued an order directing Reclamation to

> immediately preclude or stop the distribution, use or release of stored water from the UKL, in excess of amounts that may be put to beneficial use under [the Project's provisionally decreed storage right] downstream of the Link River Dam.

18-KID-ER_4530-39.  OWRD subsequently issued two notices finding

Reclamation in violation of the April 6, 2021 order. 19-KID-ER_4577-96.

### 3.    United States' cross-complaint

In June 2021, Reclamation and NMFS moved the district court to lift the

stay in the present case for the limited purpose of litigating a proposed federal

cross-complaint against OWRD and KWUA.  *See* 12-KWUA-ER_2884 (Doc.

938); *see also* 8-KWUA-ER_1725-66 (cross-complaint).  The cross-complaint

sought injunctive relief against the enforcement of OWRD's orders, and

declaratory relief: (1) that OWRD "lacks jurisdiction to issue orders impinging

upon Reclamation's satisfaction of its obligations under the federal ESA," (2) that

"Reclamation's operation of the Klamath Project, including the exercise of its

rights to store water in UKL for irrigation use, is subject to compliance with the

ESA," (3) that "the ESA may require Reclamation to release water from UKL

regardless of the water's classification under state law," and (4) that the OWRD's

orders, where conflicting with Reclamation's ESA obligations, are preempted by

federal law.  8-KWUA-ER_1764-65.  The cross-complaint sought similar

injunctive and declaratory relief with respect to Reclamation's authority to release

water from UKL to serve federal reserved water rights for the Yurok and Hoopa

Valley Tribes.  8-KWUA-ER_1765.

The Yurok Plaintiffs and Klamath Tribes stipulated to a lifting of the stay to litigate the crossclaims, subject to conditions to protect tribal sovereign immunity. 8-KWUA-ER_1778-83. Specifically, the stipulating parties asked the court to resolve the ESA-related crossclaim first ("phase one") and to reach the crossclaim concerning tribal water rights ("phase two") only thereafter, at the option of the moving parties. 8-KWUA-ER_1781-82. The district court lifted the stay and permitted the cross-complaint and associated claims on that basis. 8-KWUA-ER_1767-72.

The United States filed its cross-complaint in October 2021, 8-KWUA-ER_1725-66, which the district court permitted the Yurok Plaintiffs to join. 7-KWUA-ER_1683. OWRD and KWUA each filed related counterclaims for injunctive and declaratory relief against the United States. 7-KWUA-ER_1657-68, 1685-1723. KID was granted leave to intervene, 1-KID-ER_54, and the Hoopa Valley Tribe consented to being joined on the cross-complaint. 2-KWUA-ER_234-36. The parties then briefed motions for summary judgment and other relief on the various phase-one (ESA-related) claims and counterclaims. 1-KWUA-ER_21-22.

### 4. Decision below

The district court issued a final order in phase one on February 6, 2023, granting summary judgment for the United States and for the Yurok Tribe and Co-

Plaintiffs.  1-KWUA-ER_10-43.  The court denied KID's threshold motion to stay the case pending the resolution of the KBA, rejecting KID's argument that the federal crossclaim concerned matters within the jurisdiction of the KBA court. 1-KWUA-ER_23-27.  The court also denied KID's motion for discovery, holding that KID's requests were irrelevant for resolution of the crossclaim.  1-KWUA-ER_29-30.

On the merits, following *Patterson*, the district court held that Reclamation "must comply" with ESA Sections 7 and 9 "when operating the Klamath Project." 1-KWUA-ER_32-37.  The court rejected KWUA's arguments that *Patterson* is dicta or no longer good law and KWUA's argument that Reclamation's duties under the Reclamation Act are "nondiscretionary" or "mandatory" and thus exempt from the ESA.  *Id.*  Because it would be "physically impossible" for Reclamation to comply both with OWRD's April 6, 2021 Order (prohibiting releases of stored water for non-Project purposes) and with ESA Sections 7 and 9, 1-KWUA-ER_37, the court held that the order is preempted, 1-KWUA-ER_37-39, and enjoined OWRD from "attempt[ing] to enforce" it, 1-KWUA-ER_43.  KWUA and KID appealed from this order.  12-KWUA-ER_2833-39.

## 5. Rule 54(b) judgment

In the meantime, OWRD filed a state-court appeal from the Marion County Circuit Court injunction that required OWRD to take charge of UKL.  *See KID v.*

*OWRD*, 518 P.3d at 972.  In that case, the Oregon Court of Appeals reversed and

remanded with instructions to dismiss on the grounds that Reclamation was an

indispensable party that could not be joined due to federal sovereign immunity.  *Id.*

After the Oregon Supreme Court denied further review, OWRD withdrew its April

6, 2021 order, which was the subject of the injunctive relief granted in phase one of

the litigation on the United States' cross-complaint.  *See* 1-KWUA-ER_5 (n.3).[2]

KWUA thereafter moved under Fed. R. Civ. P. 54(b) for the entry of a final

judgment on the declaratory relief granted in the district court's phase-one order.

1-KWUA-ER_7.  The district court granted that motion and entered final judgment

on August 14, 2023.  1-KWUA-ER_8.

## SUMMARY OF ARGUMENT

### A.     Applicability of the ESA

For more than two decades, in accordance with this Court's ruling in

*Patterson*, Reclamation has operated the Klamath Project subject to the

requirements of ESA Section 7.  Specifically, Reclamation has stored and supplied

water for Project irrigation except where such actions are likely to jeopardize the

---

[2] KID has challenged OWRD's withdrawal of the April 6, 2021 order.  *See* Refiled Pet. for Judicial Rev. under ORS 183.484(4), *Klamath Irrigation Dist. v. Oregon Water Resources Dep't.*, No. 21CV39570 (Marion Cnty. Cir. Ct. July 7, 2023).

continued existence of listed species or to adversely modify designated critical habitat. *Patterson* remains good law and dictates Reclamation's approach.

The Supreme Court's ruling in *National Association of Home Builders v. Defenders of Wildlife* is not to the contrary. In *Home Builders*, the Supreme Court held (as a matter of *Chevron* deference) that ESA Section 7 does not apply where another statute compels discrete action upon the satisfaction of specified conditions. The Court reasoned that when Congress dictates a particular outcome—and thus deprives an agency of discretion—there is no "agency action" under ESA § 7 (16 U.S.C. § 1536(a)(2)). But the Reclamation Act is not such a statute. It authorizes and directs Reclamation to take actions in support of broad objectives. As this Court has explained, agency actions under such statutes are discretionary "by definition." *National Wildlife Federation v. NMFS*, 524 F.3d 917, 929 (9th Cir. 2008).

It is true that Section 8 of the Reclamation Act requires Reclamation to appropriate water for irrigation in accordance with state water law. But when Reclamation releases water from UKL to the natural river channel—to ensure that Project operations are not likely to jeopardize listed salmon or to adversely modify their designated critical habitat in the Klamath River downstream—Reclamation is not acting contrary to Oregon water law. Water rights are *permissive*, not *obligatory*. Nothing in Oregon water law requires Reclamation to exercise Project

water rights, much less to do so in contravention of federal law. When Reclamation releases stored water to the Klamath River to comply with ESA regulatory requirements, Reclamation is not appropriating or using water under state law or claiming an instream water right against non-Project water users.

Nor do the Project contracts remove Reclamation's discretion to operate the Project subject to ESA Section 7. The contracts commit Reclamation to storing and supplying *available* water for Project irrigation use, expressly disclaiming liability for water shortages due to drought or other causes. This Court has long construed these provisions as excusing nonperformance when water is not *legally* available, including when storage and irrigation use likely would jeopardize listed species or adversely modify their critical habitat. KWUA and KID have identified no basis for revisiting this longstanding contract construction. Nor is KWUA correct in suggesting that Reclamation has contractually transferred all Project operational authorities to KID. As *Patterson* holds, Reclamation controls water storage in UKL, which is critical for the determination of Project water supply. Reclamation must carry out those operational authorities in accordance with ESA Section 7.

## B. Remaining Issues

KID's remaining arguments are meritless. In holding that Reclamation's Project operations are subject to ESA Section 7, the district court did not define or

redefine the scope of the Project users' state-law water rights. Rather, the district court correctly determined that the exercise of state-law water rights is subject to federal regulatory restrictions. For this reason, even if judicial decisions construing state property law are subject to the Fifth Amendment Just Compensations Clause, the doctrine of *judicial* takings is inapposite here. The only potential taking in the present case is a taking by federal *agency* action to comply with the ESA. KID did not plead such a claim below and the potential availability of Fifth Amendment compensation is irrelevant to the federal crossclaim.

For similar reasons, KID errs in arguing that the Oregon state court hearing the KBA has "prior exclusive jurisdiction" over the federal crossclaim, or that the district court should have abstained in hearing the crossclaim in deference to the KBA proceedings. The KBA court is reviewing OWRD's determination of rights to the waters of the Klamath River basin in Oregon, including Project water rights. But as just explained, the federal crossclaim does not implicate that review. In asking the district court to hold that Project operations are subject to ESA Section 7, Reclamation did not seek the adjudication of Project water rights or the administration of such rights as against adverse claimants in Oregon. Thus, as this Court effectively has already determined in a related case, the federal crossclaim is not within the state court's jurisdiction under Oregon's general stream adjudication

statute, nor is the United States' waiver of sovereign immunity under the McCarran Amendment relevant to that crossclaim.

Finally, KID errs in arguing that there are genuine issues of material fact that preclude summary judgment on the federal crossclaim. This case does not concern a challenge to any specific operations plan. The sole issue is whether Reclamation's Project operations—including the storage of water in UKL for Project irrigation use—are subject to ESA Section 7. KID identifies no genuine dispute of fact relevant to that legal issue.

## STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed de novo. *Friends of Animals v. U.S. Fish and Wildlife Service*, 28 F.4th 19, 28 (9th Cir. 2022).

## ARGUMENT

**I.      The ESA applies to Klamath Project operations.**

**A.      *Patterson* holds that operating the Klamath Project is "agency action" subject to ESA Section 7.**

A federal agency must ensure that any "agency action"—i.e., any action that it "authorize[s], fund[s], or carrie[s] out"—is "not likely to jeopardize the continued existence" of a listed species or to "result in the adverse modification" of its designated critical habitat. 16 U.S.C. § 1536(a)(2). This Court in *Patterson* held that Reclamation has control over the storage of water in UKL for purpose of

determining the Project water supply for irrigation use, and therefore, that storage and water-supply operations are "agency action" subject to the ESA, and that when there is a conflict with a demand for water storage or supply under Project contracts, the ESA's mandates "override the water rights of [Project] irrigators." 204 F.3d at 1213. *Patterson* has been the law of the Circuit for over two decades and controls this case.

In *Patterson*, KWUA (then the "Klamath Water Users Protective Association") sued to compel PacifiCorp, the contract operator of Link River Dam, to operate the dam in disregard of the operating plan that Reclamation had developed through ESA Section 7 consultation. *Id.* at 1209-10. Because PacifiCorp's contract created no water rights for hydropower purposes and required PacifiCorp to store water as needed for Project lands, KWUA argued that Project irrigators were third-party beneficiaries who could enforce their water rights directly against PacifiCorp, bypassing Reclamation's operating plan. *Id.* at 1210.

The district court disagreed, noting that Reclamation's contract with PacifiCorp was "not the source" of the Project users water rights, which were founded instead upon the users' "repayment contracts with the federal government and . . . state water law." *Klamath Water Users Protective Association v. Patterson*, 15 F.Supp.2d 990, 996 (D. Or. 1998). The district court further

observed that the Project users' contracts contained clauses disclaiming liability for shortages, and that it would be inconsistent with those provisions to allow the water users "to sue for a shortage under the 1956 contract, to which they are not parties." *Id.*

This Court affirmed, noting that the contract with PacifiCorp plainly reserved Reclamation's authority (through its contracting officer) to enforce Project irrigation rights against hydropower use, *Patterson*, 204 F.3d at 1210-12, and that this ongoing federal control made federal contract performance subject to the ESA. *Id.* at 1213. This Court also cited the "well settled" principle that "contractual arrangements can be altered by subsequent Congressional legislation." *Id.* (citing *Merion v. Jicarilla Apache Tribe*, 455 U.S. 130, 147 (1982); *O'Neill v. United States*, 50 F.3d 677, 686 (9th Cir. 1995)). Because Reclamation owns the dam and other project works and has ongoing control over water storage and supply, Reclamation's contract performance—consistent with the plain terms of the contract shortage clauses—is "agency action" subject to ESA Section 7, including the duty to avoid jeopardizing listed species or adversely modifying critical habitat. *See id.*; *see also O'Neill*, 50 F.3d at 682-83.

## B. *Home Builders* **did not alter** *Patterson.*

Contrary to KWUA's argument (Brief at 5-6, 26-31) there is no conflict between *Patterson* and the Supreme Court's subsequent decision in *National*

*Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007).

*Home Builders* concerned whether ESA Section 7(a)(2) applied to the

Environmental Protection Agency's decision under Clean Water Act § 402(b)

(33 U.S.C. § 1342(b)) to approve a state permitting program. 551 U.S. at 652-54.

The Supreme Court acknowledged that the text of § 7(a)(2) literally applies to such

approval decisions. *See id.* at 662. But § 402(b) also provides a statutory

"imperative," mandating federal approval whenever a state program satisfies "nine

specified criteria." *Id*. at 661.

    Requiring compliance with § 7(a)(2), the Court observed, would add an

additional criterion to an otherwise "exclusive list" under § 402(b), effectively

amending or repealing that provision, *id.* at 662. Such a construction of the ESA

would "run[] foursquare" into the "presumption against implied repeals," *id*. at

662-64. "In this situation"—where applying ESA § 7(a)(2) "would implicitly

abrogate or repeal" a statutory mandate, *id.* at 666—the Court found a

"fundamental ambiguity that is not resolved by the statutory text," and deemed it

"appropriate" to look to agency regulations to help resolve the ambiguity. *Id.* at

665-66 (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,

456 U.S. 837, 843 (1984)).

    Regulations adopted by FWS and NMFS to govern Section 7 consultation

"apply to all actions in which there is *discretionary* Federal involvement or

control." 50 C.F.R. § 402.03 (emphasis added). This rule "accords with the commonsense conclusion that, when an agency is required to do something by statute, it simply lacks the power to 'insure' that such action will not jeopardize [listed] species," *Home Builders*, 551 U.S. at 666-67. Similarly, an agency "cannot be considered the legal 'cause' of an action that it has no statutory discretion *not* to take." *Id.* at 668 (citing *Department of Transportation v. Public Citizen*, 541 U.S. 752, 770 (2004)). For these reasons, the *Home Builders* Court deferred to the regulation, holding that the nondiscretionary "transfer of . . . permitting authority" under Clean Water Act § 402(b) was not subject to ESA § 7(a)(2). *Id.* at 673.

In contrast, *Patterson* involved the applicability of § 7(a)(2) to Project operations under pre-existing Reclamation Act contracts. *See* 204 F.3d at 1213. As *Patterson* observed, contract performance constitutes "agency action" whenever, under the contract and its authorizing statute, an agency retains "some" ongoing "measure of control," *id.* (citing *Sierra Club v. Babbitt*, 65 F.3d 1502, 1510 (9th Cir. 1995)), which might "inure to the benefit of a protected species," *Turtle Island Restoration Network v. National Marine Fisheries Service*, 340 F.3d 969, 974 (9th Cir. 2003). As explained *infra* (pp. 37-59), the Reclamation Act does not specifically constrain Reclamation's discretion in contracting for the delivery of Klamath Project water, and Reclamation retains discretion under the

Project contracts to determine available supplies for Project water users during times of shortages, including shortages resulting from changes in law.

Moreover, under the "sovereign acts" doctrine, "[t]he government is not liable for a breach of contract" when a "generally applicable" statute enacted by the government "in its sovereign capacity . . . incidentally frustrates performance of a contract to which it is a party." *Klamath Irrigation District v. United States*, 635 F.3d 505, 520 (Fed. Cir. 2011); *see also U.S. v. Winstar Corp.*, 518 U.S. 839, 891 (1996). Indeed, in a breach-of-contract suit brought by KID and other Project irrigators, the Federal Circuit held that the ESA is a generally applicable statute that provides a "sovereign acts" defense for nonperformance, when the ESA's mandates make it impossible for Reclamation to deliver irrigation water under Klamath Project contracts. *Klamath Irrigation District*, 635 F.3d at 520-22. Consistent with that holding and this Court's precedents, the contracts here do not compel water delivery contrary to the ESA's requirements. *See Patterson*, 204 F.3d at 1213; *O'Neill*, 50 F.3d at 680-84. Nothing in *Home Builders* is to the contrary.

### C. The Reclamation Act imposes no specific nondiscretionary mandates.

There is no merit to KWUA's arguments (Brief at 31-37) that the Reclamation Act creates a nondiscretionary duty that compels contractual water deliveries to Project users, even where jeopardy to listed species would result. As

KWUA observes (Brief at 31-32), the Reclamation Act authorizes and directs the construction of "irrigation works," specifying no other objective. *See* 43 U.S.C. § 411.

As this Court has explained, an agency retains discretion and the duty to comply with ESA Section 7 unless the enabling legislation for the subject agency action is both "mandatory and *inconsistent* with [the agency's] obligations under the ESA." *San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581, 640 (9th Cir. 2014) (emphasis added). Even when an enabling statute dictates particular action, the ESA applies if the statutes can be construed "in harmony." *San Luis Obispo Coastkeeper v. Santa Maria Valley Water Conservation District*, 49 F.4th 1242, 1247 (9th Cir. 2022). And when a statute imposes a "broad . . . mandate" that might be achieved in multiple ways, the agency's actions "by definition" are "discretionary" for Section 7 purposes. *National Wildlife Federation*, 524 F.3d at 929; *see also San Luis*, 747 F.3d at 640.

In granting broad authority to construct and operate irrigation projects, the Reclamation Act does not compel Reclamation to construct or operate any project in a manner that would jeopardize species listed under the ESA. *See* 43 U.S.C. §§ 411, 491. Nor is there any other statute requiring the Klamath Project to be operated according to specific conditions. The only legislation specific to Klamath Project operations is the 1905 Act that "authorized" Reclamation "in carrying out

any irrigation project that *may* be undertaken" under the 1902 Reclamation Act to "raise or lower" water levels in specified lakes in the Klamath Project area. Act of Feb. 9, 1905, ch. 567, 33 Stat. 714 (emphasis added). This law does not *mandate* any project, much less the lowering of any lake for Project purposes, nor does it *prohibit* the lowering (or filling) of UKL as necessary to ensure that Project storage and diversion does not jeopardize listed species in UKL or downstream.

KWUA's observation (Brief at 32-33) that Congress has not specifically authorized non-irrigation uses for the Klamath Project is beside the point. Where Congress specifies that wildlife needs may be considered in the operation of a project, *see*, *e.g.*, 16 U.S.C. §§ 662-663, Reclamation may so operate a project, even if ESA-listed species are not implicated. But this does not mean that the ESA applies only where Congress has affirmatively authorized consideration of wildlife needs. *See*, *e.g.*, *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 185-86 (1978).

As explained in *Home Builders*, agency action is "discretionary" for purposes of the ESA unless the relevant enabling statute specifically "prohibit[s]" the agency from "considering extrastatutory factors." 551 U.S. at 665. In other words, an agency action is nondiscretionary for ESA purposes only if the relevant enabling statute and the ESA are "mutually prohibitive," *San Luis Obispo Coastkeeper*, 49 F.4th at 1249; *see also*, *e.g.*, *WildEarth Guardians v. United States Army Corps of Engineers*, 947 F.3d 635, 640-41 (10th Cir. 2020) (Corps

project not subject to ESA § 7 where statute dictates in "categorical" terms that project is to be operated "solely" for flood control). Unlike statutes that direct agency action upon the satisfaction of limited specific criteria, *see Home Builders*, 551 U.S. at 662-65; *see also Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1224 (9th Cir. 2015), or that categorically limit agency actions "solely" to a single purpose, *WildEarth Guardians*, 947 F.3d at 640-41, the enabling legislation for the Klamath Project merely authorized and directed Reclamation to work toward a broad goal.

Moreover, Section 10 of the Reclamation Act gives Reclamation authority to "perform any and all acts and to make such rules and regulations as may be necessary and proper for the purpose of carrying out" the Act's provisions. 43 U.S.C. § 373. This includes the authority to ensure the Project operations comply with other federal laws like the ESA. Contrary to KWUA's suggestion (Brief at 34), Reclamation's operating plans for the Klamath Project are "rules and regulations" under Section 10, even though they are developed in substantial part for ESA compliance purposes. *See United States v. Klamath Drainage District*, 2023 WL 5899910, *13, *15 (D. Or. 2023).

Regardless, KWUA misses the mark in faulting the district court (Brief at 34) for relying on Section 10. Section 10 plainly does not *constrain* Reclamation's authority and the district court did not consider it alone. *See* 1-KWUA-ER_36.

Rather, the court correctly held that the relevant provisions of the Reclamation Act "[t]aken together" do not compel Reclamation "to perform any specific nondiscretionary actions" and thus do not relieve Reclamation of its obligations to comply with the ESA. *Id.* (citing *National Wildlife Federation*, 524 F.3d at 928); *see also Home Builders*, 551 U.S. at 661-67.

### D. Reclamation's obligation to comply with state water law does not impact its ESA duties.

Nor is KID correct in arguing (Brief 54-65) that Reclamation's discretion, for ESA purposes, is constrained by Reclamation Act Section 8. That section directs Reclamation to "proceed in conformity" with state law concerning the "control, appropriation, use, or distribution" of irrigation water. 43 U.S.C. § 383. This means that Reclamation must appropriate water rights for irrigation projects "in strict conformity with state law," and that water "distribution" from such projects is to be "controlled by state law." *California*, 438 U.S. 665-67. But Reclamation's operating plans, including the prescribed water releases from UKL for ESA compliance, do not contravene these principles.

KID argues (Brief at 58) that the United States holds a state-law right to "store" water in UKL, but not the right to "use" the stored water, which belongs instead to Project water users. *See Klamath Irrigation District*, 227 P.3d at 1161-67 (recognizing the Project users' "beneficial interest" in Project water rights); *see also* 9-KID-ER_1892 (OWRD determination that "the beneficial users hold a legal

41

interest" in the "beneficial use" of Project water rights). Because Reclamation lacks the right to "use" stored water, KID concludes (Brief at 63) that "Oregon law prohibits Reclamation from *diverting* stored water in UKL for instream uses," including ESA compliance (emphasis added).

This argument relies on a false premise. The *release* of water from UKL to the natural river channel—to ensure that the storage and diversion of water for Project irrigation use does not jeopardize listed species or adversely modify critical habitat downstream in the Klamath River, *see* 16 U.S.C. § 1536(a)(2)—is not a "use" of water nor a "diversion" of surface flows for which a water right is required. Rather, when releasing water from UKL to the river, Reclamation is simply *limiting* the exercise of its Project water rights, as necessary to comply with the mandates of the ESA, a federal regulatory statute.

As KID observes (Brief at 63), under current Oregon law, a "person may not *use*, store, or divert any waters until after [OWRD] issues a permit to appropriate the waters," *see* Or. Rev. Stat. § 537.130 (emphasis added),[3] and OWRD may grant water-rights certificates for certain instream uses, *id.* § 537.336. But KID errs in supposing that leaving water in the river or releasing it back to the river necessarily constitutes an appropriation of water from the public source (and from

---

[3] When Project water rights vested (prior to 1909), Oregon had no permit requirement. *See Klamath Irrigation District*, 227 P.3d at 1150.

other users) for which a right of use is required. Under Oregon law, instream water rights are limited to state agencies, who hold them in "trust" to protect public uses for the "people of . . . Oregon." *Id.* §§ 537.332(2), (3), 537.336. Where instream rights are established, they preclude diversions by junior users that would deplete stream flows below a protected level. *See Adair*, 723 F.2d at 1411 (addressing federal reserved instream rights). Here, however, Reclamation is limiting its own Project use, not claiming a right of instream use against non-Project water users.[4]

Moreover, no holder of a state-law right to store and divert water for off-stream use is exempt from federal regulatory statutes that potentially restrict the exercise of property rights. Thus, contrary to KID's assertion (Brief at 62), recognizing the regulatory constraints imposed by the ESA on the exercise of Project water rights is not the "same thing" as "granting" a water right for ESA purposes. The ESA is not a water law statute. It is a regulatory statute that may impact property rights, including state-law water rights, where the exercise of such rights affects listed species. Nothing in Section 8 of the Reclamation Act insulates

---

[4] In the present case, there are instream water rights that support the subject releases from UKL, namely, the reserved rights of the Yurok and Hoopa Valley Tribes, *Baley*, 942 F.3d at 1335-41. The Project must be operated subject to these preexisting federal rights, notwithstanding the absence of state certificates or a state adjudication. *Id.*; *see also United States v. Truckee-Carson Irrigation Dist.*, 649 F.2d 1286, 1298 (9th Cir. 1981). The relevant point here, however, is that Reclamation does not need instream water rights to operate the Project in compliance with the ESA.

Project water rights from the regulatory impacts of the ESA. *Cf. California*, 438 U.S. at 671 (Section 8 does not require Reclamation to "ignore explicit . . . provisions" of federal law).

Nor is KID correct in arguing (Brief at 73) that the 2014 ACFFOD—OWRD's provisional decree of water rights in the KBA—altered Reclamation's obligation (as confirmed in *Patterson*) to operate the Project in conformity with the ESA. The ACFFOD did not create new water rights; it simply declared water rights that have long existed. Regardless, OWRD's confirmation that Reclamation *may* "store" water for specified Project "uses" does not mean that Reclamation *must* store water. Nor does it mean that Reclamation must exercise its water rights in disregard of its ESA obligations. Reclamation's duty to store water for the benefit of Project water users derives from the Reclamation Act and the Project contracts discussed above, not from state water law and not from the ACFFOD. Indeed, the ACFFOD specifically recognizes that the "determination of the relative rights" of Project water users and of the United States to "control or operate diversion or distribution works, including headgates, pumps, canals, and other structures, *is not within the scope of the Adjudication*." *See* 9-KID-ER_1894-95 (KBA-ACFFOD_07085-86) (emphasis added). The ACFFOD does not address how the ESA applies to the Project.

In short, under the Reclamation Act, Reclamation must operate the Project in accordance with state water law and the Reclamation Act contracts. 43 U.S.C. §§ 383, 423d-423e. But Reclamation's statutory duty to operate the Klamath Project in accordance with state water law is not a *mandate* to exercise the Project's state-law water rights to their fullest extent upon satisfaction of discrete and limited conditions. *Cf. Home Builders*, 551 U.S. at 661 (describing CWA § 402(b)). In the absence of a directly conflicting federal statutory mandate— creating "mutually prohibitive" obligations—Reclamation retains its discretion and duty to ensure that its Project operations comply with the ESA. *See San Luis Obispo Coastkeeper*, 49 F.4th at 1249; *see also Patterson*, 204 F.3d at 1213.

### E. *Babbitt* and *EPIC* are distinguishable.

KWUA and KID contend that this case is controlled by *Sierra Club v. Babbitt*, 65 F.3d 1502—a case *Patterson* distinguished, *see* 204 F.3d at 1213— rather than *Patterson*. *See* KWUA Brief at 29, 51-53; KID Brief at 66-67. This argument cannot stand.

*Babbitt* concerned a pre-ESA "reciprocal right-of-way agreement," which gave a private landowner the right to construct an access road over public land upon 30-days advance notice to the Bureau of Land Management ("BLM"). *See Babbitt*, 65 F.3d at 1506-07. BLM reserved a right to object on three specific grounds. *Id.* But the landowner could proceed if BLM did not object within the 30

days.  *Id.*  After the ESA's enactment, the landowner provided notice of intent to exercise the right-of-way.  *Id.*  Although a BLM biologist determined that logging on the private lands could affect a listed species, BLM did not object to the road construction, because it had no basis for doing so under the contract.  *Id.*  Sierra Club then sued BLM on the view that it needed to initiate Section 7 consultation prior to its alleged project approval.  *Id.* at 1507.

This Court disagreed, noting that the "approval" prepared by BLM merely "reiterate[d]" BLM's limited contractual authority.  *Id*. at 1511.  Because BLM had no contractual right to object and because BLM's affirmative authorization was not required, BLM had not "legitimately authorize[d]" the challenged action.  *See id*. at 1510-12.  As *Babbitt* explained, the ESA applied to the private logging project, to the extent it "threaten[ed] imminent harm to a listed species."  *Id.*  Specifically, ESA Section 9 prohibits any taking of an endangered species by any person in the absence of an incidental take permit or exemption.  *See id.* at 1505, 1512 (citing 16 U.S.C. §§ 1538(a), 1539(a)); *see also* 16 U.S.C. § 1533(d) & 50 C.F.R. § 17.31(a) (same rule for threatened species).  And that prohibition can be enforced through citizen suits.  *See Babbitt*, 65 F.3d at 1512 (referencing 16 U.S.C. § 1540).  But ESA Section 7 is limited to "agency action."  16 U.S.C. § 1536(a)(2).  Because the challenged action was akin to "wholly private action," this Court held that Sierra Club's suit (if any) lay against the timber company.  *Babbitt*, 65 F.3d at 1512.

This Court reached a similar decision in *Environmental Protection Information Center v. Simpson Timber Co*., 255 F.3d 1073 (9th Cir. 2001) ("*EPIC*"), another case on which KWUA relies (Brief at 52-53). *EPIC* concerned an incidental take permit issued by FWS under ESA Section 10 (16 U.S.C. § 1539) for private logging operations impacting the northern spotted owl. *Id.* at 1076-77. Thereafter, FWS and NMFS listed two other species that were also potentially present in the logging area. *Id.* at 1076. Under ESA regulations, an agency must reinitiate consultation on an ongoing federal action if "new information reveals" potential effects on listed species "in a manner or to an extent not previously considered" or other eventualities occur. 50 C.F.R. § 402.16(a)(2). Because FWS had "consulted with itself" on the effects of issuing the incidental take permit, an interest group sued FWS for failing to reinitiate such consultation upon the listing of the new species. *See EPIC*, 255 F.3d at 1074, 1077 n.5.

Following *Babbitt*, this Court held that the incidental take permit did not make the private logging "agency action." *Id.* at 1079-82. By rule, re-initiation is not required if an agency retains no "discretionary . . . involvement or control" over an approved private action. *Id.* at 1076 (quoting 50 C.F.R. § 402.16). In issuing the incidental take permit, FWS did not fund the logging, assume control for carrying it out, or impliedly authorize impacts to other species. *See* 16 U.S.C. § 1536(a)(2). Rather, the permit only provided conditional protection from ESA

liability for incidental takings of the spotted owl. *EPIC*, 255 F.3d at 1076. As this Court stressed, the logging company was "prohibited from taking" the newly listed species, unless the company obtained an incidental take permit particular to those species and operated within the terms of that permit. *Id.* at 1083.

Thus, unlike *Patterson* (and the present case), *Babbitt* and *EPIC* both concerned private actions over which there was little or no federal involvement or control (other than potential federal civil enforcement of Section 9 violations). To be sure, as KWUA observes (Brief at 52), Reclamation has acknowledged that the *EPIC* "framework" can apply to certain contracts under the federal Reclamation laws. *See* 2-KWUA-ER_297 (Federal Appellees brief in *NRDC v. Haaland*, 9th Cir. No. 21-15163 (pending)).[5] For example, if Reclamation reserves no authority to reopen or unilaterally amend the terms of a contract, Reclamation may have no duty to reinitiate consultation over the contract's terms. *See id.* It does not follow, however, that a private party may exercise its contract rights in disregard of the ESA. *See Babbitt*, 65 F.3d at 1512 (private party subject to ESA liability).

---

[5] *NRDC v. Haaland* concerns "settlement" contracts for rights that preexisted the Central Valley Project, which is also governed by its own project-specific statutes. *See NRDC v. Bernhardt*, 2020 WL 6449197 (E.D. Cal. 2020); *see also San Luis & Delta-Mendota Water Authority v. Haugrud*, 848 F.3d 1216, 1221-24 (9th Cir. 2017). Reclamation's discretion, for purposes of ESA § 7(a)(2), depends on the statutes and contracts governing each project.

Likewise, although an agency may lack discretion to modify the terms of a federal contract, it does not follow that Section 7 is inapplicable to the agency's contract performance. *See NRDC v. Houston*, 146 F.3d 1118, 1126 (9th Cir. 1998). As this Court observed in *Houston*, Reclamation "can deliver less than a contractually agreed upon amount of water in order to comply with subsequently enacted federal law." *Id.* (citing *O'Neill*, 50 F.3d at 686); *accord WildEarth Guardians*, 947 F.3d at 641 n.4. *Patterson* followed *O'Neill* to hold that the water supply commitments in the Klamath Project contracts are conditioned on the legal availability of water and therefore that Reclamation may limit its contract performance as necessary to meet ESA requirements. *See* 204 F.3d at 1213; *see also Patterson*, 15 F.Supp. 3d at 996.

F.     **The Project contracts are conditioned on water availability.**

KWUA argues (Brief at 37-53) that Reclamation's performance under the Klamath Project contracts is "nondiscretionary"—and not "agency action" for purposes of ESA Section 7—because the contracts obligate Reclamation to "store, divert, and deliver water" for a single "irrigation" purpose (*id*. at 37). This fails for reasons already explained: it is contrary to *Patterson*'s holding that Reclamation has discretion to withhold water deliveries when water is not legally available. *See* 204 F.3d at 1213. There is no basis for this Court to reconsider that long-settled

issue. Moreover, Reclamation's discretion is reflected in the plain terms of the Project contracts.

As explained above, the primary beneficiaries of the Klamath Project are KID and TID. *See Baley*, 134 Fed. Cl. at 627. Reclamation initially contracted with individual homesteaders or landowners in these districts. *Id.* The "Form A" agreements for homesteaders specified that Reclamation would furnish water up to the "quantity" that could be "used beneficially." *Id.* But the agreements further specified that, in times of "shortage," Reclamation would furnish an "equitable proportionate share" of available water, and that Reclamation would "in no event" be liable for a shortage "on account of drought, inaccuracy in distribution, or other cause." *Id.*

These same terms are in the contracts that Reclamation subsequently entered directly with KID and TID. *See Baley*, 134 Fed. Cl. at 629-30. KID's 1954 contract "supplements" earlier agreements on water delivery, 11-KWUA-ER_2644 (¶ 2), authorizing KID to "take" its previously promised "water supply," at a specified point of delivery through specified "transferred works." 11-KWUA-ER_2650 (Art. 13(a)). But it reiterates that the United States will not be liable for any water "shortage" at such point of delivery, on "account of drought or other causes." 11-KWUA-ER_2666.

Similarly, TID's 1956 contract gives TID the right to "receive" from specified Project works "under the control of the United States or its designees or agents" "all water needed for . . . beneficial irrigation uses."  11-KWUA-ER_2630-31 (¶ 33(a)).  But the contract reserves Reclamation's right to "apportion the *available* supply" in the "event of a shortage" arising "as a result of drought or *other unavoidable causes*," 11-KWUA-ER_2631 (¶ 33(c)) (emphasis added).  And the contract contains an additional shortage provision, identical to the shortage provision in KID's contract, disclaiming liability for any shortage due to "drought or other causes."  11-KWUA-ER-2627 (¶ 26).

The Warren Act contracts, which expanded the Project to additional irrigation districts, mirror the KID and TID contracts.  All three Warren Act contracts highlighted by KWUA (Brief at 40-50)—contracts with the Malin Irrigation District ("Malin"), the Klamath Basin Irrigation District ("KBID"), and the Klamath Drainage District ("KDD")—specify that Reclamation "will" or "shall" furnish irrigation water in amounts up to amounts that might be beneficially used on district lands.  *See* 11-KWUA-ER_2782 (Malin); 11-KWUA-ER_2551 (KBID); 11-KWUA-ER_2730 (KDD).  But like the KID and TID contracts, these contracts disclaim liability for shortages caused by drought or any "other cause." *See* 10-KWUA-ER_2488-89; 11-KWUA-ER_2553 (KBID); 11-KWUA-ER_2737-38 (KDD).  Moreover, two of these contracts expressly recognize Reclamation's

right, in times of shortage "to apportion the available surplus water supply" among Warren Act water users, 11-KWUA-ER_2553 (KBID), or to provide an "equitable" "proration," 11-KWUA-ER_2730-31 (KDD).

In short, while all the above contracts obligate Reclamation to deliver water for irrigation purposes, all recognize that this duty is subject to water availability. And this Court has made it clear that such contractual terms apply in the event of both physical and *legal* unavailability. *See O'Neill*, 50 F.3d at 682-84. In *O'Neill*, this Court considered a Reclamation water-supply contract materially identical to the contracts above. *Id.* at 683. The contract provided that "in no event shall any liability accrue" for a water "shortage on account of errors in operation, drought, *or any other causes.*" *Id.* at 683 (emphasis in original). This Court determined that an "unavailability of water resulting from the mandates of valid [post-contract] legislation"—including the ESA—unambiguously "constitute[d] a shortage by reason of 'any other causes." *Id.* at 684. Accordingly, this Court held that Reclamation could not be compelled to "perform" under the contract, when "the full contractual amount of water . . . cannot be delivered consistently with the requirements" of the ESA. *Id.* at 680. The same conclusion applies here.

It is true that some of the Warren Act contracts contain shortage clauses that speak only to the *physical* unavailability of water, *see Baley*, 134 Fed. Cl. at 657; *see also* 6-KWUA-ER_1411 (1934 contract disclaiming liability for water

shortages due to "hostile diversion, drought, interruption to stream flow in the river made necessary by repairs, damages caused by floods, unlawful acts or unavoidable accidents"). But all the Warren Act contracts are secondary contracts, limited to "excess water" not needed under the primary contracts. *See* 43 U.S.C. § 523; *see also*, *e.g.*, 11-KWUA-ER_2782 (Malin water rights are "inferior and subject to" KID and TID's rights); 11-KWUA-ER_2551 (KBID rights are to "surplus" water). Under the terms of the Warren Act and the implementing contracts, there is no water available for Warren Act contractors when water is unavailable for the primary Project beneficiaries. *O'Neill* confirms that Reclamation may decline to deliver water, where water is not legally available due to ESA restrictions. 50 F.3d at 680; see also *Houston*, 146 F.3d at 1126. *Patterson* followed *O'Neill* in holding that the ESA "overrides" (or conditions) Reclamation's water-supply duties under the Klamath Project contracts, consistent with the terms of those contracts. 204 F.3d at 1213.

G.     **The Van Brimmer contract is not at issue.**

KWUA also highlights Reclamation's contract with the Van Brimmer Ditch Company ("Van Brimmer"), *see* KWUA Brief at 39-40, which has no shortage clause. *See* 12-KWUA-ER_2826-31. But that contract is not a repayment contract under the Reclamation Act. *See* 43 U.S.C. §§ 423d-423e. Nor is it at issue in this case.

Van Brimmer claimed a *preexisting* state-law water right to divert water from Lower Tule Lake, which was to be drained as part of the construction of the Klamath Project. *See* 11-KWUA-ER_2809. Reclamation agreed to construct, at its own cost, a "turnout" to connect a Project canal to a company "lateral." 12-KWUA-ER_2828-29. And Reclamation agreed to deliver to that turnout, in perpetuity at its own cost, an amount of water "not to exceed" Van Brimmer's preexisting claim. 12-KWUA-ER_2827. These terms reflect Reclamation's statutory duty not to "interfere" with state water law, including preexisting water rights. 43 U.S.C. § 383. As to such rights—which have priority over federal project rights and would be exercised with or without a project—the Reclamation Act leaves Reclamation little or no agency discretion. *Id.*

But this case does not involve claims for declaratory relief specific to the Van Brimmer contract. Instead, the United States' crossclaim concerns Reclamation's operation of the Klamath Project as a whole and Reclamation's determination of the available water supply for all Project uses. *See* 8-KWUA-ER_1764-65 (crossclaim); *see also* 13-KID-ER_3011-17. Moreover, this Court has made it clear that an agency may not "avoid potential jeopardy risks by labeling parts of an action nondiscretionary." *National Wildlife Federation*, 524 F.3d at 928; *see also San Luis*, 747 F.3d at 639 (agency need not "segregate

discretionary from non-discretionary actions" in determining the "baseline" for ESA effects analysis).

For the most part, the Klamath Project supplies water for irrigation uses that were enabled by federal action, under water rights perfected through the beneficial use of water physically appropriated by Reclamation. While users hold legal interests in the use of the water, Oregon law provides that those rights are qualified by the terms of the Project contracts. *See Klamath Irrigation District*, 227 P.3d at 1161-65. In addition, Reclamation exercises its own storage rights to establish the water supply to serve Project rights, as well as its own use and re-use rights. *See* 9-KID-ER_1869-72, 1892-94 (KBA_ACFFOD_07060-63, 07083-85). And state-law water rights developed under the Reclamation Act are subject to specific requirements of federal law. *California*, 438 U.S. at 671.

For all these reasons, Reclamation's water storage and delivery under the Project repayment contracts does not implicate the statutory duty of noninterference that applies to preexisting rights. *See* 43 U.S.C. § 383. Under Oregon law and the Reclamation Act, Reclamation's duty to supply water to Project users is a contractual duty, subject to ESA Section 7 and other federal laws that govern agency action. *See Patterson*, 204 F.3d at 1213. As just explained, Reclamation's discretion (and obligation) to comply with the ESA in operating the

Klamath Project is reflected in the plain terms of the Project contracts. *See*

*O'Neill*, 50 F.3d at 680.

### H. The contracts do not relinquish Reclamation's storage and water supply authorities.

KWUA's contention (Brief at 44-49) that Reclamation has contractually

transferred all relevant control over Project water-supply operations is also

mistaken. It is true that Reclamation gave KID authority to operate the A-Canal

and other Project works branching from the A-Canal, *see* 11-KWUA-ER_2644-46,

including for purposes of delivering water to other water districts under

Reclamation's contracts with those districts, *see* 11-KWUA-ER_2650-55. And

Reclamation also transferred specified Project works to TID. *See* 11-KWUA-

ER_2606-09.

But Reclamation did not transfer title to Project works or all operational

control to water users. Most importantly, while Reclamation authorized

PacifiCorp to operate Link River Dam to generate hydropower, that contract gave

PacifiCorp no water rights and Reclamation retains exclusive control over UKL

storage for purposes of Project water use. *See Patterson*, 204 F.3d at 1211-13.

This control over UKL levels is integral to the determination of the water supply

for Project water uses. *Patterson* held that Reclamation—not PacifiCorp nor the

water users—controls water storage and the determination of the Project water

supply. *Id.* at 1210-13.

Moreover, the Project contracts do not shield Project water users from their own ESA obligations. Reclamation's 1954 contract with KID specifies that KID must deliver and distribute water "in full compliance with the Federal reclamation laws as they now exist or *hereafter may be amended*." 11-KWUA-ER_2646 (¶ 6) (emphasis added). And KID specifically agreed that it "will make no water deliveries" to other districts "when notified by [Reclamation] that the contracting parties are not entitled to the delivery of irrigation water because of nonpayment of charges due the United States, *or for other reasons*." 11-KWUA-ER_2652 (¶ 13(f)) (emphasis added).

If KID owned the Klamath Project as a private venture and operated it to the full extent of its water rights—*i.e.*, if KID stored, diverted, and delivered, on an annual basis, the maximum amount of water that can be beneficially used on Project lands[6]—there is little doubt that KID would face Section 9 liability for the taking of the listed suckers and SONCC coho salmon, in the absence of an incidental take permit. FWS and NMFS determined that even *mitigated* Project operations in a drought year would likely *jeopardize* the continued existence of these species, *see Baley*, 942 F.3d at 1323-25, an impact substantially greater than

---

[6] OWRD determined that the maximum water "duty" for Project lands (maximum beneficial use) is over 570,000 acre feet per year, 9-KID-ER_1969, which exceeds the active capacity of and the annual flow through UKL in low water years. 1-SER_98.

the incidental take of individual fish, *see* 16 U.S.C. § 1536(b)(4)(B).  In such a case, it would be no defense for KID to argue that it lacks discretion, under Project contracts, to avoid incidental takings of listed species.  The exercise of a water right is discretionary with its owner.  No law compels Project users to exercise their water rights, and individual users could not compel KID to carry out private contracts in violation of federal law.  *See American Postal Workers Union ALFC-CIO v. USPS*, 682 F.2d 1280, 1286 (9th Cir. 1982).  Because KID would face Section 9 liability for any unpermitted incidental takings if it were a private operator of the Klamath Project, KID reasonably could in those circumstances condition operations on obtaining an incidental take permit and complying with the permit's terms.  *See* 16 U.S.C. §§ 1538(a)(1)(B), 1539(a).

But KID is not the sole operator of the Klamath Project.  Reclamation retains exclusive control over the storage of Project water and associated determination of the available Project water supply.  *Patterson*, 204 F.3d at 1213.  Accordingly, Reclamation is required, under ESA Sections 7 and 9, to consult with FWS and NMFS to ensure that Project operations are not likely to jeopardize listed species or adversely modify designated critical habitat and will not incidentally take listed species except within the limits of an incidental take statement.  *Id.*; *see also* 16 U.S.C. §§ 1536(a)(2), (b)(4)(B), (o)(2), 1538(a)(1)(B).  In turn, so long as such operations are in conformity with the terms and conditions imposed by an

incidental take statement, KID and other Project users are also insulated from

related Section 9 liability.  *See Ramsey*, 96 F.3d at 440-42.

I.     **Enforcement of state water law is preempted by the ESA in the event of a conflict.**

Notwithstanding the regulatory constraints that the ESA imposes on

Klamath Project operations, OWRD issued an order on April 6, 2021 directing

Reclamation to "immediately preclude or stop the distribution, use or release of

stored water" from UKL to the Klamath River, except to deliver water for Project

needs served from diversion points downstream.  18-KID-ER_4530-39.  On its

face, the order prohibited Reclamation from releasing water from UKL to meet its

"overrid[ing]" ESA obligations, *see Patterson*, 204 F.3d at 1213, as determined by

Reclamation in consultation with NMFS.  *See supra*, pp. 17-25.  Contrary to KID's

suggestion (Brief at 52), the district court did not hold that the ESA preempts state

water law.  The district court correctly held that the ESA preempted OWRD's

order, which would have compelled Reclamation to exercise the Project's state-law

water rights contrary to the requirements of the ESA.  *See* 1-KWUA-ER_31-39.

Under the Supremacy Clause, federal law governs in the event of any conflict with

state law, including any alleged conflict with the exercise of a state-law property

right.  *See Arizona v. United States*, 567 U.S. 387, 399-400 (2012).

**II.     KID and KWUA's remaining arguments are meritless.**

**A.     There was no judicial taking.**

This Court should also reject KID's contention that the district court's ruling amounts to a "judicial taking."  Four justices of the Supreme Court have opined that a state court might cause a "judicial taking" in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution, if, as a matter of adjudicating state-law property rights, it "declares that what was once an established right of private property no longer exists." *Stop the Beach Renourishment, Inc. v. Florida Dept. of Environmental Protection*, 560 U.S. 702, 715 (2010) (plurality).  But as KID stresses (Brief at 49-65), the Project water rights at issue here are creatures of state law.  The district court had no jurisdiction to declare the scope of the state-law water rights and did not purport to do so.  *See* 1-KWUA-ER_31-39.  The district court simply held that a federal regulatory statute—the ESA—restricts the exercise of the state-law water rights.  *Id.*  Accordingly, if there were a taking of Klamath Project water rights, it would not be a "judicial taking," it would be a taking resulting from agency action under a federal statute.

Moreover, contrary to KID's argument (Brief at 53), the district court's holding does not amount to a determination that Reclamation may "steal from individual farms in the Klamath Basin to pay the cost of providing water to fish." The Federal Circuit has held that ESA limitations on Project operations do *not*

constitute a taking of the water users' right to use Project water, because Project

water rights are subject to the senior rights of the Klamath Basin tribes, which are

"at least equal" in amount to the water needed to avoid jeopardy to the listed

suckers and salmon. *Baley*, 942 F.3d at 1335-41. In any event, KID's remedy for

any alleged taking caused by the application of the ESA is a suit for just

compensation under the Tucker Act or Little Tucker Act. *See Ruckelshaus v.

Monsanto Co.*, 467 U.S. 986, 1017 (1984). There is no right to enjoin a taking

where a suit for just compensation is available. *Id.*

### B.      KID's jurisdictional arguments are meritless.

In addition to arguing that Reclamation must exercise Project rights in

compliance with state law and that the Project water rights were subject to

adjudication in the KBA—points that are undisputed and irrelevant to

Reclamation's ESA compliance—KID argues (Brief at 77-81) that the district

court erred in reaching the ESA issues in the United States cross-complaint and

granting summary judgment for the United States on those issues (1) because the

state court hearing the KBA has "prior exclusive jurisdiction" over such issues, or,

alternatively, (2) because the district court should have abstained from hearing the

crossclaim pending a final judgment in the KBA. Neither argument has any merit.

### 1. The KBA court has no jurisdiction over Reclamation's crossclaim.

This Court has already rejected KID's argument regarding prior exclusive jurisdiction. KID filed a motion for a preliminary injunction in the KBA court, asking that court to enjoin Reclamation from releasing water from UKL for purposes of ESA compliance. *See In re KID*, 69 F.4th at 940. This requested relief was essentially the opposite of the declaratory and injunctive relief that the United States sought on its crossclaim (presently before this Court). After the United States removed KID's suit to federal district court in Oregon, this Court declined to issue a writ of mandamus to compel a remand, rejecting KID's argument that the KBA court had prior exclusive jurisdiction to hear KID's challenge to Reclamation's ESA compliance. *Id.* at 940-45. The same conclusion is warranted here.

The dispute between the United States and KID over water releases from UKL for ESA compliance plainly is not within the scope of the KBA or the jurisdiction of the KBA court. The United States is participating in the KBA pursuant to the McCarran Amendment, which waives the United States' immunity from suit "(1) for the adjudication of rights to the use of water of a river system or other source," and "(2) for the administration of such rights," in any case "where it appears that the United States is the owner of, or is in the process of acquiring, water rights" in the subject source and "is a necessary party to such suit." 43

U.S.C. § 666(a). There is no dispute that the KBA court has jurisdiction to adjudicate the United States' water-rights claims in the Klamath River Basin in Oregon as against all other claimants in Oregon. *See Oregon*, 44 F.3d at 765-70. Nor is there any dispute that Project rights have been provisionally adjudicated in the ACFFOD and are enforceable under Oregon law, pending judicial review. Or. Rev. Stat. §§ 539.130(4), 539.170; *Hawkins*, 991 F.3d at 222. But the relevant question here is whether the United States' crossclaim regarding Reclamation's ESA obligations involves the adjudication or administration of the Project's provisionally determined water rights.

It does not, for reasons already stated. In limiting the exercise of Project water rights to avoid jeopardy to listed species or adverse modification of their critical habitat, Reclamation is not claiming a water right or taking water from non-Project water users. Under the ACFFOD, the United States possesses a 1905 priority right to store and divert water for beneficial use by Project irrigators, 9-KID-ER_1869-70, 1892-93, and the Project irrigators possess the right to beneficially use such water, 9-KID-ER_1884-91; *see also Klamath Irrigation District*, 227 P.3d at 1161-69. These rights were perfected through the joint efforts of Reclamation and the beneficial users, and these rights are exercised and enforced against junior appropriators in tandem.

The obligations that Reclamation owes to Project users and the rights such users hold against each other are not determined by Oregon's law of prior appropriation, but by the Reclamation Act contracts and federal law. These contractual rights, and the extent to which such rights are impacted by the ESA, are not subject to determination in the KBA, nor to administration by the KBA court. *See Klamath Irrigation District*, 227 P.3d at 1166-68 (individual water users claiming a beneficial interest are not "claimants" in the KBA and their right as against the United States are not subject to adjudication therein); *see also Klamath Irrigation District*, 635 F.3d at 517.

## 2. The abstention doctrine does not apply.

For the same reasons, KID errs in invoking *Colorado River* abstention (Brief at 79-81). Under that doctrine, a federal court may decline to adjudicate federal water rights claims as against other claimants, where their relative rights in a common source are being comprehensively adjudicated in a state-court McCarran Amendment proceeding. *See* 424 U.S. at 809-821. Because the federal crossclaim concerning Reclamation's ESA obligations is not being adjudicated in the KBA and is not subject to adjudication in that proceeding, the district court had no cause to abstain in deference to the state-court proceeding. *Id.*; *see also In re KID*, 69 F.4th at 941-45.

**C.  There are no genuine issues of material fact.**

Nor is there any merit to KID's claim (Brief at 75-77) that the district court erred in granting summary judgment for the United States due to unresolved issues of material fact.  As a threshold matter, the district court denied KID's discovery request—as to the facts KID now claims are material and disputed—in part because KID "did not diligently pursue discovery."  1-KWUA-ER_29-31.  That holding amounts to a determination that KID failed to diligently pursue and thus forfeited its present factual arguments.  *See* Brief at 75-77.  KID does not contend that the district court abused its discretion in so holding.  The district court's ruling can be affirmed on this basis alone.

Regardless, the factual disputes now asserted by KID are irrelevant.  If, during Section 7 consultation, "jeopardy or adverse modification is found," FWS or NMFS (as relevant) must suggest any "reasonable and prudent alternatives" that an agency can take to avoid such jeopardy or adverse modification.  16 U.S.C. § 1536(b)(3)(A).  Invoking that provision, KID argues (Brief at 75-76) that the district court erred in disallowing evidence on a supposed reasonable alternative for meeting Reclamation's ESA obligations: namely, the purchase of water rights from KID or other Project users.

This is a non sequitur.  The release of water from UKL—to minimize the adverse impacts of Project operations on downstream salmon—makes that water

unavailable to KID and the other Project users. "[L]easing or licensing" the users' beneficial right to use that very same water is not, as KID suggests (Brief at 76), an *alternative* to releasing the water. It is an argument that Reclamation should *compensate* Project users for the released water, an argument that has no relevance here. *See* pp. 60-61, *supra*.

Nor is KID correct in arguing (Brief at 76) that there is a material dispute concerning the amount of water the ESA requires Reclamation to release from UKL. As KID observes (*id*.), a "no jeopardy" determination for a Project operating plan does not mean that water releases dictated by the plan are required by the ESA. A plan conceivably could dictate the release of more water than necessary to meet Section 7's "no jeopardy" and "no adverse modification" mandates. But the consultation history for the Klamath Project reveals no such releases.

Beginning in 2001, FWS and NMFS have issued multiple *jeopardy* determinations for Project operating plans with respect to suckers in UKL and SONCC coho salmon downstream in the Klamath River. *See Baley*, 942 F.3d at 1323-25; 1-SER_111. NMFS, FWS, and Reclamation have since worked "collaboratively" to ensure that operating plans "meet contractual obligations in compliance with" the ESA. 1-SER_111. Reclamation's longstanding objective is to maximize Project irrigation deliveries consistent with its Section 7 obligation to

avoid jeopardy to listed species or adverse modification of their critical habitat. *Id.* While Reclamation's current operating plan received "no jeopardy" determinations at the outset, 17-KID-ER_4214-18; 1-SER_234, this reflects the collaborative approach to plan development and lessons learned from two decades of consultation. It does not suggest that Reclamation is withholding water from Project use that is not required for ESA compliance.

More to the point, while KID might quibble with the expert opinions of the resource agencies as to how much water is required to avoid jeopardy or adverse modification of critical habitat, KID errs in suggesting (Brief at 76-77) that a precise determination of ESA requirements was necessary for adjudicating the United States' crossclaim. The crossclaim sought to enjoin an OWRD order that prohibited *any* release of stored water for ESA purposes, and it sought a declaration of Reclamation's authority to operate the Project under a plan and incidental take statement developed through Section 7 consultation. 8-KWUA-ER_1764. The district court correctly determined that it could grant such relief without resolving factual disputes particular to the most recent consultation. Any claim by KID that Reclamation is releasing more water from UKL than necessary to meet Section 7 obligations would be essentially a breach-of-contract claim (that Reclamation failed to supply legally available water). *See Klamath Irrigation*

*District*, 635 F.3d at 520-22 (sovereign acts defense depends on proof of "impossibility"). No such claim was before the district court.

### D. The tribal water rights are not before this Court.

Finally, KWUA errs in arguing (Brief at 55-60) that the district court abused its discretion in "striking" (declining to consider) its argument relating to tribal water rights. As KWUA observes, the United States argued below—in addition to the arguments addressed above—that the senior federal reserved water rights held in trust for the Yurok and Hoopa Valley Tribes *also* provide Reclamation with discretion over Project operations that triggers ESA Section 7. 8-KWUA-ER_1746, 1755 (cross-complaint); 7-KWUA-ER_1642 (motion for summary judgment). The district court did not reach that argument.

Nor does this Court need to reach that argument. The United States' second crossclaim contends that Reclamation may release water to serve the water rights of downstream tribes. *See* 8-KWUA-ER_1765. That crossclaim is both independent of the ESA claim and related to it, as Reclamation relies on ESA consultation to provide a surrogate measure of the downstream rights, which have not otherwise been quantified or adjudicated. *See id.*; *Baley*, 942 F.3d at 1335-41; *Patterson*, 204 F.3d at 1214. Under the district court's bifurcation order, the United States' second crossclaim is to be litigated if the grant of summary judgment on the United States' first crossclaim is not affirmed. 8-KWUA-

ER_1772, 1776; *see also* 8-KWUA-ER_1765 (complaint). In that event, the

district court may consider any ESA obligations specific to the tribal water rights.

Contrary to KWUA's suggestion (Brief at 60-61), the district court's order

"striking" KWUA's argument regarding tribal water rights does not preclude

KWUA from raising any relevant defense in phase two, should the parties proceed

to that phase. *See* 1-KWUA-ER_27.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be

affirmed.

TODD KIM
*Assistant Attorney General*

Of counsel:

/s/ *John L. Smeltzer*

LANCE C. WENGER
Solicitor's Office
U.S. Department of the Interior

THOMAS K. SNODGRASS
ROBERT P. WILLIAMS
KEVIN MCARDLE

MEGAN J. WALLINE
Office of General Counsel
National Oceanic and
   Atmospheric Administration

JOHN L. SMELTZER
Environment & Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, DC  20044
(202) 305-0343
john.smeltzer@usdoj.gov

January 16, 2024
D.J. No. 90-8-6-08304/1

**STATEMENT OF RELATED CASES**

Undersigned counsel is unaware of any related cases currently pending in this court.

/s/ *John L. Smeltzer*

JOHN L. SMELTZER
Environment & Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, DC  20044
(202) 305-0343
john.smeltzer@usdoj.gov

# **ADDENDUM**

16 U.S.C. § 1536 ............................................................................1

16 U.S.C. § 1538 ..........................................................................14

16 U.S.C. § 1539 ..........................................................................16

43 U.S.C. § 373 ............................................................................19

43 U.S.C. § 383 ............................................................................19

43 U.S.C. § 411 ............................................................................20

43 U.S.C. § 423d ..........................................................................20

43 U.S.C. § 491 ............................................................................21

43 U.S.C. § 523 ............................................................................21

43 U.S.C. § 524 ............................................................................22

43 U.S.C. § 666 ............................................................................22

Act of Feb. 9, 1905, c. 567, 33 Stat. 714 ....................................23

# 16 U.S.C. § 1536. Interagency cooperation (ESA § 7)

## (a) Federal agency actions and consultations

(1) The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this chapter. All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 1533 of this title.

(2) Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

(3) Subject to such guidelines as the Secretary may establish, a Federal agency shall consult with the Secretary on any prospective agency action at the request of, and in cooperation with, the prospective permit or license applicant if the applicant has reason to believe that an endangered species or a threatened species may be present in the area affected by his project and that implementation of such action will likely affect such species.

(4) Each Federal agency shall confer with the Secretary on any agency action which is likely to jeopardize the continued existence of any species proposed to be listed under section 1533 of this title or result in the destruction or adverse modification of critical habitat proposed to be designated for such species. This paragraph does not require a limitation on the commitment of resources as described in subsection (d).

**(b) Opinion of Secretary**

(1) (A) Consultation under subsection (a)(2) with respect to any agency action shall be concluded within the 90-day period beginning on the date on which initiated or, subject to subparagraph (B), within such other period of time as is mutually agreeable to the Secretary and the Federal agency.

(B) In the case of an agency action involving a permit or license applicant, the Secretary and the Federal agency may not mutually agree to conclude consultation within a period exceeding 90 days unless the Secretary, before the close of the 90th day referred to in subparagraph (A)—

(i) if the consultation period proposed to be agreed to will end before the 150th day after the date on which consultation was initiated, submits to the applicant a written statement setting forth--

(I) the reasons why a longer period is required,
(II) the information that is required to complete the consultation, and
(III) the estimated date on which consultation will be completed; or

(ii) if the consultation period proposed to be agreed to will end 150 or more days after the date on which consultation was initiated, obtains the consent of the applicant to such period.

The Secretary and the Federal agency may mutually agree to extend a consultation period established under the preceding sentence if the Secretary, before the close of such period, obtains the consent of the applicant to the extension.

(2) Consultation under subsection (a)(3) shall be concluded within such period as is agreeable to the Secretary, the Federal agency, and the applicant concerned.

(3)(A) Promptly after conclusion of consultation under paragraph (2) or (3) of subsection (a), the Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat. If jeopardy or

adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) and can be taken by the Federal agency or applicant in implementing the agency action.

(B) Consultation under subsection (a)(3), and an opinion issued by the Secretary incident to such consultation, regarding an agency action shall be treated respectively as a consultation under subsection (a)(2), and as an opinion issued after consultation under such subsection, regarding that action if the Secretary reviews the action before it is commenced by the Federal agency and finds, and notifies such agency, that no significant changes have been made with respect to the action and that no significant change has occurred regarding the information used during the initial consultation.

(4) If after consultation under subsection (a)(2), the Secretary concludes that—

(A) the agency action will not violate such subsection, or offers reasonable and prudent alternatives which the Secretary believes would not violate such subsection;

(B) the taking of an endangered species or a threatened species incidental to the agency action will not violate such subsection; and

(C) if an endangered species or threatened species of a marine mammal is involved, the taking is authorized pursuant to section 1371(a)(5) of this title; the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written statement that—

(i) specifies the impact of such incidental taking on the species,

(ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

(iii) in the case of marine mammals, specifies those measures that are necessary to comply with section 1371(a)(5) of this title with regard to such taking, and

(iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

## (c) Biological assessment

(1) To facilitate compliance with the requirements of subsection (a)(2), each Federal agency shall, with respect to any agency action of such agency for which no contract for construction has been entered into and for which no construction has begun on November 10, 1978, request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the Secretary advises, based on the best scientific and commercial data available, that such species may be present, such agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action. Such assessment shall be completed within 180 days after the date on which initiated (or within such other period as is mutually agreed to by the Secretary and such agency, except that if a permit or license applicant is involved, the 180-day period may not be extended unless such agency provides the applicant, before the close of such period, with a written statement setting forth the estimated length of the proposed extension and the reasons therefor) and, before any contract for construction is entered into and before construction is begun with respect to such action. Such assessment may be undertaken as part of a Federal agency's compliance with the requirements of section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. 4332).

(2) Any person who may wish to apply for an exemption under subsection (g) of this section for that action may conduct a biological assessment to identify any endangered species or threatened species which is likely to be affected by such action. Any such biological assessment must, however, be conducted in cooperation with the Secretary and under the supervision of the appropriate Federal agency.

## (d) Limitation on commitment of resources

After initiation of consultation required under subsection (a)(2), the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of

foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section.

**(e) Endangered Species Committee**

(1) There is established a committee to be known as the Endangered Species Committee (hereinafter in this section referred to as the "Committee").

(2) The Committee shall review any application submitted to it pursuant to this section and determine in accordance with subsection (h) of this section whether or not to grant an exemption from the requirements of subsection (a)(2) of this section for the action set forth in such application.

(3) The Committee shall be composed of seven members as follows:

(A) The Secretary of Agriculture.

(B) The Secretary of the Army.

(C) The Chairman of the Council of Economic Advisors.

(D) The Administrator of the Environmental Protection Agency.

(E) The Secretary of the Interior.

(F) The Administrator of the National Oceanic and Atmospheric Administration.

(G) The President, after consideration of any recommendations received pursuant to subsection (g)(2)(B) shall appoint one individual from each affected State, as determined by the Secretary, to be a member of the Committee for the consideration of the application for exemption for an agency action with respect to which such recommendations are made, not later than 30 days after an application is submitted pursuant to this section.

(4)(A) Members of the Committee shall receive no additional pay on account of their service on the Committee.

(B) While away from their homes or regular places of business in the performance of services for the Committee, members of the Committee shall be allowed travel expenses, including per diem in lieu of subsistence, in the

same manner as persons employed intermittently in the Government service are allowed expenses under section 5703 of Title 5.

(5)(A) Five members of the Committee or their representatives shall constitute a quorum for the transaction of any function of the Committee, except that, in no case shall any representative be considered in determining the existence of a quorum for the transaction of any function of the Committee if that function involves a vote by the Committee on any matter before the Committee.

(B) The Secretary of the Interior shall be the Chairman of the Committee.

(C) The Committee shall meet at the call of the Chairman or five of its members.

(D) All meetings and records of the Committee shall be open to the public.

(6) Upon request of the Committee, the head of any Federal agency is authorized to detail, on a nonreimbursable basis, any of the personnel of such agency to the Committee to assist it in carrying out its duties under this section.

(7)(A) The Committee may for the purpose of carrying out its duties under this section hold such hearings, sit and act at such times and places, take such testimony, and receive such evidence, as the Committee deems advisable.

(B) When so authorized by the Committee, any member or agent of the Committee may take any action which the Committee is authorized to take by this paragraph.

(C) Subject to the Privacy Act, the Committee may secure directly from any Federal agency information necessary to enable it to carry out its duties under this section. Upon request of the Chairman of the Committee, the head of such Federal agency shall furnish such information to the Committee.

(D) The Committee may use the United States mails in the same manner and upon the same conditions as a Federal agency.

(E) The Administrator of General Services shall provide to the Committee on a reimbursable basis such administrative support services as the Committee may request.

(8) In carrying out its duties under this section, the Committee may promulgate and amend such rules, regulations, and procedures, and issue and amend such orders as it deems necessary.

(9) For the purpose of obtaining information necessary for the consideration of an application for an exemption under this section the Committee may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents.

(10) In no case shall any representative, including a representative of a member designated pursuant to paragraph (3)(G) of this subsection, be eligible to cast a vote on behalf of any member.

## (f) Promulgation of regulations; form and contents of exemption application

Not later than 90 days after November 10, 1978, the Secretary shall promulgate regulations which set forth the form and manner in which applications for exemption shall be submitted to the Secretary and the information to be contained in such applications. Such regulations shall require that information submitted in an application by the head of any Federal agency with respect to any agency action include, but not be limited to--

(1) a description of the consultation process carried out pursuant to subsection (a)(2) of this section between the head of the Federal agency and the Secretary; and

(2) a statement describing why such action cannot be altered or modified to conform with the requirements of subsection (a)(2) of this section.

## (g) Application for exemption; report to Committee

(1) A Federal agency, the Governor of the State in which an agency action will occur, if any, or a permit or license applicant may apply to the Secretary for an exemption for an agency action of such agency if, after consultation under subsection (a)(2), the Secretary's opinion under subsection (b) indicates that the agency action would violate subsection (a)(2). An

application for an exemption shall be considered initially by the Secretary in the manner provided for in this subsection, and shall be considered by the Committee for a final determination under subsection (h) after a report is made pursuant to paragraph (5). The applicant for an exemption shall be referred to as the "exemption applicant" in this section.

(2)(A) An exemption applicant shall submit a written application to the Secretary, in a form prescribed under subsection (f), not later than 90 days after the completion of the consultation process; except that, in the case of any agency action involving a permit or license applicant, such application shall be submitted not later than 90 days after the date on which the Federal agency concerned takes final agency action with respect to the issuance of the permit or license. For purposes of the preceding sentence, the term "final agency action" means (i) a disposition by an agency with respect to the issuance of a permit or license that is subject to administrative review, whether or not such disposition is subject to judicial review; or (ii) if administrative review is sought with respect to such disposition, the decision resulting after such review. Such application shall set forth the reasons why the exemption applicant considers that the agency action meets the requirements for an exemption under this subsection.

(B) Upon receipt of an application for exemption for an agency action under paragraph (1), the Secretary shall promptly (i) notify the Governor of each affected State, if any, as determined by the Secretary, and request the Governors so notified to recommend individuals to be appointed to the Endangered Species Committee for consideration of such application; and (ii) publish notice of receipt of the application in the Federal Register, including a summary of the information contained in the application and a description of the agency action with respect to which the application for exemption has been filed.

(3) The Secretary shall within 20 days after the receipt of an application for exemption, or within such other period of time as is mutually agreeable to the exemption applicant and the Secretary—

(A) determine that the Federal agency concerned and the exemption applicant have--

(i) carried out the consultation responsibilities described in subsection (a) in good faith and made a reasonable and responsible effort to

develop and fairly consider modifications or reasonable and prudent alternatives to the proposed agency action which would not violate subsection (a)(2);

(ii) conducted any biological assessment required by subsection (c); and

(iii) to the extent determinable within the time provided herein, refrained from making any irreversible or irretrievable commitment of resources prohibited by subsection (d); or

(B) deny the application for exemption because the Federal agency concerned or the exemption applicant have not met the requirements set forth in subparagraph (A)(i), (ii), and (iii).

The denial of an application under subparagraph (B) shall be considered final agency action for purposes of chapter 7 of Title 5.

(4) If the Secretary determines that the Federal agency concerned and the exemption applicant have met the requirements set forth in paragraph (3)(A)(i), (ii), and (iii) he shall, in consultation with the Members of the Committee, hold a hearing on the application for exemption in accordance with sections 554, 555, and 556 (other than subsection (b)(1) and (2) thereof) of Title 5 and prepare the report to be submitted pursuant to paragraph (5).

(5) Within 140 days after making the determinations under paragraph (3) or within such other period of time as is mutually agreeable to the exemption applicant and the Secretary, the Secretary shall submit to the Committee a report discussing—

(A) the availability of reasonable and prudent alternatives to the agency action, and the nature and extent of the benefits of the agency action and of alternative courses of action consistent with conserving the species or the critical habitat;

(B) a summary of the evidence concerning whether or not the agency action is in the public interest and is of national or regional significance;

(C) appropriate reasonable mitigation and enhancement measures which should be considered by the Committee; and

(D) whether the Federal agency concerned and the exemption applicant refrained from making any irreversible or irretrievable commitment of resources prohibited by subsection (d).

(6) To the extent practicable within the time required for action under subsection (g) of this section, and except to the extent inconsistent with the requirements of this section, the consideration of any application for an exemption under this section and the conduct of any hearing under this subsection shall be in accordance with sections 554, 555, and 556 (other than subsection (b)(3) of section 556) of Title 5.

(7) Upon request of the Secretary, the head of any Federal agency is authorized to detail, on a nonreimbursable basis, any of the personnel of such agency to the Secretary to assist him in carrying out his duties under this section.

(8) All meetings and records resulting from activities pursuant to this subsection shall be open to the public.

## (h) Grant of exemption

(1) The Committee shall make a final determination whether or not to grant an exemption within 30 days after receiving the report of the Secretary pursuant to subsection (g)(5). The Committee shall grant an exemption from the requirements of subsection (a)(2) for an agency action if, by a vote of not less than five of its members voting in person—

(A) it determines on the record, based on the report of the Secretary, the record of the hearing held under subsection (g)(4) and on such other testimony or evidence as it may receive, that—

(i) there are no reasonable and prudent alternatives to the agency action;

(ii) the benefits of such action clearly outweigh the benefits of alternative courses of action consistent with conserving the species or its critical habitat, and such action is in the public interest;

(iii) the action is of regional or national significance; and

(iv) neither the Federal agency concerned nor the exemption applicant made any irreversible or irretrievable commitment of resources prohibited by subsection (d); and

(B) it establishes such reasonable mitigation and enhancement measures, including, but not limited to, live propagation, transplantation, and habitat acquisition and improvement, as are necessary and appropriate to minimize the adverse effects of the agency action upon the endangered species, threatened species, or critical habitat concerned.

Any final determination by the Committee under this subsection shall be considered final agency action for purposes of chapter 7 of Title 5.

(2)(A) Except as provided in subparagraph (B), an exemption for an agency action granted under paragraph (1) shall constitute a permanent exemption with respect to all endangered or threatened species for the purposes of completing such agency action—

(i) regardless whether the species was identified in the biological assessment; and

(ii) only if a biological assessment has been conducted under subsection (c) with respect to such agency action.

(B) An exemption shall be permanent under subparagraph (A) unless—

(i) the Secretary finds, based on the best scientific and commercial data available, that such exemption would result in the extinction of a species that was not the subject of consultation under subsection (a)(2) or was not identified in any biological assessment conducted under subsection (c), and

(ii) the Committee determines within 60 days after the date of the Secretary's finding that the exemption should not be permanent.

If the Secretary makes a finding described in clause (i), the Committee shall meet with respect to the matter within 30 days after the date of the finding.

**(i) Review by Secretary of State; violation of international treaty or other international obligation of United States**

Notwithstanding any other provision of this chapter, the Committee shall be prohibited from considering for exemption any application made to it, if the Secretary of State, after a review of the proposed agency action and its potential implications, and after hearing, certifies, in writing, to the Committee within 60 days of any application made under this section that the granting of any such exemption and the carrying out of such action would be in violation of an international treaty obligation or other international obligation of the United States. The Secretary of State shall, at the time of such certification, publish a copy thereof in the Federal Register.

**(j) Exemption for national security reasons**

Notwithstanding any other provision of this chapter, the Committee shall grant an exemption for any agency action if the Secretary of Defense finds that such exemption is necessary for reasons of national security.

**(k) Exemption decision not considered major Federal action; environmental impact statement**

An exemption decision by the Committee under this section shall not be a major Federal action for purposes of the National Environmental Policy Act of 1969: Provided, That an environmental impact statement which discusses the impacts upon endangered species or threatened species or their critical habitats shall have been previously prepared with respect to any agency action exempted by such order.

**(l) Committee order granting exemption; cost of mitigation and enhancement measures; report by applicant to Council on Environmental Quality**

> (1) If the Committee determines under subsection (h) that an exemption should be granted with respect to any agency action, the Committee shall issue an order granting the exemption and specifying the mitigation and enhancement measures established pursuant to subsection (h) which shall be carried out and paid for by the exemption applicant in implementing the agency action. All necessary mitigation and enhancement measures shall be

authorized prior to the implementing of the agency action and funded concurrently with all other project features.

(2) The applicant receiving such exemption shall include the costs of such mitigation and enhancement measures within the overall costs of continuing the proposed action. Notwithstanding the preceding sentence the costs of such measures shall not be treated as project costs for the purpose of computing benefit-cost or other ratios for the proposed action. Any applicant may request the Secretary to carry out such mitigation and enhancement measures. The costs incurred by the Secretary in carrying out any such measures shall be paid by the applicant receiving the exemption. No later than one year after the granting of an exemption, the exemption applicant shall submit to the Council on Environmental Quality a report describing its compliance with the mitigation and enhancement measures prescribed by this section. Such a report shall be submitted annually until all such mitigation and enhancement measures have been completed. Notice of the public availability of such reports shall be published in the Federal Register by the Council on Environmental Quality.

## (m) Notice requirement for citizen suits not applicable

The 60-day notice requirement of section 1540(g) of this title shall not apply with respect to review of any final determination of the Committee under subsection (h) of this section granting an exemption from the requirements of subsection (a)(2) of this section.

## (n) Judicial review

Any person, as defined by section 1532(13) of this title, may obtain judicial review, under chapter 7 of Title 5, of any decision of the Endangered Species Committee under subsection (h) in the United States Court of Appeals for (1) any circuit wherein the agency action concerned will be, or is being, carried out, or (2) in any case in which the agency action will be, or is being, carried out outside of any circuit, the District of Columbia, by filing in such court within 90 days after the date of issuance of the decision, a written petition for review. A copy of such petition shall be transmitted by the clerk of the court to the Committee and the Committee shall file in the court the record in the proceeding, as provided in section 2112 of Title 28. Attorneys designated by the Endangered Species Committee may appear for, and represent the Committee in any action for review under this subsection.

**(o) Exemption as providing exception on taking of endangered species**

Notwithstanding sections 1533(d) and 1538(a)(1)(B) and (C) of this title, sections 1371 and 1372 of this title, or any regulation promulgated to implement any such section—

> (1) any action for which an exemption is granted under subsection (h) shall not be considered to be a taking of any endangered species or threatened species with respect to any activity which is necessary to carry out such action; and

> (2) any taking that is in compliance with the terms and conditions specified in a written statement provided under subsection (b)(4)(iv) shall not be considered to be a prohibited taking of the species concerned.

**(p) Exemptions in Presidentially declared disaster areas**

In any area which has been declared by the President to be a major disaster area under the Disaster Relief and Emergency Assistance Act, the President is authorized to make the determinations required by subsections (g) and (h) of this section for any project for the repair or replacement of a public facility substantially as it existed prior to the disaster under section 405 or 406 of the Disaster Relief and Emergency Assistance Act, and which the President determines (1) is necessary to prevent the recurrence of such a natural disaster and to reduce the potential loss of human life, and (2) to involve an emergency situation which does not allow the ordinary procedures of this section to be followed. Notwithstanding any other provision of this section, the Committee shall accept the determinations of the President under this subsection.

## 16 U.S.C. § 1538. Prohibited acts (ESA § 9)

**(a) Generally**

> (1) Except as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of fish or wildlife listed pursuant to section 1533 of this title it is unlawful for any person subject to the jurisdiction of the United States to—

(A) import any such species into, or export any such species from the United States;

(B) take any such species within the United States or the territorial sea of the United States;

(C) take any such species upon the high seas;

(D) possess, sell, deliver, carry, transport, or ship, by any means whatsoever, any such species taken in violation of subparagraphs (B) and (C);

(E) deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species;

(F) sell or offer for sale in interstate or foreign commerce any such species; or

(G) violate any regulation pertaining to such species or to any threatened species of fish or wildlife listed pursuant to section 1533 of this title and promulgated by the Secretary pursuant to authority provided by this chapter.

(2) Except as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of plants listed pursuant to section 1533 of this title, it is unlawful for any person subject to the jurisdiction of the United States to--

(A) import any such species into, or export any such species from, the United States;

(B) remove and reduce to possession any such species from areas under Federal jurisdiction; maliciously damage or destroy any such species on any such area; or remove, cut, dig up, or damage or destroy any such species on any other area in knowing violation of any law or regulation of any State or in the course of any violation of a State criminal trespass law;

(C) deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species;

(D) sell or offer for sale in interstate or foreign commerce any such species; or

(E) violate any regulation pertaining to such species or to any threatened species of plants listed pursuant to section 1533 of this title and promulgated by the Secretary pursuant to authority provided by this chapter.

\* \* \*

## (g) Violations

It is unlawful for any person subject to the jurisdiction of the United States to attempt to commit, solicit another to commit, or cause to be committed, any offense defined in this section.

## 16 U.S.C. § 1539. Exceptions (ESA § 10)

## (a) Permits

(1) The Secretary may permit, under such terms and conditions as he shall prescribe--

 (A) any act otherwise prohibited by section 1538 of this title for scientific purposes or to enhance the propagation or survival of the affected species, including, but not limited to, acts necessary for the establishment and maintenance of experimental populations pursuant to subsection (j); or

 (B) any taking otherwise prohibited by section 1538(a)(1)(B) of this title if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity.

(2)(A) No permit may be issued by the Secretary authorizing any taking referred to in paragraph (1)(B) unless the applicant therefor submits to the Secretary a conservation plan that specifies—

(i) the impact which will likely result from such taking;

(ii) what steps the applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps;

(iii) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized; and

(iv) such other measures that the Secretary may require as being necessary or appropriate for purposes of the plan.

(B) If the Secretary finds, after opportunity for public comment, with respect to a permit application and the related conservation plan that—

(i) the taking will be incidental;

(ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking;

(iii) the applicant will ensure that adequate funding for the plan will be provided;

(iv) the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; and

(v) the measures, if any, required under subparagraph (A)(iv) will be met;

and he has received such other assurances as he may require that the plan will be implemented, the Secretary shall issue the permit. The permit shall contain such terms and conditions as the Secretary deems necessary or appropriate to carry out the purposes of this paragraph, including, but not limited to, such reporting requirements as the Secretary deems necessary for determining whether such terms and conditions are being complied with.

(C) The Secretary shall revoke a permit issued under this paragraph if he finds that the permittee is not complying with the terms and conditions of the permit.

## (b) Hardship exemptions

(1) If any person enters into a contract with respect to a species of fish or wildlife or plant before the date of the publication in the Federal Register of notice of consideration of that species as an endangered species and the subsequent listing of that species as an endangered species pursuant to

section 1533 of this title will cause undue economic hardship to such person under the contract, the Secretary, in order to minimize such hardship, may exempt such person from the application of section 1538(a) of this title to the extent the Secretary deems appropriate if such person applies to him for such exemption and includes with such application such information as the Secretary may require to prove such hardship; except that (A) no such exemption shall be for a duration of more than one year from the date of publication in the Federal Register of notice of consideration of the species concerned, or shall apply to a quantity of fish or wildlife or plants in excess of that specified by the Secretary; (B) the one-year period for those species of fish or wildlife listed by the Secretary as endangered prior to December 28, 1973, shall expire in accordance with the terms of section 668cc-31 of this title; and (C) no such exemption may be granted for the importation or exportation of a specimen listed in Appendix I of the Convention which is to be used in a commercial activity.

(2) As used in this subsection, the term "undue economic hardship" shall include, but not be limited to:

  (A) substantial economic loss resulting from inability caused by this chapter to perform contracts with respect to species of fish and wildlife entered into prior to the date of publication in the Federal Register of a notice of consideration of such species as an endangered species;

  (B) substantial economic loss to persons who, for the year prior to the notice of consideration of such species as an endangered species, derived a substantial portion of their income from the lawful taking of any listed species, which taking would be made unlawful under this chapter; or

  (C) curtailment of subsistence taking made unlawful under this chapter by persons (i) not reasonably able to secure other sources of subsistence; and (ii) dependent to a substantial extent upon hunting and fishing for subsistence; and (iii) who must engage in such curtailed taking for subsistence purposes.

(3) The Secretary may make further requirements for a showing of undue economic hardship as he deems fit. Exceptions granted under this section may be limited by the Secretary in his discretion as to time, area, or other factor of applicability.

**(c) Notice and review**

The Secretary shall publish notice in the Federal Register of each application for an exemption or permit which is made under this section. Each notice shall invite the submission from interested parties, within thirty days after the date of the notice, of written data, views, or arguments with respect to the application; except that such thirty-day period may be waived by the Secretary in an emergency situation where the health or life of an endangered animal is threatened and no reasonable alternative is available to the applicant, but notice of any such waiver shall be published by the Secretary in the Federal Register within ten days following the issuance of the exemption or permit. Information received by the Secretary as a part of any application shall be available to the public as a matter of public record at every stage of the proceeding.

**(d) Permit and exemption policy**

The Secretary may grant exceptions under subsections (a)(1)(A) and (b) of this section only if he finds and publishes his finding in the Federal Register that (1) such exceptions were applied for in good faith, (2) if granted and exercised will not operate to the disadvantage of such endangered species, and (3) will be consistent with the purposes and policy set forth in section 1531 of this title.

\*   \*   \*

## 43 U.S.C. § 373. General authority of Secretary of the Interior

The Secretary of the Interior is authorized to perform any and all acts and to make such rules and regulations as may be necessary and proper for the purpose of carrying out the provisions of this Act into full force and effect.

## 43 U.S.C. § 383. Vested rights and State laws unaffected (Reclamation Act § 8)

Nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof.

## 43 U.S.C. § 411.  Surveys for, location, and construction of irrigation works generally

The Secretary of the Interior is authorized and directed to make examinations and surveys for, and to locate and construct, as herein provided, irrigation works for the storage, diversion, and development of waters, including artesian wells.

## 43 U.S.C. § 423d. Amendment of existing water right contracts by Secretary of the Interior

The Secretary of the Interior is authorized, in his discretion, to amend any existing water-right contract to the extent necessary to carry out the provisions of sections 423 to 423g and 610 of this title, upon request of the holder of such contract. The Secretary of the Interior, as a condition precedent to the amendment of any existing water-right contract, shall require the execution of a contract by a water-users' association or irrigation district whereby such association or irrigation district shall be required to pay to the United States, without regard to default in the payment of charges against any individual farm unit or tract of irrigable land, the entire charges against all productive lands remaining in the project after the permanently unproductive lands shall have been eliminated and the charges against temporarily unproductive areas shall have been suspended in the manner and to the extent authorized and directed by sections 423 to 423g and 610 of this title.

The Secretary is authorized, in his discretion, upon request of individual water users or districts, and upon performance of the condition precedent above set forth, to amend any existing water-right contract to provide for increase in the time for payment of construction charges, which have not then accrued, to the extent that may be necessary under the conditions in each case, subject to the limitation that there shall be allowed for repayment not more than forty years from the date the first payment matured under the original contract, and also to extend the time for payment of operation and maintenance or water-rental charges due and unpaid for such period as in his judgment may be necessary not exceeding five years, the charges so extended to bear interest payable annually at the rate of 6 per centum per annum until paid, and to contract for the payment of the construction charges then due and unpaid within such term of years as the Secretary may find to be necessary, with interest payable annually at the rate of 6 per centum per annum until paid.

The Secretary of the Interior is authorized to complete and execute the supplemental contract, being negotiated on May 25, 1926, and which had, on that date, been approved as to form by the Secretary, between the United States and the Belle Fourche Irrigation District and at the expiration of said supplemental contract to enter into a permanent contract on behalf of the United States with said District in accordance with the terms of said supplemental contract.

## 43 U.S.C. § 491. Authority of Secretary to operate works

The Secretary of the Interior is authorized and directed to use the reclamation fund for the operation and maintenance of all reservoirs and irrigation works constructed under the provisions of this Act.

## 43 U.S.C. § 523. Storage and transportation of water for irrigation districts, etc.

Whenever in carrying out the provisions of the reclamation law, storage or carrying capacity has been or may be provided in excess of the requirements of the lands to be irrigated under any project, the Secretary of the Interior, preserving a first right to lands and entrymen under the project, is authorized, upon such terms as he may determine to be just and equitable, to contract for the impounding, storage, and carriage of water to an extent not exceeding such excess capacity with irrigation systems operating under section 641 of this title, and individuals, corporations, associations, and irrigation districts organized for or engaged in furnishing or in distributing water for irrigation. Water so impounded, stored, or carried under any such contract shall be for the purpose of distribution to individual water users by the party with whom the contract is made: Provided, however, That water so impounded, stored, or carried shall not be used otherwise than as prescribed by law as to lands held in private ownership within Government reclamation projects. In fixing the charges under any such contract for impounding, storing, or carrying water for any irrigation system, corporation, association, district, or individual, as herein provided, the Secretary shall take into consideration the cost of construction and maintenance of the reservoir by which such water is to be impounded or stored and the canal by which it is to be carried, and such charges shall be just and equitable as to water users under the Government project. No irrigation system, district, association, corporation, or individual so contracting shall make any charge for the storage, carriage, or delivery of such water in excess of the charge paid to the United States except to such extent as may be reasonably necessary to cover cost of carriage and delivery of such water through their works.

## 43 U.S.C. § 524. Cooperation with irrigation districts, etc., in construction of reservoirs and canals

In carrying out the provisions of the said reclamation Act, and Acts amendatory thereof or supplementary thereto, the Secretary of the Interior is authorized, upon such terms as may be agreed upon, to cooperate with irrigation districts, water-users' associations, corporations, entrymen, or water users for the construction or use of such reservoirs, canals, or ditches as may be advantageously used by the Government and irrigation districts, water-users' associations, corporations, entrymen, or water users for impounding, delivering, and carrying water for irrigation purposes: Provided, That the title to and management of the works so constructed shall be subject to the provisions of section 498 of this title: Provided further, That water shall not be furnished from any such reservoir or delivered through any such canal or ditch to any one landowner in excess of an amount sufficient to irrigate one hundred and sixty acres: Provided, That nothing contained in sections 523 to 525 of this title shall be held or construed as enlarging or attempting to enlarge the right of the United States, under existing law, to control the waters of any stream in any State.

## 43 U.S.C.A. § 666. Suits for adjudication of water rights

### (a) Joinder of United States as defendant; costs

Consent is given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit. The United States, when a party to any such suit, shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty, and (2) shall be subject to the judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and

to the same extent as a private individual under like circumstances: *Provided*, That no judgment for costs shall be entered against the United States in any such suit.

### Act of Feb. 9, 1905, c. 567, 33 Stat. 714

**CHAP. 567** – An Act Authorizing the changing of the levels of certain lakes and the disposal of certain lands under the terms of the national reclamation Act.

*Be it enacted by the 8enate and House of Representatives of the United States of America in Congress assembled*, That the Secretary of the Interior is hereby authorized in carrying out any irrigation project that may be undertaken by him under the terms and conditions of the national reclamation Act and which may involve the changing of the levels of Lower or Little Klamath Lake, Tule or Rhett Lake, and Goose Lake, or any river or body of water connected therewith, in the States of Oregon and California, to raise or lower the level of said lakes as may be necessary and to dispose of any lands which may come into the possession of the United States as a result thereof by the cession of any State or otherwise under the terms and conditions of the national reclamation Act.

Approved, February 9, 1905.

**Form 8.  Certificate of Compliance for Briefs**

**9th Cir. Case Nos. 23-15499, 23-15521**

I am the attorney or self-represented party.

**This brief contains  15,382  words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[√] complies with the word limit of Cir. R. 32-1 and 32-2(b).

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   s/ *John L. Smeltzer*

**Date**  January 16, 2024