Nos. 23-15499 and 23-15521 (Consolidated)

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

YUROK TRIBE; PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS;
INSTITUTE FOR FISHERIES RESOURCES; HOOPA VALLEY TRIBE,
*Plaintiffs/Joined Cross-Claimants/Appellees,*

and

UNITED STATES OF AMERICA,
*Cross-Claimant/Counterclaim-Defendant/Appellee,*

and

KLAMATH TRIBES,
*Intervenor-Defendant,*

v.

KLAMATH WATER USERS ASSOCIATION,
*Crossclaim-Defendant/Counter-Claimant/Appellant,*

and

KLAMATH IRRIGATION DISTRICT,
*Joined Crossclaim-Defendant/Appellant,*

and

OREGON WATER RESOURCES DEPARTMENT,
*Crossclaim-Defendant.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:19-cv-04405-WHO
Hon. William H. Orrick

## APPELLANT KLAMATH WATER USERS ASSOCIATION'S
## REPLY BRIEF

BRITTANY K. JOHNSON, ESQ. (Cal. Bar No. 282001)
PAUL S. SIMMONS, ESQ. (Cal. Bar No. 127920)
SOMACH SIMMONS & DUNN, P.C.
500 Capitol Mall, Suite 1000
Sacramento, CA 95814
Telephone: (916) 446-7979
bjohnson@somachlaw.com
*Attorneys for Crossclaim-Defendant/Counter-Claimant/Appellant*
*KLAMATH WATER USERS ASSOCIATION*

# TABLE OF CONTENTS

Page

INTRODUCTION ..............................................................................................1

ARGUMENT ....................................................................................................3

I.    KWUA's Counterclaim Asks for a Judicial Determination on What the ESA Requires of Reclamation When Reclamation and Nonfederal Parties Operate the Klamath Project ..........................................3

II.    The Appellees' Focus on Preemption Is Erroneous Because the Proper Analysis Does Not Start and End with the ESA ................................5

III.    Appellees Misstate the *Home Builders* Standard ..........................................8

IV.    Appellees' Arguments Are Based on an Unfounded Reading of the 1902 Reclamation Act ..........................................................................11

       A.    The United States Does Not Defend the District Court's Ruling on Sections 6 and 10 of the Reclamation Act ........................11

       B.    Appellees' Discussion of the Reclamation Act Ignores the Purpose of the Statute and the History of the Western United States ......................................................................................12

       C.    The Project Is Authorized Under the 1902 Reclamation Act and 1905 Project Authorization for the Single Purpose of Reclamation, and No Other Statute Has Amended That Authorization ..................................................................................15

V.    Appellees' Have Not Identified Sources of Discretion in the Project Contracts That Allow Reclamation to Curtail the Project ..............19

       A.    The "Shortage" Clauses Do Not Permit Curtailment of Water Deliveries ..................................................................................20

       B.    Apportionment Clauses in the Project Contracts Are Not a Source of Discretion to Curtail ..........................................................25

       C.    The Van Brimmer Contract Is at Issue as Part of KWUA's Counterclaim for Declaratory Relief ................................................26

D.      Appellees Do Not Convincingly Explain Why *EPIC* Is the Incorrect Standard to Evaluate Reclamation's Discretion Under the Project Contracts .................................................27

E.      The Unmistakable Terms Doctrine Is Not Relevant to This Case ...........................................................................31

VI.    Appellees Admit That KWUA's Arguments That Were Stricken Were Relevant to the United States' Arguments on Discretion ..................31

CONCLUSION .......................................................................32

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*California v. United States*,
438 U.S. 645 (1978) ......................................................................................7, 13

*Clem v. Lomeli*,
566 F.3d 1177 (9th Cir. 2009) ................................................................................26

*DBSI/TRI IV Ltd. P'ship v. United States*,
465 F.3d 1031 (9th Cir. 2006) ...............................................................................31

*Defs. of Wildlife v. Norton*,
257 F. Supp. 2d 53 (D.D.C. 2003) ...........................................................................6

*Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*,
255 F.3d 1073 (9th Cir. 2001) ...................................................20, 23, 27, 28, 29

*Jicarilla Apache Tribe v. United States*,
657 F.2d 1126 (10th Cir. 1981) ........................................................................15, 16

*Klamath Water Users Protective Ass'n v. Patterson*,
204 F.3d 1206 (9th Cir. 1999), *amended on denial of rehearing*,
203 F.3d 1175 (9th Cir. 2000) ...................................10, 11, 18, 20, 29, 30

*Michigan v. EPA*,
268 F.3d 1075 (D.C. Cir. 2001) ..............................................................................16

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
551 U.S. 644 (2007) .................................................................................8, 10, 19

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
524 F.3d 917 (9th Cir. 2008) ..............................................................................8, 9

*NRDC v. Houston*,
146 F.3d 1118 (9th Cir 1998) ................................................................................28

*NRDC v. Jewell*,
749 F.3d 776 (9th Cir. 2014) ......................................................................4, 21, 22

*NRDC v. Norton*,
236 F. Supp. 3d 1198 (E.D. Cal. 2017) ...........................................20, 22, 23, 25, 29

*O'Neill v. United States*,
50 F.3d 677 (9th Cir. 1995) ..................................................................19, 20, 24, 25

*Rio Grande Silvery Minnow v. Bureau of Reclamation*,
    601 F.3d 1096 (10th Cir. 2010) ........................................23, 24

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) .......................................8, 9, 10

*San Luis Unit Food Producers v. United States*,
    709 F.3d 798 (9th Cir. 2013) ........................................17, 18

*Sierra Club v. Babbitt*,
    65 F.3d 1502 (9th Cir. 1995) ........................................27, 28

*Truckee-Carson Irrigation Dist. v. Sec'y of Dept. of Interior*,
    742 F.2d 527 (9th Cir. 1984) ...........................................14

*United States v. Alpine Land & Reservoir Co.*,
    887 F.2d 207 (9th Cir. 1989) ...........................................14

*Westlands Water Dist. v. U.S. Dep't of Interior, Bureau of Reclamation*,
    805 F. Supp. 1503 (E.D. Cal. 1992)....................................14

**Federal Statutes**

16 U.S.C.
    § 1536(a)(2) (Endangered Species Act § 7(a)(2)) ...................1

43 U.S.C.
    § 617m .............................................................18

Act of February 9, 1905, Pub. L. No. 58-66, Chapter 567, 33 Stat. 714 .......................................1

Central Valley Project Improvement Act of 1992, Pub. L. No. 102-575, 106 Stat. 4704
    §§ 3401-3412 ......................................................16
    § 3406(b)..........................................................17

Reclamation Act of 1902, Pub. L. No. 57-161, 32 Stat. 388 ........................................1

Reclamation Projects Authorization and Adjustment Act of 1992,
    Pub. L. No. 102-575, 106 Stat. 4600 ...............................18

**Other Authorities**

50 C.F.R. § 402.02..................................................................9

Final Rule, 84 Fed. Reg. 44,976, 44,978-79 (Aug. 27, 2019) .......................................9

Proposed Rule, 88 Fed. Reg. 40,753, 40,755-56 (June 22, 2023) ................................10

# INTRODUCTION

Appellant Klamath Water Users Association (KWUA) urges this Court to correct the district court's flawed decision and resolve the fundamental questions of agency authority and obligations in the Klamath Project. In its opening brief, KWUA presented a coherent approach to deciding the relevant questions presented in its counterclaim now on appeal. KWUA explained the authority of the U.S. Bureau of Reclamation (Reclamation) to operate the Klamath Reclamation Project (Project) under the Reclamation Act of 1902, Pub. L. No. 57-161, 32 Stat. 388 ("1902 Reclamation Act" or "Reclamation Act"), and the Act of February 9, 1905, Pub. L. No. 58-66, ch. 567, 33 Stat. 714 (1905 Project Authorization). KWUA explained in detail the United States' nondiscretionary obligations under its contracts with the nonfederal entities that divert and deliver water from the Project to 200,000 acres of farmland and wildlife refuges. Based on these authorities, Reclamation does not have discretion to curtail, or direct the curtailment of, the storage, diversion, and delivery of water from the Project for irrigation to benefit threatened or endangered species, and therefore, Section 7(a)(2) of the Endangered Species Act (ESA), 16 U.S.C. § 1536(a)(2) (Section 7(a)(2)), does not apply.

Appellees[1] simply respond with the assertion that Reclamation has "any and all" authority that it needs to comply with the ESA. This position amounts to unrestrained agency "discretion" to reallocate water based on ever-changing biological opinions. In contrast to KWUA, Appellees do not present a framework that is discernible, that can be reconciled with modern ESA regulations, guidance, or jurisprudence, or that can be applied consistently to provide answers to the difficult water resources questions in the Klamath Basin or other Western States. KWUA requests that this Court examine the authorities that the district court ignored and rule on KWUA's issue presented on Section 7(a)(2) discretion. KWUA also requests that this Court reverse the district court's ruling striking certain arguments that will be relevant in further proceedings below.

---

[1] KWUA's reply brief responds to the answering briefs filed by Federal Appellees (United States), ECF No. 60 (U.S. Br.), Appellees Yurok Tribe, Pacific Coast Federation of Fishermen's Associations, and Institute for Fisheries Resources (Yurok Tribe), ECF No. 62 (Yurok Br.), and Appellee Oregon Water Resources Department (OWRD), ECF No. 59 (OWRD Br.). Appellee Klamath Tribes filed an answering brief, ECF No. 64, to which KWUA has no reply. Appellee Hoopa Valley Tribe did not file a separate answering brief, ECF No. 69. When used herein, "Appellees" refers to both the United States and the Yurok Tribe.

**ARGUMENT**

I.    **KWUA's Counterclaim Asks for a Judicial Declaration on What the ESA Requires of Reclamation When Reclamation and Nonfederal Parties Operate the Project**

KWUA's first issue presented to this Court for review is whether Reclamation has discretionary authority to curtail, or direct the curtailment of, the storage, diversion, and delivery of water from the Project for irrigation to benefit threatened or endangered species.  Appellant's Opening Br. (KWUA Br.) at 4.  The issue presented is derived directly from KWUA's motion for summary judgment on its First Counterclaim, which the district court denied in the decision on appeal. 1-KWUA_ER-0005 (Final Judgment on KWUA's First Counterclaim); 1-KWUA_ER-0011; 7-KWUA_ER-1716-20.

Under current and applicable Supreme Court and Ninth Circuit authority, Section 7(a)(2) of the ESA requires Reclamation to exercise any *otherwise existing* discretion to benefit listed species when it is necessary to do so in order to prevent specified types of injury to the species.  Compliance with Section 7(a)(2) thus starts with the proposed action, identifying the relevant statutes and legal obligations that define the action, and understanding what is discretionary and nondiscretionary under those authorities.  "[I]f another legal obligation makes it impossible for the agency to exercise discretion for the protected species' benefit[,]" then the agency lacks discretion, and Section 7(a)(2)'s procedural and

substantive obligations do not apply. *NRDC v. Jewell*, 749 F.3d 776, 784 (9th Cir. 2014).

Resolving KWUA's first issue presented requires an analysis of Reclamation's authority to operate the Project under the authorizing legislation. In its opening brief, KWUA explained that the Project is authorized for the single purpose of irrigation, including authority to modify lake levels and reclaim land for irrigation, and that the Reclamation Act includes the nondiscretionary mandate to comply with state water law, which in this case, defines the purpose of the Project's water rights to be irrigation and the place of use to be Project agricultural lands. KWUA Br. at 15-17, 25-37.

Resolving KWUA's first issue presented also requires an analysis of the terms of contracts with Project beneficiaries that the United States executed before the enactment of the ESA. Under these contracts, functions related to storage, diversion, and delivery of water are either: nondiscretionary federal obligations or functions performed by nonfederal parties who are not subject to Section 7(a)(2) and as to whom Reclamation has not, in the contracts, reserved the discretion to require the nonfederal actor to take actions that inure to the benefit of listed species. *See* KWUA Br. at 37-53.

The district court did not consider these authorities, finding Reclamation can rely on the broadest possible authority that Reclamation has under statute as an

agency and ignoring the many specific, applicable federal and state authorities and contractual obligations that define how Reclamation operates the Project. The district court erred in this regard. This Court should proceed to review and analyze Reclamation's contractual commitments and applicable federal law and determine what the ESA requires based on Reclamation's nondiscretionary obligations and the fact that the Project is largely operated by nonfederal parties.

## II. Appellees' Focus on Preemption Is Erroneous Because the Proper Analysis Does Not Start and End with the ESA

In response to KWUA's arguments, Appellees fail to identify a valid source of discretion that allows Reclamation to curtail the storage, diversion, and delivery of water by the Project for irrigation in order to provide that water for instream needs of listed species. Instead, Appellees focus on questions of preemption and hypothetical requirements that are not at issue.[2] Their focus is necessarily on preemption because their arguments start with the premise that Reclamation has discretion <u>under the ESA</u> to provide water for listed species, and thus, must comply with Section 7 of the ESA. For example, according to the Yurok Tribe, only "[o]nce Reclamation meets its ESA obligations by releasing water to provide

---

[2] The United States uses several pages of its answering brief to argue hypothetical liability under Section 9 of the ESA if Appellant Klamath Irrigation District (KID) were to own and operate the entirety of the Project. U.S. Br. at 57-59. This hypothetical is not relevant or helpful. As the United States points out at the end of its hypothetical, KID is not the sole operator of the Project. KWUA does not dispute that private actors are subject to the requirements of Section 9 of the ESA.

instream flows for salmon, OWRD may, under Section 8 [of the Reclamation Act], apply its water laws to the distribution of the available water for irrigation." Answering Br. for Appellees Yurok Tribe, et al. (Yurok Br.) at 37; *see also* Yurok Br. at 12 ("the ESA determines how much water is available to state water right holders to be used in accordance with the relative priorities and terms of their water rights"). At the same time, both Appellees admit that the ESA does not confer authority on Reclamation. 3-KWUA_ER-0533; 4-KWUA_ER-0699; *see also Defs. of Wildlife v. Norton*, 257 F. Supp. 2d 53, 68 (D.D.C. 2003) ("the ESA does not loosen [the] limitations [of a project's authorizing statute] or expand Reclamation's authority"). The logic is circular and confounding and assumes that everything Reclamation does starts and ends with the nonspecific mandate of "ESA compliance."

KWUA's first issue presented does not implicate any preemption questions; it is focused on a determination of what the ESA requires based on an analysis of what is or is not discretionary federal agency action. After the resolution of the first issue, the second issue presented, which does involve preemption, can be easily dispensed with: because the ESA does not require curtailment of the storage, diversion, and delivery of water from the Project for irrigation to benefit listed species, there cannot be a conflict between federal law and OWRD's

implementation and enforcement of state water law.[3]  And in any event, the

applicable federal law—the 1902 Reclamation Act and specifically section 8—

requires compliance with state water law, thus creating a nondiscretionary

obligation.

To avoid this nondiscretionary obligation to comply with state water law, the

United States responds that it is not required under state water law to exercise its

water rights and store water in the first instance.  Appellee OWRD offers the same

interpretation of state law: Reclamation's primary right to store water in Upper

Klamath Lake is not an obligation to store water under state law.[4]  OWRD Br. at 5,

---

[3] The State of California, as Amicus Curiae, offers that the district court used the
wrong obstacle preemption standard and should have applied the specific
preemption test from *California v. United States*, 438 U.S. 645 (1978).  Br. of
Amicus State of California at 5-7, ECF No. 76.  The question under *California v.
United States* is whether a given state law is directly inconsistent with an explicit
congressional directive.  *Id.* at 2 (citing *California v. United States*, 438 U.S.
at 672-73, 678).  KWUA takes no position on which preemption standard is
applicable.  Because the ESA does not require curtailment of the storage,
diversion, and delivery of water from the Project for irrigation to benefit listed
species, there is no conflict with federal law under either standard.

[4] OWRD offers other positions on state water law in response to statements by
KID.  KWUA's issues presented do not ask this Court to construe state water law.
The controversy presented in this case on appeal is framed by the pleadings: the
United States' Crossclaim and KWUA's Counterclaim.  In the Crossclaim and in
briefs below, the United States admits that its operation of the Project is not in
compliance with state water law as determined by OWRD.  8-KWUA_ER-1728-29
(¶¶ 4-6, 101).  With these admissions in the record, it is not necessary for the Court
to wade further into state water law requirements in order to decide the issues
presented.

22-23.  KWUA does not contend that state water law requires Reclamation to store

water.  KWUA contends that Reclamation's contracts with Project beneficiaries

obligate Reclamation to deliver water from the Project to its contractors in

quantities and on the conditions identified in those contracts,[5] and specifically, that

federal reclamation law and state water law are not sources of discretion that allow

Reclamation to curtail the storage, diversion, and delivery of water by the Project

to Reclamation's contractors in order to benefit listed species.

KWUA does not agree that use of stored water to augment flows it the

Klamath River does not require a water right, but a determination of that issue is

not necessary to the resolution of the appeal on KWUA's Counterclaim because

Reclamation's nondiscretionary obligations related to water delivery arise from its

contracts with Project beneficiaries.

## III.    Appellees Misstate the *Home Builders* Standard

Appellees present tortured recitations of the Section 7(a)(2) discretion

standard.  Specifically, the Yurok Tribe claims that the Ninth Circuit has rejected

"the fine-tuned parsing of discretionary and nondiscretionary actions that KWUA

asks this Court to undertake" and that *San Luis & Delta-Mendota Water Auth. v.*

*Jewell*, 747 F.3d 581 (9th Cir. 2014) (*San Luis v. Jewell*), and *Nat'l Wildlife Fed'n*

---

[5] OWRD agrees with this contention.  "[T]he contracts between water users and
Reclamation govern whether the bureau is required to supply water."  OWRD Br.
at 24.

*v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917 (9th Cir. 2008) (*NWF*), "close[] the door to the approach KWUA urges the Court to impose on Reclamation." Yurok Br. at 50, 51.

*San Luis v. Jewell* and *NWF* both include discussions on the adequacy of Section 7 consultations that distinguish discretionary and nondiscretionary aspects of water project operations for purposes of the environmental baseline in analyzing the impacts of federal agency action in biological opinions. *San Luis v. Jewell*, 747 F.3d at 638-41; *NWF*, 524 F.3d at 928-29. This case, however, concerns only the question of whether Reclamation has discretion to shut off irrigation supplies in the name of ESA-listed species.

Moreover, in 2019, the U.S. Fish and Wildlife Service and the National Marine Fisheries Service (Services) promulgated revisions to the ESA regulation, which remain in effect, and added a definition of "environmental baseline" that requires parsing of actions as discretionary or nondiscretionary. In that way, the regulations confirm that the requirements of Section 7 only apply when an agency has discretion independent of the ESA. *See* Final Rule, 84 Fed. Reg. 44,976, 44,978-79 (Aug. 27, 2019); 50 C.F.R. § 402.02 (defining "environmental baseline" and stating the "consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline"). The Biden

Administration's review of the 2019 ESA regulations and proposed changes published in June 2023 do not include substantive changes to this definition. Proposed Rule, 88 Fed. Reg. 40,753, 40,755-56 (June 22, 2023). Accordingly, it is questionable whether the holdings of *San Luis v. Jewell* and *NWF* regarding the adequacy of biological opinions would be the same under the currently applicable ESA regulations. Indeed, the revisions to the ESA regulations and the Services' discussion and explanations in the rulemakings confirm that defining the extent of agency discretion is a crucial part of a Section 7 consultation. This case, like other decisions of this Court, concerns that issue.

The consultations for the Klamath Project, of course, ignore this regulatory framework because of the United States' position that *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206 (9th Cir. 1999), *amended on denial of rehearing*, 203 F.3d 1175 (9th Cir. 2000) (*Patterson*) "dictates Reclamation's approach." *See* U.S. Br. at 29. The district court agreed with this troubling position. 1-KWUA_ER-0033-34. *Patterson* is three decades old, decided before the Supreme Court's seminal decision in *Home Builders* and this Court's subsequent decisions implementing *Home Builders*, before OWRD's determinations of water rights in the Klamath Basin Adjudication, and before revisions to the ESA regulations. It also concerned an entirely different (and now expired) contract and questions of contract law on third-party beneficiaries, not

ESA Section 7(a)(2) discretion.  *See* KWUA Br. at 27-29.  It has never supplied

the answers on the scope and application of Section 7(a)(2) to Project operations—

a series of federal and nonfederal actions to deliver water in accordance with state

law and hundreds of contracts with individuals and irrigation and drainage

districts.  Regardless of whether it is or is not applicable precedent, a question the

parties have briefed ad nauseum,[6] there have been enough intervening changes in

law that warrant a new look from this Court on this issue.

## IV. Appellees' Arguments Are Based on an Unfounded Reading of the 1902 Reclamation Act

### A. The United States Does Not Defend the District Court's Ruling on Sections 6 and 10 of the Reclamation Act

The district court anchored its conclusion that Reclamation's operation of

the Project is imbued with broad discretion such that the substantive provisions of

Section 7(a)(2) apply to all of Reclamation's actions.  The district court relied on

section 6 of the Reclamation Act, which creates the reclamation fund, and

section 10, which gives Reclamation rulemaking authority and authorizes any and

all acts necessary to carry out the Reclamation Act.  1-KWUA_ER-0036.  The

United States does not defend this part of the district court's ruling.  There is no

mention of section 6 of the Reclamation Act in the United States' answering brief.

---

[6] The briefing in the district court on *Patterson* was extensive.  *See, e.g.*,
7-KWUA_ER-1511-22.

With regard to section 10, the United States agrees that section 10 includes authority to ensure that Project operations comply with the ESA, but frames the ruling as acknowledging that the relevant provisions of the Reclamation Act do not compel Reclamation to perform nondiscretionary actions. U.S. Br. at 40-41. The attempt to recast the district court's ruling under a different formulation of the legal standard is telling and shows that Reclamation is not in agreement with the reasoning of the district court.

### B. Appellees' Discussion of the Reclamation Act Ignores the Purpose of the Statute and the History of the Western United States

Distancing its position from the district court ruling, the United States characterizes the Reclamation Act as "granting broad authority" to Reclamation to take actions in support of "broad objectives." U.S. Br. at 29, 38; *see also* Yurok Br. at 22-25.[7] The 1902 Reclamation Act is a statutory framework to authorize, fund, and contract for repayment of the construction of <u>irrigation</u>

---

[7] The Yurok Tribe references the "interstate stream" language in section 8 of the 1902 Reclamation Act as another provision that supports its argument that Oregon state law cannot prevent "Reclamation's ESA compliance," but qualifies that the Court should not rely on this provision. Yurok Br. at 38 n.13. No party here claims that Oregon's adjudication of the Klamath River in Oregon is somehow affecting the adjudication or administration of water rights in California. And a dispute over the water rights administration in an upstream state by a downstream state is just that: a dispute between states. And although an Oregon state agency is an Appellee here, the state of California is not a party, nor is this venue the United States Supreme Court. The Yurok Tribe's allegation that there is a dispute over an interstate stream is not properly plead or raised in this action.

projects in the 17 Western States, incorporating "cooperative federalism" in section 8 by mandating compliance with state law "relating to the control, appropriation, and use or distribution of water used in irrigation." *California v. United States*, 438 U.S. at 648-69 (recounting the lengthy history of the 1902 Reclamation Act).

Amici Curiae explain in detail the history of the 1902 Reclamation Act, individual provisions in the statute, and the congressional intent to incentivize irrigation. To avoid duplication, KWUA refers the Court to the helpful discussion in their briefs. *See* Br. of Amici Curiae Association of California Water Agencies and the California Farm Bureau Federation at 8-19, ECF No. 32; Br. of Amicus Curiae Oregon Water Resources Congress, National Water Resources Association, Oregon Farm Bureau Federation, Family Farm Alliance, Agribusiness and Water Council of Arizona, Idaho Water Users Association, and Washington State Water Resources Association in Support of Appellant KWUA and Reversal (hereinafter "OWRC Br.") at 6-8, 12-20, ECF No. 31; Br. of Amici Curiae Klamath, Modoc, and Siskiyou Counties in Support of KWUA at 8-10, ECF No. 33-1.

The Yurok Tribe also argues that the Ninth Circuit has upheld Reclamation's previous exercises of "Section 10 authority," which "gives wide discretion to the Secretary over water management under the 1902 Reclamation Act." Yurok Br. at 24-26 (quotes and citations omitted). None of the cases cited stands for the

proposition that section 10 provides Reclamation authority that is so broad that it nullifies other provisions of the same statute.

In fact, in *United States v. Alpine Land & Reservoir Co*., 887 F.2d 207 (9th Cir. 1989) (*Alpine*), the Ninth Circuit held that Reclamation had authority under section 10 of the Reclamation Act to adopt regulations for a "bench/bottom classification scheme" for land in the Newlands Reclamation Project, "provided that state law beneficial use standards mandated by section 8 are followed." *Id.* at 213. Thus, Reclamation must still comply with section 8 when adopting regulations under section 10. *Truckee-Carson Irrigation Dist. v. Sec'y of Dept. of Interior*, 742 F.2d 527 (9th Cir. 1984), addresses the termination of an irrigation contract without reference or citation to section 10. And in *Westlands Water Dist. v. U.S. Dep't of Interior, Bureau of Reclamation*, 805 F. Supp. 1503, 1507 (E.D. Cal. 1992), the court merely affirmed that Reclamation has "broad authority" under the Reclamation Act to perform its statutory duties before going on to analyze whether Reclamation had authority under the San Luis Act to provide water from San Luis Reservoir to specific contractors. *Id.* at 1507-10. This case does not stand for the proposition that Reclamation has independent authority under section 10 of the Reclamation Act to change project purposes or take action to benefit species.

The "broad" general authority under the Reclamation Act to carry out policy goals does not eliminate the specific legal mandates with which Reclamation must comply when operating the Project. Reclamation cannot "dodge or otherwise avoid" its mandates under section 8 and its repayment and water service contracts by pointing to the broadest possible authority it can find in its enabling statute as a source of discretion. *See* OWRC Br. at 11.

### C. The Project Is Authorized Under the 1902 Reclamation Act and 1905 Project Authorization for the Single Purpose of Reclamation, and No Other Statute Has Amended That Authorization

In the district court, Appellees acknowledged and admitted that the Project is authorized under the 1902 Reclamation Act and the 1905 Project Authorization.[8] 3-KWUA_ER-0497-98; 4-KWUA_ER-0654 ("Only two federal statutes are relevant to this inquiry: the Reclamation Act of 1902 and the 1905 Act of Congress authorizing certain actions relating to the Project."). But the Yurok Tribe argues that the 1902 Reclamation Act and the 1905 Project Authorization do not confine the purpose of the Project to irrigation. Yurok Br. at 26-30.

"From the very beginning of the reclamation program, Congress has restricted the use of water released from reclamation projects." *Jicarilla Apache*

_____

[8] Additional documents in the record confirm Reclamation's position that the Klamath Project is a single purpose project authorized for the purpose of irrigation. 4-KWUA_ER-0747-49; 6-KWUA_ER-1317; 7-KWUA_ER-1523-27

*Tribe v. United States*, 657 F.2d 1126, 1138 (10th Cir. 1981). "These directives are binding on the Secretary and on those seeking to obtain project water." *Id.* at 1139-40. There is no plausible reading of 1902 Reclamation Act and the 1905 Project Authorization under which the authorized congressional uses of the Klamath Project include fish and wildlife. Those words do not appear in the statutes.

The Yurok Tribe gets it backwards by suggesting "no statute confines" Reclamation's authority. But under a federalist system with a federal government of limited powers, an agency has no authority unless that authority derives from a federal statute. *See Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001) ("It is elementary that our federal government is one of limited and enumerated powers . . . This principle applies with equal force to the so-called modern administrative state . . . [A federal agency has] only those authorities conferred upon it by Congress") (quotes and citations omitted). Federal reclamation law is replete with examples of Congress acting to amend the 1902 Reclamation Act to provide specific authority for Reclamation to take actions to benefit fish and wildlife. A prime example already discussed in KWUA's opening brief is the Central Valley Project Improvement Act of 1992 (CVPIA), Pub. L. No. 102-575, §§ 3401-3412, 106 Stat. 4704, which amended the 1937 reauthorization statute for the Central Valley Project (CVP) by adding fish, wildlife, and habitat restoration as purposes

with coequal priority with municipal, agriculture, and agricultural water supply purposes. The CVPIA also expressly provided that Reclamation's CVP operations must comply with the ESA. CVPIA § 3406(b) ("The Secretary, immediately upon the enactment of this title, shall operate the Central Valley Project to meet all obligations under State and Federal law, including but not limited to the Federal Endangered Species Act."). Because of this reauthorization, citations to cases referencing Reclamation's authority to operate the CVP must be read with this context.

For example, the Yurok Tribe's citation to *San Luis Unit Food Producers v. United States*, 709 F.3d 798 (9th Cir. 2013), to support the proposition that Reclamation has no mandatory duty to operate reclamation projects solely for irrigation is simply incorrect. *See* Yurok Br. at 27-28. First, the Ninth Circuit discussed Reclamation's authority when considering a "failure to act" claim under the Administrative Procedure Act, a standard which requires an allegation of "discrete agency action" that the agency is required to take. 709 F.3d at 803-04. The Court's discussion of broad programmatic authority was in this context. *Id.* at 808. Second, the Court examined the allegations of Reclamation's failure to act under the San Luis Act, a specific congressional authorization for the San Luis Unit of the CVP for the principal purpose of irrigation and four incidental purposes, including fish and wildlife benefits. *Id.* at 802. The authorizing

legislation for the Klamath Project includes no similar "incidental purposes" to the single authorized purpose of irrigation of reclaimed lands. *Id.*

To solidify this fundamental point, section 3408(g) of the CVPIA states "[t]his title shall amend and supplement the Act of June 17, 1902, and Acts supplementary thereto and amendatory thereof."[9] The CVPIA itself is just one title—Title XXXIV—in the much more comprehensive Reclamation Projects Authorization and Adjustment Act of 1992, Pub. L. No. 102-575, 106 Stat. 4600. This law amended prior congressional authorizations on projects across the West. The Yurok Tribe has pointed to <u>no</u> amendatory or supplementary act to the 1902 Reclamation Act that adds another congressionally authorized purpose of the Klamath Project. The Yurok Tribe's citation to *Patterson* is also incorrect. *See* Yurok Br. at 30. The only time the Ninth Circuit referenced "fish and wildlife" purposes of federal statutes was when quoting language from the 1956 contract it was examining. *Patterson*, 204 F.3d at 1209. There was no holding that the Project is authorized for fish and wildlife purposes.

---

[9] This "amendatory and supplementary thereto" language is a term of art to define "federal reclamation law," which Congress uses explicitly to indicate an amendment to the 1902 Reclamation Act. *See, e.g.*, 43 U.S.C. § 617m (codifying section 14 of the Boulder Canyon Project Act of 1928 and confirming the act is a "supplement to the reclamation law, which said reclamation law shall govern" the project).

Finally, any suggestion that the ESA itself amended the 1902 Reclamation Act and the 1905 Project Authorization, *see* Yurok Br. at 32-33, is squarely inconsistent with the holding in *Home Builders* that Section 7(a)(2) did not impliedly repeal and partially override other federal statutes, *see Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 664, 669 (2007) (*Home Builders*). Appellees must find discretion outside of the ESA to support their position that Reclamation can curtail the Project to provide water to benefit listed species. It does not exist under the authorizing legislation for the Project.

## V. Appellees Have Not Identified Sources of Discretion in the Project Contracts That Allow Reclamation to Curtail the Project

In an effort to identify discretionary authority to curtail the storage, diversion, and delivery of Project water for irrigation, the United States points to provisions in the contracts with KID and Tulelake Irrigation District (TID) that provide that the United States is not liable to those contractors for any water "shortage" on "account of drought or other causes." U.S. Br. at 50-51. The United States also points to "shortage" provisions in the Warren Act contracts. *Id.* at 51-52. The United States then argues that under the precedent in *O'Neill v. United States*, 50 F.3d 677 (9th Cir. 1995), unavailability of water due to restrictions under the ESA constituted a "shortage" under a similar provision in a different reclamation contract. U.S. Br. at 52-53 ("*O'Neill* confirms that Reclamation may decline to deliver water, where water is not legally available due

to ESA restrictions.").  The Yurok Tribe makes the same argument based on the "shortage" clauses and *O'Neill*.  Yurok Br. at 43-45.

Appellees misstate the applicable precedent in *O'Neill*.  Multiple courts have reviewed similar language that is ubiquitous in reclamation contracts and found that the contract provision is not a source of discretion to take action to benefit species.  Instead, it merely waives liability of the United States under certain conditions.  In fact, the United States has stated as much in other cases.

Further, the Yurok Tribe continues to misapply *O'Neill* in arguing that the ESA amended the Project contracts.  As explained below, the "unmistakable terms" doctrine is not relevant to this declaratory relief action.  And despite Appellees' efforts to distinguish the cases *Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073 (9th Cir. 2001) (*EPIC*), and *NRDC v. Norton*, 236 F. Supp. 3d 1198 (E.D. Cal. 2017), they remain the applicable precedents to apply to evaluate discretion under executed contracts, not *Patterson*.

## A.    The "Shortage" Clauses Do Not Permit Curtailment of Water Deliveries

The Project contracts contain variations of the following provision:

On account of drought or other causes, there may occur at times a shortage in the quantity of water available in Project reservoirs and, while the United States will use all reasonable means to guard against such shortage, in no event shall any liability accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom and the payments to the United

> States provided for herein shall not be reduced because of any such
> shortages.

11-KWUA_ER-2666 ¶ 26 (KID contract); *see also* 11-KWUA_ER-2627 ¶ 26 (TID

contract); 10-KWUA_ER-2488-89 ¶ 11 (MID contract); 11-KWUA_ER-2553 ¶ 4

(KBID contract); 11-KWUA_ER-2737-38 ¶ 24 (KDD contract). Appellees

describe this language as a "shortage" clause that allows Reclamation to reduce

water deliveries to meet legal obligations. This is illogical and analogous to

arguing that a party does not have to perform under a contract at all if there is a

clause limiting a party's liability in the event of breach. Moreover, courts have

reviewed this contract language in multiple cases and found, consistent with prior

positions of the United States, that the contract provisions are not "shortage"

clauses but are properly construed as liability waivers.

In *NRDC v. Jewell*, this Court considered this type of liability provision in

its analysis of whether plaintiffs had standing to bring a procedural violation of

ESA Section 7(a)(2). Specifically, the water service contracts for the Delta-

Mendota Canal Unit of the CVP "contain a provision that absolves the government

from liability for breaches that result from complying with its legal obligations (the

shortage provision)." *NRDC v. Jewell*, 749 F.3d at 782; *see also id.* at 783

(quoting contract language). The district court had interpreted this contract

language to provide the "greatest possible protection" to the endangered delta

smelt. The Ninth Circuit disagreed: "[n]othing about the shortage provision

requires the Bureau to take actions to protect the delta smelt.  The provision is permissive, and merely absolves the United States of liability if there is a water shortage resulting from, *inter alia*, 'actions taken . . . to meet legal obligations.' " *Id.* at 783-84.

The district court in *NRDC v. Norton* applied this same reasoning when it considered an article in the Sacramento River settlement contracts, which provides: " 'if there is a shortage of Project Water because of actions taken by the Contracting Officer to meet legal obligations then . . . no liability shall accrue against the United States . . . .' " 236 F. Supp. 3d at 1219.  The plaintiffs argued that this provision allows Reclamation to reduce the diversion of water to meet legal obligations and thus Reclamation retained discretion under the contracts that could benefit listed species.  *Id.*  The district court agreed with the contractors' argument that the provision "simply limits the federal government's liability for damages when there is a shortage of project water due to actions taken by Reclamation to comply with legal obligations" and characterized the provision as a *force majeure* clause in federal reclamation contracts.  *Id.* at 1219-20.  And the district court also agreed with the federal defendants' argument that the contract provision is not a source of discretion because it does not allow Reclamation to

unilaterally alter the existing terms of the contracts in a manner that will inure to the benefit of the species.[10] *Id.*

This conclusion should not be a surprise to the United States because it has argued the same position to federal courts in cases involving reclamation projects and application of the ESA. For example, in the *Silvery Minnow* litigation involving the Middle Rio Grande Project before the Tenth Circuit, Reclamation argued that a similar liability provision in the 1951 contract at issue is not a source of ESA Section 7(a)(2) discretion:

> Nothing in the shortage provision suggests that Reclamation has carte blanche to short contractors if it decides as a matter of policy that water is better used for other purposes. The provision thus does not provide independent allocation authority, but instead is a hold-harmless clause for situations in which circumstances beyond Reclamation's control make it impossible to deliver the contractually specified quantities of water. While the clause would thus encompass situations in which Reclamation must allocate water to other uses in order to comply with a statutory command, the ESA provides no such command. The ESA does not furnish new authority on an agency to override statutory or contractual obligations where the agency has not retained discretion to act.

KWUA_SER-090; *see also* KWUA_SER-052, 084, 086, 088.[11] When the Office of Solicitor looked at this issue as part of the Reassessment process for the Klamath

---

[10] The federal defendants advocated for the interpretation of *EPIC* ultimately adopted by the district court. KWUA_SER-017-019.

[11] The Tenth Circuit did not issue an opinion on the merits in the *Silvery Minnow* case because the issuance of intervening biological opinions mooted the scope-of-

Project, it opined that "[b]ecause these liability waivers do not authorize the United States to alter the amount of water delivered, they do not provide sufficient discretion for Reclamation to consult." 8-KWUA_ER-1945 (January 2021 Solicitor Memorandum on Project contract obligations); *see also* 8-KWUA_ER-1960-61. These opinions were withdrawn by the current Administration. 8-KWUA_ER-1882-83.

Despite a long history of the United States' position across multiple reclamation projects that "shortage" provisions are merely liability waivers rather than sources of discretion to curtail water deliveries, when it comes to the Klamath Project, the United States contends that Reclamation does have discretion under the "shortage" provisions because of the *O'Neill* precedent. However, *O'Neill* was not a case about Section 7(a)(2) discretion.[12] The Ninth Circuit in *O'Neill* expressly noted that the district court did not evaluate Reclamation's compliance with the ESA, which was the subject of a different lawsuit. 50 F.3d at 687-88. The Ninth Circuit instead considered whether the government's failure to supply the full contractual amount of water was "excuse[d]" by article 11(a) of the water service contract. *Id.* at 682. Article 11(a) included the familiar language that "the

---

consultation claims. *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1110-15 (10th Cir. 2010).

[12] Another reason that *O'Neill* is inapposite is because of the unique statutory authorization for the CVP under the CVPIA, as explained above in section IV.C.

government shall not be held liable for 'any damage, direct or indirect, arising from a shortage on account of errors in operation, drought, or any other causes.' " *Id.* The Court concluded that this provision limited the government's liability for failing to deliver the full contractual amount of water to the water users within "Area I" of the irrigation district. *Id.* at 684.

Appellees argue that *O'Neill* is the relevant precedent and cases like *NRDC v. Norton* are not on point. This gets it backwards. *O'Neill* is a breach of contract case; there is no breach of contract claim in this litigation. *NRDC v. Norton* squarely addressed whether a contract provision limiting the United States' liability for reduced water deliveries qualifies as "discretionary involvement or control" under the ESA regulations and concluded it did not. 236 F. Supp. 3d at 1219-20. It is directly on point. This Court should apply the same reasoning from *NRDC v. Norton* and hold that the liability provisions in the Project contracts do not provide discretion to curtail water deliveries to benefit listed species.

## B. Apportionment Clauses in the Project Contracts Are Not a Source of Discretion to Curtail

Appellees also include brief references to the apportionment language in article 33 in the 1956 TID contract, claiming Reclamation has the "right to 'apportion the available supply' in the 'event of shortage' arising 'as a result of drought or other unavoidable causes.' " U.S. Br. at 51 (citing 11-KWUA_ER-2631); *see also* Yurok Br. at 43-44 (emphasis omitted). Article 33

of the TID contract allows Reclamation to allocate available Project water between TID and "others" having "equal" rights. 11-KWUA_ER-2631. The "others" is defined by the preceding clause, namely "others executing similar contracts under the Reclamation Act of June 17, 1902, as amended[.]" *Id.* The apportionment language in the TID contract (or other contracts) is not an open-ended clause that allows the United States to reallocate water between the Project and instream uses of water to benefit listed species. It is not a source of discretion to curtail the Project to benefit listed species.

### C. The Van Brimmer Contract Is at Issue as Part of KWUA's Counterclaim for Declaratory Relief

The United States attempts to carve out its contract with the Van Brimmer Ditch Company (VBDC) as "not at issue." U.S. Br. at 53-54. In the district court, the United States argued that it has discretion to curtail diversions under the Project contracts in order to benefit species. 7-KWUA_ER-1631-35. It has now abandoned that argument as it applies to VBDC, a Project contractor, waiving the issue. *See Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009). KWUA agrees with the United States that it lacks discretion to curtail VBDC's contracted supply of irrigation water.

Moreover, it is nonsensical to assert that the VBDC contract is not at issue. KWUA's counterclaim includes a claim for declaratory relief regarding whether Reclamation has discretion to curtail, or direct the curtailment of, the storage,

diversion, and delivery of water from the Project for irrigation to benefit threatened or endangered species, and this is the first issue presented in KWUA's appeal. 7-KWUA_ER-1716-20; KWUA Br. at 4. As a contractor served by the Project, the VBDC contract is directly impacted by the requested declaratory relief. Article 2 of the 1909 contract, as amended in 1943, includes the nondiscretionary obligation to deliver water. "[T]he United States and its assigns, <u>will</u> deliver to the Company during each and every irrigation season . . . a quantity of water, not to exceed fifty second-feet, in which the Company claims the right to the exclusive use, to irrigate . . . ." 11-KWUA_ER-2756-57 (emphasis added). As explained in KWUA's opening brief, in the 1950s, KID assumed the United States' obligation to deliver water to VBDC. KWUA Br. at 45-46. Therefore, when the United States claims it can order KID not to divert and deliver water to provide instream flows for listed species, the VBDC contract is very much affected.

### D. Appellees Do Not Convincingly Explain Why *EPIC* Is the Incorrect Standard to Evaluate Reclamation's Discretion Under the Project Contracts

The United States argues that *EPIC* and *Sierra Club v. Babbitt*, 65 F.3d 1502 (9th Cir. 1995) (*Babbitt*), are distinguishable, and that *Patterson* is the applicable precedent that controls this case. U.S. Br. at 45-48. The United States claims that "unlike *Patterson* (and the present case), *Babbitt* and *EPIC* both concerned private actions over which there was little or no federal involvement or control . . . ."

*Id.* at 48.  This is not an accurate characterization of the cases.  *Babbitt* and *EPIC* both concerned agreements between the United States and a private party and whether, after the United States executed those agreements, it could go back to the contracting party and require actions to benefit listed species.  *EPIC*, 255 F.3d at 1076-78; *Babbitt*, 65 F.3d at 1509.  That is the exact fact pattern presented in this case.

Then, the United States concedes that an agency may lack discretion to modify the terms of a federal contract to allow the United States or require the contractor to take actions to benefit listed species, but then claims "it does not follow that Section 7 is inapplicable to the agency's contract performance." U.S. Br. at 49 (citing *NRDC v. Houston*, 146 F.3d 1118, 1126 (9th Cir 1998)).  To the contrary, that is exactly what the Ninth Circuit held in *EPIC* when it distinguished *NRDC v. Houston*.

The Ninth Circuit held in *NRDC v. Houston* that Reclamation must comply with ESA Section 7 and consult when it renews water service contracts—that is, executes new contracts with existing contractors—because it has discretion during negotiations to agree on different terms that could benefit species, like decreased water quantity.  146 F.3d at 1126.  Three years later, an environmental group relied on *NRDC v. Houston* to argue that a permitting agency had a duty to reconsult under Section 7(a)(2) on its agreements with a landowner because the agency

retained discretionary control over the permits it issued. *EPIC*, 255 F.3d at 1081-82.

The Ninth Circuit decisively disagreed: "[w]e did not suggest in *Houston* that once the renewed contracts were executed, the agency had continuing discretion to amend them at any time to address the needs of endangered or threatened species." *EPIC*, 255 F.3d at 1082. Instead, it interpreted discretionary involvement or control under the ESA regulation to require the discretion to amend the existing contract. *Id.* And the district court in *NRDC v. Norton* reasoned, based on the federal defendants' argument, to evaluate discretionary involvement or control over executed contracts, the court must look for the discretion to revise the executed contract and impose new terms to address the needs of listed species during contract implementation. *NRDC v. Norton*, 236 F. Supp. 3d at 1216-18.

Klamath Project contracts are perpetual. There is no expiration date and no renewal provision. The legal standard articulated in *EPIC* and *NRDC v. Norton* is the correct standard to evaluate KWUA's argument that Reclamation lacks discretion under the Project contracts to amend the contracts or curtail water deliveries to benefit listed species, and *Patterson* is not relevant to this analysis.

*Patterson* concerned a fifty-year contract executed in 1956 between Reclamation and the California Oregon Power Company (Copco) that gave Copco the right to construct and operate Link River Dam while the United States retained

title to the dam. 204 F.3d at 1209. The contract expired in 2006. *Id.* Project

contractors filed a lawsuit against PacifiCorp, Copco's successor in interest,

claiming a breach of the 1956 Copco contract based on their alleged status as third-

party beneficiaries to that contract. *Id.* at 1210. *Patterson* never concerned the

Project water supply contracts between the United States and Project beneficiaries.

And to the extent the Ninth Circuit made pronouncements about application of the

ESA to Link River Dam, that was in response to arguments about PacifiCorp's

"legal duty" to operate the dam under its contractual relationship with

Reclamation. *Id.* at 1213.

The Ninth Circuit stated the well settled principle that "contractual

arrangements can be altered by subsequent Congressional legislation," but the

"contractual arrangement" the Court was referencing was the 1956 Copco contract.

*Patterson,* 204 F.3d at 1213. The Court concluded that because Reclamation

retains authority to manage Link River Dam under the 1956 Copco contract,

Reclamation can take control of the dam "when necessary to meet the requirement

of the ESA" and "has the authority to direct dam operations to comply with the

ESA" under the 1956 Copco contract. *Id.* Appellees are thus incorrect in

representing that *Patterson* extended the holding in *O'Neill* to the Klamath Project

water supply contracts. *See* U.S. Br. at 49; Yurok Br. at 40-41.

### E. The Unmistakable Terms Doctrine Is Not Relevant to This Case

The Yurok Tribe also conflates contract liability with discretionary authority when it argues that the ESA modified the Project contracts under the unmistakable terms doctrine. Yurok Br. at 39. The unmistakable terms doctrine applies as a defense available to the United States "when the complaining party in a contract dispute claims that the original contract terms control, even when they conflict with subsequent legislation. Then, the court determines whether, in the contract language, the government waived its sovereign right to affect the contract through legislation 'in unmistakable terms.' " *DBSI/TRI IV Ltd. P'ship v. United States*, 465 F.3d 1031, 1040 (9th Cir. 2006). This Court does not need to delve into this complicated doctrine because this case does not involve a contract dispute, nor has the United States, as a contracting party, raised the unmistakable terms doctrine. *See generally* U.S. Br. at 49-58.

## VI. Appellees Admit That KWUA's Arguments That Were Stricken Were Relevant to the United States' Arguments on Discretion

In responding to KWUA's assertion that the district court abused its discretion in striking KWUA's arguments on whether unquantified downstream tribal water rights are a source of discretion under Section 7(a)(2), both Appellees admit that KWUA's arguments below were directly responsive to the United States' arguments. Yurok Br. at 61 ("While the United States had relied on Tribal rights as a source of discretion for its ESA compliance . . . ."); U.S. Br. at 68 ("the

United States argued below . . . that the senior federal reserved water rights held in trust for the Yurok and Hoopa Valley Tribes *also* provide Reclamation with discretion over Project operations that triggers ESA Section 7"). KWUA should have been allowed to respond to the argument that the United States raised in the first instance. For the reasons explained in KWUA's opening brief, striking these arguments was an abuse of discretion, and KWUA requests that this Court reverse that ruling and instruct the district court to reach the substantive issue on remand. KWUA Br. at 55-61.

## CONCLUSION

For all the reasons stated herein and in KWUA's opening brief, this Court should reverse the district court's entry of judgment in favor of the United States, et al., on the First Cause of Action in the United States' Crossclaim, KWUA's Counterclaim, and OWRD's Counterclaim. This Court should reverse the district court's ruling striking KWUA's arguments and remand to the district court. The remand order should direct the district court to enter judgment in favor of KWUA and against the United States, et al., on the First Cause of Action in the Crossclaim and KWUA's Counterclaim, or alternatively, to decide issues regarding the applicability of Section 7(a)(2) based on the existence of unadjudicated

downstream reserved tribal rights claims and proceed with Phase Two consistent

with this Court's rulings.

SOMACH SIMMONS & DUNN, PC

_s/ Brittany K. Johnson_
Brittany K. Johnson
*Attorneys for Crossclaim-Defendant/*
*Counter-Claimant/Appellant*
*Klamath Water Users Association*

# Certificate of Compliance for Briefs

**9th Cir. Case Number(s) 23-15499 and 23-15521**

I am the attorney or self-represented party.

**This brief contains 7,714 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief:

[X] complies with the word limit of Cir. R. 32-1.

**Signature:** _s/ Brittany K. Johnson_____        **Date:** 03/07/2024