UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

YUROK TRIBE, ET AL.,
*Plaintiffs – Appellees*,

v.

UNITED STATES OF AMERICA, ET AL.,
*Defendants - Cross-Claimants - Appellees*,

v.

KLAMATH WATER USERS ASSOCIATION,
*Intervenor – Defendant - Counter-Claimant - Appellant*,

KLAMATH IRRIGATION DISTRICT,
*Intervenor - Defendant - Appellant*,

Appeal from the United States District Court for the Northern District of California
No. 3:19-cv-4405-WHO (Hon. William H. Orrick)

***CORRECTED* FEDERAL APPELLEES' STATUS REPORT
AND MOTION TO DISMISS APPEALS DUE TO MOOTNESS, OR,
ALTERNATIVELY, TO REMAND TO ENABLE MOTION TO
VOLUNTARILY DISMISS CROSS-COMPLAINT**

Of counsel:

LANCE C. WENGER
Solicitor's Office
U.S. Department of the Interior

MEGAN J. WALLINE
Office of General Counsel
National Oceanic and
    Atmospheric Administration

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*

KEVIN MCARDLE
JOHN L. SMELTZER
Environment & Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, DC 20044
(202) 305-0343
john.smeltzer@usdoj.gov

**INTRODUCTION**

Federal Appellees, the United States, the United States Bureau of Reclamation ("Reclamation"), and the National Marine Fisheries Service ("NMFS"), respectfully file this status report in accordance with the Court's order issued on March 18, 2025. As explained herein, the Acting Solicitor of the Department of the Interior ("Interior") has issued new legal guidance concerning Reclamation's duties to consult with NMFS and the Fish and Wildlife Service ("FWS") under Section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(2), with respect to the operation of the Klamath Irrigation Project. The federal cross-complaint at issue on appeal was filed in accordance with previous legal guidance that has now been superseded. As a result of the change in legal guidance and other developments, there is no longer any concrete dispute between the United States and the defendants on the cross-complaint, namely, the Klamath Water Users Association ("KWUA"), the Klamath Irrigation District ("KID"), and the Oregon Water Resources Department ("OWRD"). Because the underlying claims in the case are moot or unripe, this Court should dismiss the pending appeals and vacate the district court's judgment. Alternatively, this Court should remand to the district court to enable the district court to hear a motion by the Federal Appellees to voluntarily dismiss their cross-complaint.

Under either scenario, Reclamation will continue to operate the Klamath Project under the current (2024-2029) operating plan and biological opinions issued by

NMFS and FWS that postdate the present litigation and that no party has challenged. Until Reclamation adopts a new operating plan under the new legal guidance, judicial review of Reclamation's ESA duties and ESA compliance is premature.

## BACKGROUND

### A.    2021 Guidance

Reclamation historically has operated the Klamath Project on the view that it possesses supervisory discretion over all Project water storage and delivery and thus is obligated under ESA Section 7 and implementing regulations: (1) to consult with FWS and NMFS over the impacts of such operations on ESA-listed species, and (2) to curtail Project water storage and delivery as necessary to ensure that such operations are not likely to jeopardize ESA-listed species or to adversely modify or destroy their designated critical habitat. *See* Answering Brief for the Federal Appellees at 17-21 (Jan. 16, 2024) (Dkt Entry #60) ("U.S. Brief"). In 2020, then Secretary of the Interior David Bernhardt (under the first Trump administration) directed Interior's Solicitor's office to review and reconsider Reclamation's operational authorities in relation to ESA Section 7—as well as in relation to the federal reserved water rights for tribal fisheries in the Klamath River Basin—given developments in the law since the 1990s, when Reclamation began Section 7 consultations on Project

operations. [1]  *See* 8-KWUA-ER_1953-54.  The Solicitor's Office completed its review in the fall of 2020.  *See* 8-KWUA-ER_1894-1935; 8-KWUA-ER_1955-63.

On January 14, 2021, then Interior Solicitor Daniel Jorjani issued two legal memoranda providing new direction to Reclamation for operating the Klamath Project (hereinafter, the "2021 Guidance").  *See* 8-KWUA-ER_1936-52.  Among other things, the 2021 Guidance determined that Reclamation has only limited discretion under the relevant water-supply contracts, and that Reclamation must alter its ESA consultation and associated operating plans to account for nondiscretionary contractual duties to store and deliver water for irrigation.  *See* 8-ER-KWUA_1943-52; *see also* U.S. Brief at 13-16 (describing ESA requirements).

Reclamation did not then implement the 2021 Guidance.  On April 8, 2021, Secretary of the Interior Deb Haaland (under the Biden administration) withdrew the 2021 Guidance and all related documents, thus reinstating Reclamation's prior position.  *See* 8-ER-KWUA_1882-83; *see also* U.S. Brief at 14 n.1.  Reclamation then continued to operate the Project under a 2019-2024 operating plan (as modified) that it had developed, in consultation with FWS and NMFS, under its prior guidance. *See* U.S. Brief at 19-21.

---

[1] Reclamation began consulting on Project operations after the listing of sucker and salmon species in the Klamath River basin.  See U.S. Brief at 16-17.

In November 2024, Reclamation completed consultation with FWS and NMFS on a new five-year operating plan. *See* NMFS 2024 Klamath Project Biological Opinion (Oct. 28, 2024) at 1.[2] This new (current) operating plan accounts for physical changes on the Klamath River pertinent to Project impacts on listed species—including the removal of four hydroelectric dams downstream from the Klamath Project—that occurred since the adoption of the prior (2019) plan. *Id.* at 1-2. In developing the current plan, Reclamation assumed that it possesses comprehensive discretionary authority over Project storage, diversion, and deliveries for irrigation. *Id.* at 8.

## B. Present Litigation

The present litigation (in the Northern District of California) began in 2019, when the Yurok Tribe challenged Reclamation's prior (2019) operating plan, alleging that it provided insufficient releases from Upper Klamath Lake ("UKL") to protect ESA-listed salmon downstream. *See* U.S. Brief at 17, 22. Around the same time, KID challenged the 2019 operating plan in federal district court in Oregon, alleging that the prescribed releases of water from UKL to benefit ESA-listed salmon violated the state-law water rights held by KID and Project water users. *Id.* at 23,

---

[2] https://www.fisheries.noaa.gov/resource/document/2024-klamath-project-biological-opinion; *see also* https://www.usbr.gov/mp/kbao/docs/20241115-finalbiologicalopinion-usfws-klamathproject.pdf (FWS biological opinon).

41-42.  KID's suit was dismissed under Federal Rule of Civil Procedure 19 on the grounds that the Hoopa Valley Tribe and Klamath Tribes were indispensable parties that could not be joined due to tribal sovereign immunity.  *See Klamath Irrigation District v. U.S. Bureau of Reclamation*, 48 F.4th 934, 948 (9th Cir. 2022) (affirming dismissal).  In the Yurok Tribe's suit, Reclamation and the Yurok Tribe stipulated to a stay of litigation, which the district court granted in March 2020, subject to the implementation of an agreed interim operating plan.  *See* U.S. Br. at 22.

In May 2020, KID filed an action in Oregon state court to compel OWRD to "take charge" of UKL and to preclude Reclamation from releasing stored water from UKL in alleged violation of Project water users' water rights.  *See* U.S. Brief at 24. KID did not name Reclamation as a defendant in this state-court suit, and the state court granted the requested injunction against OWRD.  *See* U.S. Brief at 24-25.  To comply with that injunction, OWRD issued an order on April 6, 2021, directing Reclamation to refrain from releasing stored water from UKL except for irrigation use under Project water rights.  *Id.*

The United States filed the present cross-complaint—now at issue on appeal—principally to obtain declaratory and injunctive relief against the enforcement of OWRD's administrative order.  *Id.* at 25.  The cross-complaint alleged that the order was preempted under federal law, because it prohibited releases called for in the 2019 operations plan (as modified), which Reclamation then determined to be

5

necessary to meet its obligations under ESA Section 7.  *Id.*[3] The cross-complaint was filed against OWRD (which was not previously a party) and against KWUA (which had intervened as a defendant on the complaint filed by the Yurok Tribe). *Id.*  KID subsequently joined as an intervenor-defendant, *id.*, and KWUA and OWRD filed counterclaims against the United States relating to the cross-complaint. *Id.*  The tribes joined the cross-complaint.  *Id.* at 26.  The district court granted summary judgment for the Federal Appellees.  1-KWUA-ER_43.  The court declared the order preempted by the ESA and enjoined OWRD from enforcing it.  1-KWUA-ER_4-5, 43.  KWUA and KID appealed.  *See* U.S. Brief at 27.

In the meantime, OWRD filed an appeal in state court to challenge the state-court injunction that compelled OWRD to take charge of UKL.  *See* U.S. Brief at 27-28.  The Oregon Court of Appeals set aside the injunction and ordered the state action dismissed on the grounds that Reclamation was an indispensable party that could not be joined due to federal sovereign immunity.  *KID v. OWRD*, 518 P.3d at 972.  OWRD then withdrew the administrative order.  *See* U.S. Brief at 28.

---

[3] The cross-complaint also alleged that OWRD's order (precluding releases of stored water for non-Project purposes) was contrary to federal reserved rights of Klamath Basin tribes.  *See* U.S. Brief at 25.  Pursuant to a stipulation between the United States, the Yurok Tribe, and the Klamath Tribe, the district court bifurcated the action and resolved the ESA-related claims first.  *Id.* at 26-28.

Citing OWRD's withdrawal of the administrative order that prompted the federal cross-complaint, this Court directed the parties to address, at oral argument, the issue of Article III jurisdiction. *See* Order (June 11, 2024) (Dkt Entry #109). At argument, undersigned counsel advised the Court that there was still a "live controversy" between Reclamation and Appellants KWUA and KID on the scope of Reclamation's ESA obligations, and particularly, whether Reclamation possesses discretionary authority over Project water storage and diversions "as a whole" for purposes of ESA Section 7.[4]

### C.    2025 Guidance and Motion for Abeyance

On February 10, 2025, upon the change in administrations, current Secretary of the Interior Doug Burgum issued a memorandum "vacating Secretary Haaland's April 8, 2021, rescission" of the 2021 Guidance and directing the Solicitor's Office to "conduct a review of legal developments during the past four years and to issue [an] updated version[] of [the 2021 Guidance] at the earliest opportunity." See Att. A at 2 (Memo from Secretary Burgum) (Feb. 10, 2025). Citing Secretary Burgum's order, Federal Appellees moved this Court to hold the pending appeals in abeyance for 90 days, to enable Interior "to complete the review directed by Secretary Burgum" and to enable the parties to seek assistance from the Circuit Mediator to resolve

---

[4]*See* https://www.ca9.uscourts.gov/media/video/?20240612/23-15499/ (video recording of argument on June 12, 2024) at 15:16 to 18:11

the appeals and/or the underlying litigation as warranted. Federal Appellees' Motion to Hold Appeal in Abeyance at 4 (Feb. 13, 2025) (Dkt Entry #128). The Federal Appellees explained that a decision by Interior (following review) to reaffirm the 2021 Guidance could "resolve or substantially narrow the present dispute between Reclamation and Project water users," as relevant to the question of jurisdiction over the appeal. *See* Federal Appellees' Reply in Support of Motion to Hold Appeal in Abeyance at 3 (March 7, 2025) (Dkt Entry #135). This Court granted the motion.

On May 14, 2025, the Solicitor's Office completed the review directed by Secretary Burgum. *See* Att. B (letter from Gregory Zeran, Acting Solicitor, to Secretary Burgum) ("2025 Guidance"). The 2025 Guidance reaffirms the 2021 Guidance, rejects Reclamation's prior understanding that it has discretionary authority over Project operations as a whole, and directs Reclamation to "reassess its approach" to ESA consultation and Project operations, in accordance with its contractual obligations and the mandates of the Klamath Basin Water Agreement Support Act. Att. B at 9.

## STATUS REPORT

As just explained, Interior has adopted new guidance (the 2025 Guidance) that reaffirms the 2021 Guidance and directs Reclamation to narrow the scope of its ESA consultation and to alter Project operations accordingly, to account for nondiscretionary contractual obligations under water-supply contracts that preexisted the

ESA. Due to this change in legal position, there is no longer a concrete dispute between Federal Appellees and the defendants, and the Federal Appellees seek to withdraw the federal cross-complaint. Undersigned counsel conferred with counsel for all other parties with respect to the status of this case and the motions herein and the possibility of seeking the assistance of the Circuit Mediator in aid of a negotiated settlement. Due to a lack of consensus among the parties, the Federal Appellees do not seek a referral to mediation at the present time and instead ask the Court to resolve the appeals in accordance with the motions that follow.

## MOTION TO DISMISS FOR LACK OF JURISDICTION

**A.**     **The appeals should be dismissed as moot.**

    *1.*     *The federal cross-complaint is moot.*

Under Article III of the United States Constitution, "an actual controversy must be extant at all stages of [judicial] review." *Bain v. California Teachers Association*, 891 F.3d 1026, 1211 (9th Cir. 2018). This means that "the irreducible constitutional minimum of Article III standing"— an "injury in fact" that is "fairly traceable" to the challenged action, and redressable by the Court—must be satisfied "at each stage of the litigation, including on appeal." *Id.* In a case involving an action for declaratory judgment, the "test for mootness" is whether, following a material change in circumstance, a "substantial controversy" of "sufficient immediacy and reality" remains between parties "having adverse legal interests." *Gator.com Corp*

9

*v. L.L. Bean, Inc.*, 398 F.3d 1125, 1129 (9th Cir. 2005) (cleaned up); *see also Medim-mune, Inc. v. Genetech, Inc.*. 540 U.S. 118, 127 (2007) (citing Article III standard for declaratory judgment actions).

As noted by this Court, OWRD's withdrawal of the administrative order (challenged in the federal cross-complaint) raised doubts about the existence of a continuing Article III controversy in this case. *See* Order (June 11, 2024) (Dkt Entry #109). This is so because the withdrawal of the order eliminated the United States' claimed injury. But, at that time, a "genuine, live dispute" remained between "adverse parties" (Reclamation and the Project water users) over the scope of Reclamation's ESA obligations in operating the Klamath Project. *See Carney v. Adams*, 520 U.S. 53, 58 (2020); *see also Gator.com*, 398 F.3d at 1129. Accordingly, the Federal Appellees then advised the Court that Article III jurisdiction remained.

As a result of the 2025 Guidance, however, Reclamation and the Project water users no longer stand in the same adversarial posture. Interior has now rejected its prior approach to ESA consultation for the Klamath Project (the approach challenged by KWUA and KID) and has committed to a new "legal and operational paradigm in the Klamath Basin" that could eliminate or substantially narrow any dispute with Project users. *See* Att. B at 9. Accordingly, the Federal Appellees no longer seek the declaratory relief sought in the federal cross-complaint and move to

voluntarily dismiss the cross-complaint (pp. 18-19, *infra*), should the Court determine that the cross-complaint is not already moot. As this Court has stated, "[w]here a plaintiff no longer wishes . . . to engage in the activity concerning which it is seeking declaratory relief," there is no longer the "requisite case or controversy." *Gator.com*, 398 F.3d at 1129.

### 2. KWUA's counterclaim is moot (or not ripe).

Nor is there a live controversy on KWUA's counterclaim for declaratory relief against the United States. The counterclaim seeks a declaration that Reclamation lacks authority under the water-supply contracts or any applicable law to "curtail, or direct the curtailment of, [the] storage, diversion, and delivery of [Project] water . . . to benefit ESA-listed species," and thus lacks any "obligation under the ESA to release water from UKL . . . to benefit ESA-listed species." *See* 7-KWUA-ER_1720. Although the 2025 Guidance does not categorically declare that Reclamation has no responsibilities under the ESA with respect to Klamath Project operations, the 2025 Guidance reaffirms the 2021 Guidance and determines that Reclamation must "change the fundamental legal and operational paradigm in the Klamath Basin" (i.e., fundamentally alter ESA consultation and Project operations) to account for nondiscretionary obligations under water-supply contracts and the 2025 Klamath Basin Water Agreement Support Act. *See* Att. B at 4-7, 9. Until Reclamation completes that process, KWUA's suit for declaratory or injunctive relief against Reclamation

is premature.[5]  *See Association of American Medical Colleges v. United States*, 217 F.3d 770, 779 (9th Cir. 2000).

To be clear, KWUA and KID's legal interests are injured by the district court's declaratory judgment and such injury could be redressed if this Court reverses on the merits.  In such circumstances, an appellant ordinarily has standing to appeal. *See West Virginia v. EPA*, 597 U.S. 697, 719 (2022); *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 482-83 (9th Cir. 2011); *see also Service Employees International Union v. National Union of Healthcare Workers*, 598 F.3d 1061, 1068 (9th Cir. 2010) (Noting that the "test for mootness of an appeal" is generally whether this Court "can give the appellant any effective relief in the event that it decides the matter on the merits in [the appellant's] favor.")

Nonetheless, the prospect that a district court judgment may bind a party in future cases is not sufficient to save an appeal from dismissal on mootness grounds where the *only* available relief on appeal (or remand) is declaratory relief and there no longer is a concrete dispute on appeal between adverse parties.  *See Center for Biological Diversity v. Lohn*, 511 F.3d 960, 964-66 (9th Cir. 2007); *In re Burrell*, 415 F.3d 994, 998-99 (9th Cir. 2005).  The appropriate remedy—where the "actual

---

[5] KWUA's counterclaim against Reclamation did not challenge final agency action. *See* 7-KWUA-ER_1719-22.  Reclamation has since adopted a new operating plan, *see* p. 4, *supra*, which no party has challenged.

controversy" required for a grant of declaratory relief no longer exists on appeal, *see* 28 U.S.C. § 2201(a), *see also United States v. Schlenker*, 24 F.4th 1301, 1306 (9th Cir. 2022)—is to dismiss the appeal and to vacate the judgment to avoid unfair prejudice to the appellants. *Center for Biological Diversity*, 511 F.3d at 964-66 (applying rule of *United States v. Munsingwear*, 340 U.S. 36 (1950)); *Burrell*, 415 F.3d at 989-99 (same).

This case is distinguishable from cases where this Court has permitted an intervenor-defendant to defend an agency regulation on appeal where the agency did not appeal but instead acquiesced to a district court judgment vacating the regulation. *See Western Watersheds Project*, 632 F.3d at 482-83. In such cases, the underlying claim (challenge to the regulation) is not moot, so long as the plaintiff (appellee) retains standing to challenge the regulation and to seek affirmance on appeal. *See id.* at 483-85. Where an underlying claim for relief is not moot, there is no occasion for applying the vacatur rule to the district court's judgment. The intervenor-defendant's injury—from the judgment setting aside a regulation promulgated through a public rulemaking process—can only be redressed through an appeal by the intervenor-defendant on the merits. *See id.* at 482-83.

Here, the underlying claims are moot (or unripe) because OWRD withdrew its administrative order, because the 2025 Guidance altered Interior's position on the scope of its operational authorities and ESA obligations, and because Reclamation

has yet to implement the 2025 Guidance in a final agency action, thereby eliminating any concrete dispute between Reclamation and the Project water users.  Accordingly, the appeals should be dismissed due to the mootness of the underlying claims, with vacatur of the district court judgment under *Munsingwear*.  *See*  pp. 15-18, *infra.*

### 3. *The tribes may not maintain a suit for declaratory relief in the absence of the United States.*

The presence of the tribes as intervenor-plaintiffs on the federal cross-complaint does not alter the mootness analysis.  The tribes cannot maintain an action against KWUA and KID for a declaration of Reclamation's operational authorities and ESA obligations, without effectively suing Reclamation.  Any suit against Reclamation is premature (not ripe) until Reclamation completes a new ESA consultation or determines that consultation is not required and commits in a final agency action to a new operating plan.  *See Association of American Medical Colleges*, 217 F.3d at 779; *see also* 5 U.S.C. § 704 (authorizing review of "final agency action for which there is no other adequate remedy").  Until such time, the tribes will suffer no injury.  Reclamation will continue to operate the Klamath Project in accordance with the 2024-2029 operating plan, which the tribes have not challenged.

Indeed, even if the 2025 Guidance did not render the claims in this case technically moot, this Court should dismiss the appeals as prudentially moot or unripe due to "problems of prematurity and abstractness" that make the issues in this case

unfit for appellate review. *See In re Coleman*, 560 F.3d 1000, 1006 (9th Cir. 2009) (cleaned up). Under the Declaratory Judgment Act, "any Court of the United States . . . may declare the rights and legal relations of any interested party." 28 U.S.C. § 2201(a). But such relief is discretionary. *See Snodgrass v. Provident Life and Accident Ins. Co.*, 147 F.3d 1163, 1166-67 (9th Cir. 1998). Here, the issues on appeal are not fit for review because Reclamation has not yet issued a "formalized" decision (taken final action) under the 2025 Guidance with "concrete" effects on the "challenging parties." *See Natural Resources Defense Council v. Abraham*, 388 F.3d 701, 705 (9th Cir. 2004) (quoting *National Park Hospitality Association v. Dep't of the Interior*, 538 U.S. 803, 807–08 (2003)). And the tribes will suffer no legal hardship in the interim. *See id.* at 705-706 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

## B. The district court's judgment should be vacated.

As just explained, the pending appeals are moot because the underlying claims for declaratory relief are moot or unripe. This Court's "normal practice," when a case has become moot on appeal, is to vacate the district court judgment. *Teter v. Lopez*, 125 F.4th 1301, 1309 (9th Cir. 2025); *American Civil Liberties Union of Nevada v. Masto*, 670 F.3d 1046, 1065-66 (9th Cir. 2012) (citing *Munsingwear*, 340 U.S. at 41). This Court departs from the "default approach" only where an appellant has forfeited "the equitable remedy of vacatur" through voluntary action, which

caused the mootness. *Masto*, 670 F.3d at 1065 (citing *U.S. Bancorp Mortg. Co. v. Bonner Mall Partnership*, 513 U.S. 18, 24 (1994)). Here, mootness resulted from Interior's issuance of the 2025 Guidance, not from any voluntary action by appellants KWUA and KID.

It is true that vacatur of the district court judgment will benefit the United States by allowing Reclamation to implement the 2025 Guidance and otherwise operate the Klamath Project without the cloud of an adverse judgment restricting agency options. But Interior did not adopt the 2025 Guidance to evade judicial review of Klamath Project operations. The Federal Appellees ask this Court to dispose of the appeals through a determination of mootness and vacatur of the district court judgment, to enable Reclamation to make a new final determination on its ESA obligations and Project operations, which will be subject to challenge and judicial review in the ordinary course.

In this regard, it bears noting that the federal cross-complaint was somewhat unorthodox. The United States does not ordinarily bring declaratory judgment actions against interested persons for a determination of federal agency obligations. Judicial review of agency action taken under the ESA or alleged to violate the ESA ordinarily is obtained via ESA citizen suits, 16 U.S.C. § 1540(g), or in suits under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 704, 706; *see Bennett v. Spear*, 520 U.S. 154, 170 (1997). The United States filed the cross-complaint here

in response to the OWRD order (which interfered with the Federal Appellees prior ESA determinations), and because the usual forum for resolving the Project water users' complaints was absent, given this Court's determination, under Federal Rule 19, that such suits impacting tribal water rights may not proceed in the absence of a waiver of tribal sovereign immunity. *Klamath Irrigation District*, 48 F.4th at 948. Due to the change in circumstance under the 2025 Guidance, the Federal Appellees merely ask this Court to defer appellate review until Reclamation commits to a new course of action consistent with the 2025 Guidance and the relevant legal issues can be presented in a specific factual setting, consistent with the parties' current positions and alignment.

In any event, this Court cannot, consistent with equity, dismiss the appeals without vacating the district court judgment. That outcome would deprive KWUA and KID of their appeal rights, despite the absence of any procedural default. *Cf. U.S. Bancorp*, 513 U.S. at 392 (denying vacatur where appellant settled without preserving legal claims); *Munsingwear*, 340 U.S at 37-41 (giving district court judgment res judicata effect where United States "slept on its rights" by failing to seek vacatur after its appeal was rendered moot). Here, the circumstances that mooted the underlying claims (by rendering them unripe for review) also warrant vacatur of the district court judgment to preserve the parties' rights until the relevant issues are presented in a live controversy.

## (ALTERNATIVE) MOTION FOR CONTINUED STAY TO ENABLE A MOTION TO DISMISS THE FEDERAL CROSS-COMPLAINT

If this Court determines that the 2025 Guidance is insufficient to moot the claims at issue in the pending appeals, this Court should grant a further stay of the appeals to enable the Federal Appellees to file a motion in district court, under the procedures of Fed. R. App. P. 12.1(b), to reopen the judgment for purposes of voluntarily dismissing their cross-complaint.

Under Federal Rule of Procedure 41(a)(2), a plaintiff needs leave of court to voluntarily dismiss a claim in any case where an opposing party has answered or moved for summary judgment. *Id.* But voluntary dismissal is ordinarily granted "without prejudice" to renewal, so long as the defendant will not be prejudiced . . . or unfairly affected by [the] dismissal." *Stevedoring Services of America v. Armilla Intern. B.V.*, 889 F.2d 919, 921 (9th Cir. 1989). And even when a court determines that voluntary dismissal is proper only with prejudice, *see, e.g.*, *Smith v. Lenches*, 263 F.3d 972, 976 (9th Cir. 2001), the judgment of dismissal ordinarily would not extend to declaratory relief. Because a voluntary dismissal with prejudice, like a default judgment, is granted for reasons unrelated to the merits of a claim, a court has no occasion to determine the relevant legal issues, and the judgment ordinarily has no issue-preclusive effect (as opposed to claim preclusion). *See Pike v. Hester*, 891 F.3d 1131, 1139 (9th Cir. 2018). In short, a plaintiff generally may voluntarily withdraw a claim for declaratory relief without prejudice, at any stage of a case.

18

To be sure, once a district court issues a final judgment on a claim, the plaintiff's freedom to voluntarily dismiss diminishes. A direct appeal divests the district court of jurisdiction over the judgment. *Natural Resources Defense Council, Inc. v. Southwest Marine, Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001). And a plaintiff may not seek voluntary dismissal of a claim—in lieu of appeal—to avoid the consequences of an *adverse* judgment on that claim. *Cf. Bancorp Mortg. Co.*, 513 U.S. at 24.

But this Court may stay an appeal to allow the district court to issue an "indicative ruling" on a motion otherwise within the district court's jurisdiction and may remand to enable the court to grant such relief. *See* Fed. R. App. P. 12.1(b). Under Fed. R. Civ. P. 60(b)(6), the Federal Appellees may seek to reopen the judgment in this case for "any reason that justifies relief." *See* Fed. R. Civ. P. 60(b)(6). And the United States has substantial justification for its motion in this case. *Cf.* Fed. R. App. P. 12.1(b) (permitting remand to district court to hear a motion raising a "substantial issue").

Significantly, the United States is not seeking to voluntarily dismiss a claim it lost. The United States *prevailed* on its cross-complaint and KWUA and KID appealed, which rendered the outcome uncertain and placed the United States in the position of pursuing its claim for declaratory relief in this Court. Interior changed legal positions (through the 2025 Guidance) for legitimate reasons based on the

change in administrations while the litigation remained pending, and the United States should not be prevented from withdrawing its own affirmative claims in pending litigation, where doing so would not prejudice other parties.

Here, reopening the judgment to permit voluntary dismissal of the cross-complaint would not prejudice the defendants on the cross-complaint (KWUA, OWRD, and KID). And the tribes would suffer no "legal prejudice" (i.e., prejudice to "some legal interest, legal claim, or legal argument"), as ordinarily required for denying a dismissal motion. *See Westlands Water Dist. v. U.S.*, 100 F.3d 94, 97 (9th Cir. 1996). The Yurok Tribe's original complaint remains before the district court. Any party may ask the district court to impose terms on voluntary dismissal of the cross-complaint that preserve the parties' rights pending potential future litigation. *See* Fed. R. App. P. 41(a)(2). And the district court may reach the issues in the cross-complaint if presented in future litigation.

## CONCLUSION

For the foregoing reasons, the Federal Appellees respectfully ask this Court to dismiss the appeals and vacate the district court's judgment due to mootness (or lack of ripeness) of the underlying claims, or, alternatively, to further stay the appeals to enable the United States to file a motion in district court, under the procedures set out in Fed. R. App. 12.1, to reopen the judgment and dismiss the federal cross-complaint without prejudice.

Respectfully submitted,

ADAM R.F. GUFSTASON
*Acting Assistant Attorney General*

Of counsel:

/s/ *John L. Smeltzer*

LANCE C. WENGER
Solicitor's Office
U.S. Department of the Interior

KEVIN MCARDLE
JOHN L. SMELTZER
Environment & Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, DC  20044
(202) 305-0343
john.smeltzer@usdoj.gov

MEGAN J. WALLINE
Office of General Counsel
National Oceanic and
   Atmospheric Administration

May 14, 2025
D.J. No. 90-8-6-08304/1

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(C) because it contains **4,696** words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ *John L. Smeltzer*

JOHN L. SMELTZER
Counsel for Federal Appellees



February 10, 2025

Memorandum

To:          Solicitor

From:        Secretary

Subject:     Recission of April 2, 2021, Secretarial "Withdrawal of Klamath Project-Related
             Memoranda, Letters, and Analyses" and Examination of Legal Developments

In 2020, Secretary of the Interior David L. Bernhardt directed the Office of the Solicitor to
conduct a comprehensive analysis of the legal requirements for consultation pursuant to Section 7
of the Endangered Species Act, 16 U.S.C. 1536 et seq., pertaining to the Bureau of Reclamation's
operations in the Klamath Basin. In response, the Office of the Solicitor issued a series of
memoranda in late 2020 and early 2021, which analyzed this topic and established a framework to
harmonize the operations of the Klamath Project with the requirements of Federal and State law.
Simultaneously, Reclamation conducted a reassessment of Klamath Project operations to facilitate
compliance with the Endangered Species Act. Secretary Bernhardt further wrote two letters
which conveyed those memoranda and analyses and enunciated a vision for discussions with
stakeholders to correct imbalances within the Klamath Basin in accordance with the law.

Those memoranda and letters were:

- October 28, 2020, Memorandum from Carter L. Brown, Associate Solicitor – Division
  of Water Resources and Lance C. Wenger, Regional Solicitor – Pacific Southwest to
  Daniel H. Jorjani, Solicitor re: "An Updated Review of Legal Issues concerning the
  United States Bureau of Reclamation Operation of the Klamath Project" (Solicitor
  Jorjani signed and concurred on October 29, 2020).

- November 12, 2020, Letters from David Bernhardt to Paul Simmons, Klamath Water
  Users Association, and Nathan Rietmann, Rietmann Law PC, respectively, re:
  "Klamath Project Water Contracts and the Endangered Species Act."

- January 2021 Reassessment of U.S. Bureau of Reclamation Klamath Project
  Operations to Facilitate Compliance with Section 7(a)(2) of the Endangered Species
  Act.

- January 14, 2021, Memorandum from Solicitor to Secretary re: Analysis of Klamath
  Project contracts to determine discretionary authority in accordance with the
  November 12, 2020, Letter of the Secretary of the Interior.

- January 14, 2021, Memorandum from Solicitor to Secretary re: "Use of Water
  Previously Stored in Priority for Satisfaction of Downstream Rights."

- January 16, 2021, Letters from David Bernhardt to Paul Simmons, Klamath Water
  Users Association, and Nathan Rietmann, Rietmann Law PC, respectively, re:
  completion of analysis based on November 12, 2020, letter (enclosing January 14,

2021, memoranda and January 2021 reassessment).

On April 8, 2021, Secretary of the Interior Debra Haaland rescinded those memoranda, letters, and analyses by memorandum titled "Withdrawal of Klamath Project-Related Memoranda, Letters, and Analyses."

By this memorandum, I am vacating Secretary Haaland's April 8, 2021, rescission of those memoranda, letters, and analyses. I am further directing you to conduct a review of legal developments during the past four years and to issue updated versions of those documents at the earliest opportunity. This action is taken pursuant to the authority of Section 2 of Reorganization Plan No. 3 of 1950 (64 Stat. 1262) and other applicable authorities.

**From:**       Gregory Zerzan, Acting Solicitor

**Date:**       May 14, 2025

**Subject:**    **Klamath Updated Analysis of Endangered Species Act Obligations**

---

<u>**Background**</u>

For generations the federal government has made various commitments to the people and wildlife of the Klamath River basin. For the Indian tribes in the area, it made treaties and reserved lands, to help protect ancestral hunting and fishing rights as well as the ability to celebrate traditional ceremonial practices. For farmers and irrigators, it constructed the Klamath Irrigation Project and entered water-supply contracts to provide water to nourish their crops. Later, through the Endangered Species Act, the United States made commitments to protect the various wildlife and aquatic species in the region from threatened extinction. These multiple and at times conflicting commitments have proven difficult to keep, leading to conflict and litigation that has spanned decades.

The Department of the Interior's efforts to balance these competing interests has in recent times borne some fruit. To fulfill ancestral fishing rights, the Department has launched a hatchery program to supplement declining wild populations. However, questions regarding water rights and the protection of species have continued to vex the federal government. Thankfully, in recent times the U.S. Congress has passed legislation that helps to clarify how these various claims are to be managed and thus informs the Department's approach.

On February 10, 2025, the Secretary of the Interior rescinded the April 2021, withdrawal of certain analyses of the discretionary authority possessed by the Bureau of Reclamation for Endangered Species Act ("ESA") purposes and permissible uses of stored water. The Secretary further directed the Solicitor to update the reinstated analyses in light of legal developments since January 2021. This memo explains how the Department is to proceed with fulfilling the federal government's commitments. While this analysis directs the Department to manage resources in the Klamath River basin in the most fair and equitable manner possible consistent with the law, it does not in any way diminish the United States' trust authorities and responsibilities to local Tribes nor the valid and longstanding legal rights of irrigators. While this memo addresses how the Department will approach these at-times conflicting commitments, consistent with recent law and judicial precedent, it does not resolve them. It will continue to be the duty of the United States to attempt to fulfill all of the commitments it has made to its citizens.

The issues of discretionary authority and availability of stored water for downstream purposes are distinct, though interrelated, and are addressed separately below.

<u>**Discretionary Authority**</u>

On October 31, 2020, the Solicitor's Office completed an analysis of Reclamation's obligations to consult under Section 7 of the Endangered Species Act, 16 U.S.C. 1536, on its operations of the Klamath Project. On November 20, 2020, the Secretary endorsed this analysis and stated that its conclusions mandated a reassessment of the environmental baseline for the Project and a

determination of what portion of Project water is segregable and, thus, set aside solely for irrigation and unavailable for other uses. ("2020 Analysis").

In response to the direction of the 2020 Analysis, on January 14, 2021, the Solicitor provided a memorandum to the Secretary titled "Analysis of Klamath Project contracts to determine discretionary authority in accordance with the November 12, 2020, Letter of the Secretary of the Interior ("Discretion Analysis"). As stated in the Discretion Analysis, "if a contract provides Reclamation with discretionary authority to take action that could benefit species listed under the ESA, Reclamation must consult under ESA Section 7 on the impacts of that action. However, if a contract does not provide discretionary authority, Reclamation must include the impacts of the action in the environmental baseline of the consultation."

The Discretion Analysis was intended to implement direction from the Secretary to assess the degree of discretionary authority possessed by Reclamation and inform Reclamation as it implemented its January 2021 Reassessment of Klamath Project operations. The Discretion Analysis focuses on provisions in contracts between Reclamation and Klamath Project irrigators that affect the degree of discretionary authority possessed by Reclamation to take action that could benefit ESA listed species to determine whether specific provisions provide Reclamation with sufficient discretionary authority to engage in ESA Section 7 consultation.

Since 2021, there have been several major legal developments that impact the 2020 Analysis and Discretion Analysis, as discussed below.

Klamath Basin Water Agreement Support Act, Pub. L. No. 118-246

On January 4, 2025, the Klamath Basin Water Agreement Support Act ("Act") was enacted into law. This statute contains general catch-all provisions which respectively provide that

> "(1) Compliance. – In implementing the amendments made by this section, the Secretary of the Interior shall comply with …
>
> > (B) the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.); and (C) all other applicable laws" and
>
> "(2) Effect. – None of the amendments made by this section –
>
> > (A) modify any authority or obligation of the United States with respect to any Tribal trust or treaty obligation of the United States;
> > (B) create or determine any water right; or
> > (C) affect any water right or water right claim in existence on the date of enactment of this Act."

The statute also includes the following specific mandate:

> "(g) Keno and Link River Dams. – The Secretary of the Interior shall comply with the terms of the agreement entitled '2016 Klamath Power and Facilities Agreement' ('Agreement'), including Attachment A to the Agreement."

2

Attachment A to the Agreement in turn provides in relevant part that "(Reclamation) shall comply with the following provisions related to Link River Dam on Upper Klamath Lake and Keno Dam and Keno development." Section 1 of the Agreement then requires that "Reclamation shall operate Link River Dam to provide water for diversion for the Klamath Reclamation Project, and consistent with existing contracts between Klamath Reclamation Project contractors and Reclamation and for flood control and subject to Applicable Law."

The statutory provisions and the Agreement incorporated by reference make clear that the Act does not affect the general applicability of the ESA or the rights of the tribes and other water rights holders. The Act also does not disturb the general applicability limitation on ESA Section 7, which makes clear that Section 7 only applies when an agency retains discretionary authority to act to benefit listed species. *See National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 669 (2007) ("*Home Builders*") ("[ESA Section] 7(a)(2)'s no jeopardy duty covers only discretionary agency actions[.]").

The Act shows a clear and specific mandate from Congress to Reclamation to (1) operate the Project for the purposes of providing water for irrigation and conducting flood control and (2) provide water for the Project in accordance with the contracts between Reclamation and the irrigators. The Act uses "shall" to require Reclamation to comply with the Agreement, specifically including reference to Attachment A. Attachment A to the Agreement then uses "shall" in two places: first to require Reclamation to comply with its provision regarding operation of Link River Dam, then again in the provision specific to Link River Dam to require Reclamation to "operate Link River Dam to provide water for diversion for the Klamath Reclamation Project, and consistent with existing contracts[.]"

These statutory mandates clearly direct Reclamation to operate Link River Dam, the critical facility for the Klamath Project, for water diversion to the Project consistent with existing contracts and flood control. The unequivocal language does not provide Reclamation the discretion to divert water for other uses if to the detriment of the Klamath Reclamation Project contractors. For example, Reclamation cannot operate the Project *both* to provide sufficient water to fully meet contractual requirements *and* to meet requirements imposed by the Biological Opinions prepared under ESA Section 7 if doing so would impair the mandated purposes of the Act.

Past examples of Reclamation trying to manage multiple demands for water are illustrative of the clarity provided by the Act. In 2021, Reclamation prohibited water diversions for irrigation because the Biological Opinions required that all but a de minimis amount of water be used for ESA purposes. In 2022, Reclamation was found to have violated the ESA by providing a small Project allocation.[1] The attempt to balance competing interests is now clearly resolved in favor of the Project contractors. Under *Home Builders*, if Reclamation cannot both comply with the specific mandates of the Act and take action – provide water to benefit ESA listed species – then ESA Section 7 does not apply. 551 U.S. at 669.

To the degree that ESA Section 7 has any application to the Klamath Project, it is constrained by the contracts themselves (see below re: *NRDC v. Haaland*) and the 2025 Act's mandate that contract terms control. Reclamation must provide water for diversion by the Project consistent with the contracts. If a particular contract is non-discretionary, Reclamation lacks the

---

[1] *Klamath Tribes v. United States Bureau of Reclamation*, 2023 U.S. Dist. LEXIS 198398 (D. Ore. 2023).

discretionary authority to alter its performance under that contract in order to benefit listed species. Having no discretionary authority, Reclamation lacks the duty to consult under ESA Section 7 on the effects of that contract and must include the effects of that contract in the environmental baseline.

Language in the preceding portions of the Act does not change this analysis. In subsection (d) "Restoration Activities", the Act provides that "[t]he Secretary may" carry out projects which benefit fish and aquatic resources and restore habitats. Use of the word "may" makes clear that this statutory provision is permissive, rather than mandatory. In contrast, Congress' direction that the Secretary "shall" operate Link River Dam according to the terms of the '2016 Klamath Power and Facilities Agreement' establishes that water delivery for irrigation purposes and flood control are the primary purposes of the Project. Subsection (d) is therefore properly read as empowering the Secretary to use the Klamath Project for the designated other purposes *only if* those other purposes do not impose upon the rights of the Klamath contractors.

Subsection "(e) Goals" modifies subsection (d) described above, as well as Section (2)(b) in the underlying Klamath Basin Water Supply Enhancement Act, to enunciate the goals of the programs authorized by (b) and (d). Nothing in subsection (e) or in the subsections that it modifies establishes a mandatory duty to take action to benefit wildlife.

"If the statutory language is clear, that is the end of our inquiry." *A-1 Ambulance Service, Inc. v. California*, 202 F.3d 1238, 1244 (9th Cir. 2000). The Act states unequivocally that the Secretary of the Interior "shall comply with the terms of" the Agreement and Attachment A of the '2016 Klamath Power and Facilities Agreement'. Attachment A requires Reclamation to operate Link River Dam to deliver water for irrigation purposes and to adhere to its contracts with Project irrigators. Under *Home Builders*, those statutory provisions deprive Reclamation of the discretion needed to trigger ESA Section 7.

### *Natural Resources Defense Council v. Haaland*

If Reclamation must engage in ESA Section 7 consultation on portions of Klamath Project operations, consultation must adhere to the Ninth Circuit decision in *NRDC v. Haaland*, 102 F.4th 1045 (9th Cir. 2024). This case is the latest relevant development in a long line of litigation challenging Reclamation's Section 7 consultations on the implementation of the executed water delivery contracts with a group of irrigators (the Sacramento River Settlement Contractors) in California's Sacramento Valley on ESA-listed fish species. *Id.* at 1056 – 1063. Plaintiffs contended that the contracts between Reclamation and these irrigators provided Reclamation with sufficient discretionary authority to take actions that could benefit Chinook salmon, and that consultation was therefore required. *Id.* at 1062. This contention was rejected in *NRDC v. Norton*, 236 F. Supp. 3d 1198 (E.D. Cal. 2017), in which the District Court conducted a detailed examination of the contract terms and found that they did not provide Reclamation with sufficient discretion to implement the contracts in a manner that would benefit Chinook salmon. *NRDC v. Haaland*, 102 F.4th at 1063. Notably, the 2020 Analysis and Discretion Analysis rely heavily on *NRDC v. Norton* and its interpretation of contractual provisions similar to those found in Klamath Project contracts. 2020 Analysis, 3, 9; Discretion Analysis, 3 – 5.

In *NRDC v. Haaland*, the Ninth Circuit rejected Plaintiffs' assertions and upheld *NRDC v. Norton*. It first cited *Environmental Protection Information Center v. Simpson Timber Co.* for the holding that "once the agency has entered into a legally binding agreement, it has such discretion

4

[to benefit ESA-listed species] only to the extent permitted by the agreement's terms." 255 F.3d 1073, 1082 (9th Cir. 2001) (*EPIC*). It then cited *Sierra Club v. Babbitt* for the holding that "Reclamation retained discretion under the Settlement Contracts only to the extent the contracts themselves give it the power to 'implement measures that inure to the benefit of the protected species.'" 65 F.3d 1502, 1509 (9th Cir. 1995). These are two of the main cases relied upon by the 2020 Analysis for the same holdings.

*NRDC v. Haaland* then examined several provisions in the Settlement Contracts at issue to determine whether they provided Reclamation with sufficient discretionary authority to require consultation. Three of those provisions are especially relevant to the Klamath Project contracts considered in the Discretion Analysis.

The first two relevant provisions of the Settlement Contracts are Articles 3(i) and 3(h), which waive liability for the United States for shortages of water because of legal obligations and "errors in operation, drought, or unavoidable causes," respectively. *NRDC v. Haaland*, 102 F.4th at 1075 – 1076. Plaintiffs had argued that "Article 3(i) allows Reclamation to reduce the water it provides to the Settlement Contractors if necessary to meet legal obligations." *Id.* at 1075. The Ninth Circuit disagreed, stating "this provision does not give Reclamation discretion to alter the Settlement Contract to benefit a listed species. Rather, this is a force majeure clause that limits Reclamation's liability for damages in the event legal obligations are imposed on Reclamation that require it to breach the Settlement Contracts by reducing the diversion of water." *Id.* The Court reached a similar conclusion after examining Article 3(h), finding that it was simply a limitation of Reclamation's liability, not a license for Reclamation to "alter the amount of water diverted at its discretion." *Id.* at 1076. The Court then drove home the point, citing *Home Builders* for the holding that "[t]he duty to comply with mandatory legal obligations is not a source of discretion." 551 U.S. at 669. *NRDC v. Haaland*, 102 F.4th at 1076. The analyses of liability waivers in Klamath Project contracts in the 2020 Analysis and Discretion Analysis comport with the analysis in *NRDC v. Haaland*: the Klamath Project liability waivers have similar terms and must, therefore, be read as force majeure clauses which do not impart sufficient discretion to allow Reclamation to take action to benefit ESA-listed species. 2020 Analysis, 7; Discretion Analysis, 2 – 3.

The third relevant contractual provision analyzed in *NRDC v. Haaland* is Article 9(a), which provided that the contract constituted the full agreement between the parties as to quantities of water that could be diverted for beneficial use. 102 F.4th at 1076 – 1077. Plaintiffs argued that the reference to beneficial use imparted discretionary authority to Reclamation to determine what amount of water was reasonable for beneficial use. *Id.* The Court disagreed, finding that the provision simply confirmed the quantity and allocation of water without giving Reclamation the discretion to make adjustments. This is consistent with the conclusions in the 2020 Analysis and Discretion Analysis that portions of the Klamath contracts tying the quantity and timing of water delivered to beneficial use do not provide Reclamation with discretionary authority to take actions that could benefit listed species and therefore do not trigger a requirement to consult.

<u>Other cases and legal positions are subject to the Klamath Basin Water Agreement Support Act and *NRDC v. Haaland.*</u>

Since 2021, several cases have addressed application of the ESA to the Klamath Project.[2] However, all but one of these cases pre-date enactment of the Klamath Basin Water Agreement Support Act and *NRDC v. Haaland.* Their applicability to questions regarding the extent of Reclamation's discretionary authority for ESA Section 7 purposes is limited, at best, in light of these two developments.[3] Furthermore, all but one of these cases omit the searching inquiry into contractual terms necessitated by the Klamath Basin Water Agreement Support Act and *NRDC v. Haaland.*[4]

Of special importance is the excessive reliance that all of the Klamath cases decided after 2021 place upon *Klamath Water Users Protective Association v. Patterson*, 204 F.3d 1206 (9th Cir. 1999) (*Patterson*), or its progeny or, directly or indirectly, on a 1995 vintage opinion from the Regional Solicitor, Pacific Southwest Region. *Patterson* found that Reclamation had discretionary authority to operate Link River Dam for ESA purposes and that the ESA overrides the water rights of the irrigators. 204 F.3d at 1213. The limitations of *Patterson* were noted in the 2020 Analysis, which explained that *Patterson* pre-dates the Supreme Court's decision in *Home Builders* and thus "does not perform the necessary searching inquiry into the extent of Reclamation's discretion at the Klamath Project, nor does it conduct a detailed analysis of the contracts between Reclamation and the irrigators." 2020 Analysis, 8. These limitations in *Patterson* changed to fundamental flaws with enactment of the 2025 Act and its specific mandates that Reclamation operate the Project for irrigation purposes and adhere to the contracts. *Patterson*, therefore, does not define the parameters of ESA Section 7's applicability, nor does it determine whether certain aspects of Project operations are non-discretionary and whose effects must, therefore, be included in the environmental baseline. As the 2020 Analysis notes, *Patterson* stands for the simple proposition that Reclamation must meet the requirements of the ESA.[5] The mandates of the 2025 Act and the carefully reasoned decision in *NRDC v. Haaland* drive home the point that this simple proposition is all that can be read into *Patterson*.

The 1995 Regional Solicitor opinion[6] was cited extensively in *KID v. Reclamation*, for a description of various aspects of Klamath Project operations and Reclamation's asserted ESA and other obligations in the Basin. 48 F.4th 934, 939 - 941 (9th Cir. 2022). This opinion does not analyze the issue of discretionary authority. Its lack of relevant analysis is not surprising given

---

[2] *Yurok Tribe v. Bureau of Reclamation*, 19-cv-04405-WHO (N.D. Cal. 2023), appeal Nos. 23-15499 and 23-15521 pending; *United States v. Klamath Drainage District*, 2023 U.S. Dist. LEXIS 16171 (D. Ore. 2023), *affirmed* 2025 U.S. App. LEXIS 1347 (9th Cir. 2025), petition for en banc review pending (*U.S. v. KDD*); *Klamath Irrigation District v. U.S. Bureau of Reclamation*, 48 F.4th 934 (9th Cir. 2022) (*KID v. Reclamation*); *KID v. U.S. District Court*, 69 F.4th 934 (9th Cir. 2023); *Klamath Tribes v. Bureau of Reclamation*, 2023 U.S. Dist. LEXIS 198400 (D. Ore. 2023); and *Klamath Tribes v. Bureau of Reclamation*, 2023 U.S. Dist. LEXIS 198398 (D. Ore. 2023). The Ninth Circuit decision in *U.S. v. KDD* is the sole case decided after enactment of the 2025 Act and, since it does not address the Act, does not affect the analysis of this memorandum.

[3] It should be noted that the regulatory definitions of "effects of the action" and "environmental baseline" were subject to minor clarifying changes in 2024, however these changes do not impact this analysis.

[4] The exception is *U.S. v. KDD*, 2023 U.S. Dist. LEXIS 16171.

[5] To the degree that the 2020 Analysis stated that *Patterson* could be read to require a duty to consult on Project operations as a whole, that statement must be reassessed in light the 2025 Act and this memorandum.

[6] <u>Certain Legal Rights and Obligations Related to the U.S. Bureau of Reclamation, Klamath Project for Use in Preparation of the Klamath Project Operations Plan (KPOP)</u>; Regional Solicitor, Pacific Southwest Region; July 25, 1995.

that this opinion is dated July 25, 1995, and thus pre-dates *Sierra Club* and subsequent caselaw establishing the need to determine whether contractual provisions restrain Reclamation's discretionary authority. Its conclusions regarding Reclamation's ESA Section 7 obligations are inaccurate, as noted in the 2020 Analysis and driven home by the 2025 Act and *NRDC v. Haaland.* For these reasons, the 1995 Regional Solicitor opinion is hereby withdrawn.

## Stored Water

Use of stored water to satisfy downstream tribal needs was the subject of a memorandum titled "Use of Water Previously Stored in Priority for Satisfaction of Downstream Rights" and issued on January 14, 2021 ("Stored Water Analysis").[7] It concluded that:

> Reclamation must determine how best to satisfy its trust obligation to the Yurok and Hoopa Tribes, who hold senior, but unquantified, rights on the Klamath River. Reclamation satisfies that trust obligation by providing water that would be available in the tribal fishery, absent the project. Project storage, then, would be delivered pursuant to Reclamation's other obligations, and most importantly, the [2014 Amended and Corrected Findings of Fact of the Final Order of Determination in the Klamath Basin Adjudication ("ACFFOD")]. Therefore, water previously stored in priority would not be available to draw upon to supplement the natural flow of the river.

Stored Water Analysis, 5. Since issuance of this memorandum, there have been only a limited number of legal developments which affect its conclusion and underlying analyses.

### Klamath Basin Water Agreement Support Act, Pub. L. No. 118-246.

As discussed above, the Klamath Basin Water Agreement Support Act included a general provision specifying that none of its provisions modify the tribal trust or treaty obligations of the United States or affect any water right, as well as a specific mandate that Reclamation operate the Project to provide water for the Project irrigators pursuant to their contracts. These provisions provide several key inputs to the Stored Water Analysis. First, Congress clearly conveyed its intent for the Project to be operated to provide water for irrigation consistent with the contracts by using the word "shall" to create a specific mandate to comply with the 2016 Klamath Power and Facilities Agreement and Attachment A to the Agreement. In the general provision, Congress highlighted the importance of tribal and other water rights, which necessarily include the right of Reclamation to store water in Upper Klamath Lake and the right of the irrigators to use that stored water as affirmed in the ACFFOD.[8] However, Congress did not specifically create an obligation to use stored water to satisfy downstream tribal rights. As discussed below, the lack of a specific Congressional mandate to use stored water to satisfy downstream tribal rights is critical.

Enactment itself of this statute is relevant to the stored water issue. The 2025 Act is the latest in a line of statutory provisions which specifically authorize and appropriate funds for different facets of Klamath Project facilities and operations. *See, e.g.*, Pub. L. 106-498, 114 Stat. 2221; Pub. L. 115-270, Sec. 4308; Pub. L. 116-191, Sec. 1, 134 Stat. 976. The Klamath Project was

---

[7] While the 2020 Analysis briefly addressed the ACFFOD and stored water issue, it did not analyze Reclamation's authority to use stored water for downstream purpose and is therefore of limited utility on this issue.

[8] ACFFOD Claim KA 294 provides that the United States has a right to store 486,828 acre/feet of water on behalf of Klamath Project irrigators and that the irrigators have a right to use that amount.

7

created to allow irrigation using water stored behind Link River Dam. As the Supreme Court explained in *Nebraska v. Wyoming*, "if storage water is not segregated, those who have not contracted for the storage supply will receive at the expense of those who have contracted for it a substantial increment to the natural flow supply…" 325 U.S. 589, 639-640 (1945). Enactment of these statutes, including as recently as 2025, show clear Congressional intent for the Project to continue to operate for irrigation purposes using stored water.

Read together, these statutory provisions and enactment of the Act itself support the conclusion of the Stored Water Analysis: the United States has a general trust obligation to the downstream tribes, but a specific duty to operate the Project to provide water to the Project irrigators in accordance with their water rights and contracts. The United States meets these trust obligations by providing natural flow to the downstream tribes, while stored water is reserved for use by the Project irrigators.

Additional Judicial Decisions

The most instructive judicial decision is that of the Supreme Court in *Arizona v. Navajo Nation*, 599 U.S. 555, 561 (2023). This case involved the nature and extent of the United States' obligations to take affirmative measures to provide water to the Navajo Nation. In an especially salient holding, the court stated that "[t]he Federal Government owes judicially enforceable duties to a tribe 'only to the extent it expressly accepts those responsibilities.'" *Arizona v. Navajo Nation*, 599 U.S. at 564 *citing United States v. Jicarilla Apache Nation*, 564 U.S. 162, 177 (2011). While Congress has expressed its intent to protect the rights of downstream tribes in the 2025 Act, it did not define those rights, nor did it expressly accept a duty to provide stored water to satisfy those rights. Without such an express acceptance, there is no duty to use water stored in Upper Klamath Lake to satisfy downstream tribal rights.

None of the Klamath specific court decisions explicitly state that the United States has an obligation to use stored water for the benefit of downstream tribes.[9] Relevant here is the Supreme Court's admonition that "[w]hether the Government has expressly accepted such obligations 'must train on specific rights-creating or duty-imposing' language in a treaty, statute, or regulation. *Navajo Nation*, 537 U.S., at 506. That requirement follows from the separation of powers principles. As this Court recognized in *Jicarilla*, Congress and the President exercise the 'sovereign function' of organizing and managing the 'Indian trust relationship.' 564 U.S., at 175." *Arizona v. Navajo Nation*, 599 U.S. at 564. Given the Supreme Court's words and the lack of a statutory mandate to use stored water to satisfy tribal rights, it would be unwarranted to read into any of the existing judicial decisions an enforceable duty to use stored water in a manner contrary to that addressed in the Stored Water Analysis.

Previous Office of the Solicitor Analysis

On March 21, 2024, a Regional Solicitor provided a memorandum to the Bureau of Reclamation Regional Director titled "Bureau of Reclamation Authority to Release Water from Klamath Project for Yurok Boat Dance Ceremony." ("Boat Dance Memorandum"). This memorandum was issued as part of a settlement of litigation regarding the authority of Reclamation to provide water for the biennial Boat Dance conducted by the Yurok Tribe. The Department acknowledges

---

[9] See Footnote 1 supra for a list of cases decided since 2021 and *KID v. U.S. District Court*, 69 F.4th 934 (9th Cir. 2023).

its general trust obligations to the Yurok and other tribes, including the general obligation to support important tribal religious and cultural practices such as the Boat Dance. However, the Boat Dance Memorandum did not identify a statute or similar mandate which specifically establishes a right to use stored water, as required under *Arizona v. Navajo Nation*. The Boat Dance Memorandum must be read to conform to the analysis in this memorandum and the Stored Water Analysis. During each year that the Department is required to provide Boat Dance flows to the Yurok Tribe, the Department will need to engage in a specific analysis to determine how to provide Boat Dance flows while remaining consistent with this memorandum and the Stored Water Analysis.

## Conclusions and follow-on actions

Secretary Burgum directed the Office of the Solicitor to review legal developments during the last four years and issue updated versions of the 2020 Analysis, Discretion Analysis, Stored Water Analysis, and other specified documents. As discussed above, the major legal developments since 2021 are consistent with those analyses. Those analyses remain valid, as updated and modified by this memorandum.

The Klamath Basin Water Agreement Support Act created specific mandates for Reclamation to operate the Project to deliver water for irrigation and flood control and act consistently with existing contracts. If Reclamation cannot simultaneously obey these mandates and comply with ESA Section 7, Reclamation does not have a duty to comply with Section 7. *Home Builders*, 551 U.S. at 669. These mandates thus change the fundamental legal and operational paradigm in the Klamath Basin, which was predicated on the understanding of ESA application embodied in *Patterson* and the 1995 Regional Solicitor's opinion. This shift requires Reclamation, in coordination with the Office of the Solicitor, to reassess its approach to Project operations and align those operations with the requirements of the 2025 Act.

Given the fundamental changes in the legal landscape created by enactment of the 2025 Act and the decision in *NRDC v. Haaland*, the Office of the Solicitor will work with the United States Department of Justice to encourage its approach be consistent with this memorandum.