**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| YUROK TRIBE; PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS; INSTITUTE FOR FISHERIES RESOURCES; HOOPA VALLEY TRIBE, | No. 23-15499<br><br>D.C. No. 3:19-cv-04405-WHO |
| *Plaintiffs-Appellees*, | OPINION |
| v. | |
| U.S. BUREAU OF RECLAMATION, | |
| *Defendant-counter-claimant-cross-claimant-Appellee*, | |
| NATIONAL MARINE FISHERIES SERVICE, | |
| *Defendant-Appellee*, | |
| v. | |
| KLAMATH WATER USERS ASSOCIATION, | |
| *Defendant-counter-claimant-cross-claimant-Appellant*, | |

KLAMATH TRIBES; KLAMATH
IRRIGATION DISTRICT,

>*Intervenor-Defendants-*
>*Appellees*,

  v.

OREGON WATER RESOURCES
DEPARTMENT,

>*Cross-claim-defendant-*
>*Appellee*.

---

YUROK TRIBE; PACIFIC COAST
FEDERATION OF FISHERMEN'S
ASSOCIATIONS; INSTITUTE FOR
FISHERIES RESOURCES; HOOPA
VALLEY TRIBE,

>*Plaintiffs-Appellees*,

  v.

U.S. BUREAU OF RECLAMATION;
KLAMATH WATER USERS
ASSOCIATION,

>*Defendants-counter-*
>*claimants-cross-claimants-*
>*Appellees*,

No. 23-15521

D.C. No. 3:19-cv-
04405-WHO

NATIONAL MARINE FISHERIES SERVICE,

>*Defendant-Appellee*,

KLAMATH TRIBES,

>*Intervenor-Defendant-Appellee*,

> v.

KLAMATH IRRIGATION DISTRICT,

>*Intervenor-Defendant-Appellant*,

> v.

OREGON WATER RESOURCES DEPARTMENT,

>*Cross-claim-defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of California
William Horsley Orrick, District Judge, Presiding

Argued and Submitted June 12, 2024
Submission Vacated October 24, 2024
Resubmitted June 17, 2026
San Francisco, California

Filed June 17, 2026

Before:  Mary M. Schroeder, Ronald M. Gould, and Ryan
D. Nelson, Circuit Judges.

Opinion by Judge Gould;
Dissent by Judge R. Nelson

## SUMMARY[*]

### Environmental Law

The panel affirmed the district court's holding that the Endangered Species Act ("ESA") applies to the Bureau of Reclamation's operation of the Klamath Project, a very large water management initiative in Northern California and Southern Oregon that provides water for irrigation and for wildlife refuges.

In response to the listing of two endangered species of suckers, and consecutive critically dry years in the Klamath Basin, the Bureau began to consult with the National Marine Fisheries Service and the U.S. Fish and Wildlife Service.  The result of the most recent consultations required the Bureau to maintain water levels in Upper Klamath Lake and to provide minimum stream flows in the Klamath River.

Appellants, the Klamath Irrigation District ("KID") and the Klamath Water Users Association, argued that the

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

district court erred in determining that the ESA applied to the Bureau of Reclamation's operation of the Klamath Project, allowing releases from Upper Klamath Lake for ESA compliance purposes.

The panel held that Section 7(a)(2) of the ESA—which requires all federal agencies to engage in consultation to "insure that any action authorized, funded, or carried out by such agency ( . . . an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species"—applies to the Bureau's operations related to the Klamath Project. *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206 (9th Cir. 1999), continues to govern as controlling precedent for Klamath Basin litigation.

The panel further held that the district court's decision was not a "judicial taking" of KID's water rights because determining whether the ESA applied to the Klamath Project is not an adjudication of water rights.

Finally, the panel held that the district court had jurisdiction to decide the federal appellees' crossclaim seeking to confirm the Bureau of Reclamation's authority to operate the Klamath Project in compliance with the ESA because the doctrines of prior exclusive jurisdiction and *Colorado River* abstention did not apply.

Judge R. Nelson dissented. He agreed with the majority's analysis of the judicial taking and *Colorado River* abstention issues, but he would hold that ESA § 7's obligations are not triggered by the contractual obligations in this case. Under *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007), and *National Resources Defense Council v. Haaland*, 102 F.4th 1045 (9th

Cir. 2024), the generalized holding in *Patterson* that the ESA applies to the Klamath Project is no longer good law. He would hold that no statutory provision or contract provided agency discretion sufficient to trigger the ESA.

---

**COUNSEL**

Patti A. Goldman (argued) and Kristen L. Boyles, Earthjustice, Seattle, Washington; Anna K. Stimmel, Earthjustice, San Francisco, California; Amy C. Cordalis, Ridges to Riffles Indigenous Conservation, Ashland, Oregon; Thomas P. Schlosser and Thane D. Somerville, Morisset Schlosser Jozwiak & Somerville, Seattle, Washington; for Plaintiffs-Appellees.

John L. Smeltzer (argued), Kevin McCardle, Robert P. Williams, Kaitlyn Poirier, and Thomas K. Snodgrass, Attorneys, Environment & Natural Resources Division; Todd Kim, Assistant Attorney General; United States Department of Justice, Washington, D.C.; Megan J. Walline, Office of General Counsel, National Oceanic and Atmospheric Administration; Washington, D.C.; Lance C. Wenger, Solicitor's Office, United States Department of the Interior, Washington, D.C.; Brittany K. Johnston (argued) and Paul S. Simmons, Somach Simmons & Dunn, Sacramento, California; Maximilian C. Bricker, Somach Simmons & Dunn, Boulder, Colorado; for Defendant-Appellee and Defendants-counter-claimant-cross-claimant-Appellants.

Nathan R. Rietmann (argued), Rietmann & Kim LLP, Salem, Oregon; Jeremiah D. Weiner (argued), Rosette LLP, Sacramento, California; John P. Kinsey and Nicolas R.

Cardella, Wanger Jones Helsley PC, Fresno, California; for Intervenor-Defendants-Appellees.

Denise G. Fjordbeck and Carson L. Whitehead, Assistant Attorneys General; Benjamin Gutman, Solicitor General; Ellen F. Rosenblum, Attorney General; Oregon Office of the Attorney General, Salem, Oregon; for Cross-claim-defendant-Appellee.

David E. Filippi and Merissa A. Moeller, Stoel Rives LLP, Portland, Oregon; Wade C. Foster, Stoel Rives LLP, Boise, Idaho; Norman M. Semanko, Parsons Behle & Lahtimer, Boise, Idaho; Paul L. Arrington, Idaho Waters, Boise, Idaho; Wade Noble and Meghan Scott, Noble Law Office, Yuma, Arizona; Lawrence E. Martin, Halverson Northwest Law Group, Yakima, Washington; for Amici Curiae Oregon Water Resources Congress, National Water Resources Association, Oregon Farm Bureau Federation, Family Farm Alliance, Idaho Water Users Association, Agribusiness and Water Council of Arizona, and Washington State Water Resources Association.

Meredith E. Nikkel, Samuel Bivins, and Nicolas Chapman, Downey Brand LLP, Sacramento, California, for Amici Curiae Association of California Water Agencies and California Farm Bureau Federation.

Paul S. Weiland and Brian Ferrasci-O'Malley, Nossaman LLP, Irvine, California; Marcus M. Henderson, Counsel, Klamath Falls, Oregon; Margaret E. Long, Prentice Long PC, Redding, California; for Amici Curiae Siskiyou, Modoc, and Klamath Counties.

Tara Mueller and Daniel M. Fuchs, Deputy Attorneys General; Tracy L. Winsor, Senior Assistant Attorney General; Rob Bonta, California Attorney General; Office of

the California Attorney General, Oakland, California; for Amicus Curiae State of California.

**OPINION**

GOULD, Circuit Judge:

In this case, the most recent in a litany of cases regarding water distribution in the Klamath Basin, we must decide whether the Endangered Species Act ("ESA") applies to the Bureau of Reclamation's operation of the Klamath River Basin Project ("Klamath Project"), a very large water management initiative in Northern California and Southern Oregon that provides water for irrigation and for wildlife refuges. We hold that it does.

The Klamath Project was authorized in 1905 under the Bureau of Reclamation's authority under the Reclamation Act and it distributes water throughout the Klamath Basin. Upper Klamath Lake is the major storage reservoir of the project and also provides habitat for two endangered species of suckers, and its downstream flows in the Klamath River provide habitat for threatened salmon species, which in turn affects the food supply for endangered whales that feed on the salmon. In response to the listing of these endangered species and consecutive critically dry years in the Klamath Basin, the Bureau of Reclamation began to consult with the National Marine Fisheries Service ("NMFS") (collectively, the "Federal Appellees"), and the U.S. Fish and Wildlife Service ("FWS") to ensure that Klamath Project operations would not jeopardize the continued existence of these species. Relevant to this appeal, the result of the most recent

consultations required the Bureau of Reclamation to maintain minimum water levels in Upper Klamath Lake and to provide minimum stream flows in the Klamath River.

After a complex procedural history, this case arises from the district court's resolution of a crossclaim brought by Federal Appellees that sought to confirm the Bureau of Reclamation's authority to operate the Klamath Project in compliance with the ESA. The district court confirmed this authority and concluded that the ESA applies to the Bureau of Reclamation's operation of the Klamath Project.

On appeal of this decision, Appellants, the Klamath Irrigation District ("KID") and the Klamath Water Users Association ("KWUA") contend that the district court erred in determining that the ESA applied to the Bureau of Reclamation's operation of the Klamath Project, allowing releases from Upper Klamath Lake for ESA compliance purposes. KID makes two additional arguments on appeal: First, KID contends that the district court's decision amounts to a "judicial taking" of KID's water rights. Second, KID contends that the federal district court did not have jurisdiction to decide the claim.

We note the important competing interests of the parties at stake in this case and the limited supply of water in the Klamath Basin. The Tribal Appellees have long relied on sufficient water to sustain fisheries and support the subsistence Tribal fishing rights guaranteed to them by treaty. The irrigators have similarly relied on the same Klamath Basin water for agricultural production since the beginning of the twentieth century. And the Bureau of Reclamation has long sought to manage the distribution of water in accordance with these competing interests and its obligations under federal law.

In this context we conclude that Appellants' arguments are without merit.  We affirm the district court's decision and hold that: (1) the ESA applies to the Bureau of Reclamation's operations related to the Klamath Project; (2) the district court's decision was not a "judicial taking" of KID's water rights because determining whether the ESA applies to the Klamath Project is not an adjudication of water rights; and (3) the federal district court had jurisdiction to determine this issue because the doctrines of prior exclusive jurisdiction and *Colorado River* abstention do not apply.

## I.  FACTS AND PROCEDURAL HISTORY

### A

Disputes over allocation of water within the Klamath Basin in Southern Oregon and Northern California have been the subject of many lawsuits in our Court and others. The Klamath Basin encompasses about 12,000 square miles of interconnected rivers, canals, lakes, marshes, dams, diversions, wildlife refuges, and wilderness areas.  *Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*, 48 F.4th 934, 938 (9th Cir. 2022) (*KID II*).

The Klamath Project is a large water-management initiative that was authorized by the Secretary of the Interior in 1905 pursuant to the Reclamation Act of 1902 and by the 1905 Oregon Act, which provided a procedure governing the appropriation of water for irrigation purposes in Oregon.  *See Baley v. United States*, 942 F.3d 1312, 1319–20 (Fed. Cir. 2019).  The Klamath Project is managed and operated by the Secretary of the Interior, through the Bureau of Reclamation. *See Klamath Irrigation Dist. v. United States*, 635 F.3d 505, 508 (Fed. Cir. 2011).   Before the Klamath Project was created, the Upper Klamath River was dominated by three shallow lakes and wetlands.   To create arable lands suitable

for agriculture and food production, the Bureau of Reclamation drained large areas of wetlands and two of the large lakes in order to construct a network of dams, canals, and drains. In doing so, the Bureau of Reclamation reconfigured Upper Klamath Lake, a natural lake at the headwaters of the Klamath River, to serve as the primary water storage reservoir.  The Klamath Project has "dual purposes," providing water to about 240,000 acres of irrigable crop lands for agricultural uses and providing water for wildlife needs to several national wildlife refuges, including the Lower Klamath and Tule Lake National Wildlife Refuges. *Klamath Irrigation Dist.*, 635 F.3d at 508.

In 1917, the Bureau of Reclamation authorized a public utility company to construct a hydroelectric dam, the Link River Dam, to regulate flows through Upper Klamath Lake. Water is delivered for the Klamath Project through the A Canal, which diverts water from Upper Klamath Lake above the Link River Dam, and through diversion structures on the Klamath River in Oregon below the Link River Dam. Klamath River water that is not diverted for Project or other use flows downstream into California and then out into the Pacific Ocean.

**B**

Water rights in the Klamath Basin are based on the doctrine of prior appropriation, which generally means that the "first in time [is the] first in right" so long as the user maintains beneficial use of the water. *Arizona Power Auth. v. Morton*, 549 F.2d 1231, 1233 (9th Cir. 1977); *see also Klamath Irrigation Dist. v. United States*, 227 P.3d 1145, 1150 (Or. 2010).

In 1905, the United States gave notice in accord with Oregon law of its intent to appropriate for the Klamath

Project "[a]ll of the waters of the Klamath Basin . . . constituting the entire drainage basin[] of the Klamath River," *Baley*, 942 F.3d at 1320, and gave similar notice to appropriate the Klamath Basin waters in California. The development and use of the Klamath Project perfected the United States' water rights under Oregon law with the priority date of 1905. *Id*. at 1320–21.

But, these rights were and are subject to preexisting rights for Klamath Basin Tribes, including the Klamath Tribe, the Yurok Tribe, and the Hoopa Valley Tribe. Under federal law, the establishment of a Federal Indian reservation reserved rights to unappropriated water for the purposes of the reservation. These rights are often referred to as *Winters* rights. *See Winters v. United States*, 207 U.S. 564, 576–77 (1908). These rights vest no later than the date of the reservation creation and are "superior to the rights of future appropriators." *Cappaert v. United States*, 426 U.S. 128, 138 (1976). The Klamath Tribe holds instream senior water rights for tribal fisheries in Upper Klamath Lake and its tributaries, and the Yurok and Hoopa Valley Tribes hold instream senior water rights for tribal fisheries in the Klamath River in California. *See Baley*, 942 F.3d at 1335–39.

In 1975, the Oregon Water Resources Division ("OWRD") initiated a general adjudication of the rights of all Klamath Basin water users in the Klamath Basin Adjudication. *See United States v. Oregon*, 44 F.3d 758, 762–64 (9th Cir. 1994). In 2014, OWRD issued an "Amended and Corrected Findings of Fact and Order of Determination" ("ACFFOD"), that provisionally determined the water rights of various users. While the ACFFOD is subject to ongoing judicial review in the Klamath County

Circuit Court (the "Klamath Basin Adjudication"), the ACFFOD remains in full force pending review.

The United States in the Klamath Basin Adjudication did not assert *Winters* rights on behalf of the Yurok and Hoopa Valley Tribes, both of whom have rights that are senior to other users, and that are at least coextensive to the water flows required by the ESA, meaning that these Tribes have a senior right to water sufficient to preserve fish species because of the Tribal subsistence fishing rights guaranteed to them by treaty. *See Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1213–14 (9th Cir. 1999); *Baley*, 942 F.3d at 1335–41. We have affirmed that Oregon state courts lack jurisdiction to adjudicate the rights of these California Tribes. *See In re Klamath Irrigation Dist.*, 69 F.4th 934, 941–42 (9th Cir. 2023). The ACFFOD, however, did confirm the instream *Winters* rights of the Klamath Tribe. *See Hawkins v. Haaland*, 991 F.3d 216, 221 (D.C. Cir. 2021). The adjudication of Tribal water rights was explicitly reserved for phase two of this litigation in the district court.

The ACFFOD did not determine the relative rights and priorities to Klamath Project water among users. Instead, the users' relative rights and priorities are governed by federal contracts or leases that specify the terms and conditions for the supply of Klamath Project water, including repayment obligations for construction, maintenance, and operation costs. *See Baley v. United States*, 134 Fed. Cl. 619, 627–33 (Fed. Cl. 2017). There are four main types of contracts.

First, the Bureau of Reclamation entered repayment contracts under the Reclamation Act with KID and another irrigation district. Those contracts were amended in 1954 and provide that the irrigation districts would assume responsibility for the care and maintenance of canals and

other irrigation works and would ultimately be responsible for delivering Project water to their members. However, the contracts contained a shortage clause, providing that the irrigation districts may not make deliveries when the Bureau of Reclamation notifies the districts that the parties are not entitled to water because of nonpayment or for "other reasons," which include shortages caused by droughts or "other reasons."

Second, the Bureau of Reclamation also entered into water-delivery and repayment contracts with many irrigators and individuals under the 1911 Warren Act, which allowed the Bureau of Reclamation to provide water to some users outside of the Klamath Project area when the Bureau of Reclamation determines there is excess "storage or carrying capacity." 43 U.S.C. §§ 523-24. Third, the Bureau of Reclamation entered into one settlement contract with the Van Brimmer Ditch Company to compensate it for the private company's pre-existing right to divert water from the Lower Klamath Lake, which had been drained to create the Project, and promised to deliver the same amount of water to the company. *Baley*, 134 Fed. Cl. at 632.

Fourth, the United States leases land within the Lower Klamath and Tule Lake National Wildlife Refuges for agricultural use. These leases specify that the United States cannot be held liable for damages if "irrigation water is not available." *Id.*

Apart from the one settlement contract, the contracts do not specify or guarantee a specific amount of water to be delivered to an irrigation district or individual water user. Instead, the contracts provide terms for an equitable allocation of available water. *Id.* at 627–33.

## C

In addition to serving as a storage reservoir for the Klamath Project, Upper Klamath Lake provides habitat for endangered suckers (the Lost River sucker and the shortnose sucker), that are found only in Upper Klamath Lake and the surrounding Klamath Basin waters.  *See* 53 Fed. Reg. 27,130 (July 18, 1988) (listing the Lost River sucker and shortnose sucker as endangered); *see also* 77 Fed. Reg. 73,740, 73,762-68 (Dec. 11, 2012) (designating Upper Klamath Lake as critical habitat for the suckers).  Upper Klamath Lake's downflow into the Klamath River also provides habitat for threatened Southern Oregon/Northern California Coast coho salmon ("SONCC coho salmon").  *See* 62 Fed. Reg. 24,588 (May 6, 1997) (listing SONCC coho salmon as threatened); *see also* 64 Fed. Reg. 24,049 (May 5, 1999) (designating the Klamath River as critical habitat for SONCC coho salmon).[1]

The Bureau of Reclamation has long interpreted its operations of the Klamath Project in a manner to comply with the mandates of the ESA.  After the listing of the two suckers and SONCC coho salmon, the Bureau of Reclamation, in accordance with Section 7(a)(2) of the ESA, began consulting with the U.S. Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") to determine whether Klamath Project operations would jeopardize these species.  *See Patterson*, 204 F.3d at 1209–10; *see also* 16 U.S.C. § 1536(a)(2).  In 2001, after a

---

[1] While not listed under the ESA, the Klamath River also provides spawning habitat for chinook salmon, whose populations are declining from the same threats that impact coho salmon.  *See Parravano v. Babbitt*, 70 F.3d 539, 542 (9th Cir. 1995); *Baley*, 942 F.3d at 1336. Chinook salmon are also a primary food source for the engendered Southern Resident killer whale.  *See* 70 Fed. Reg. 69,903 (Nov. 18, 2005) (listing the killer whale as endangered).

forecasted "critical dry" year for Upper Klamath Basin, the Bureau of Reclamation requested Biological Opinions ("BiOps") from FWS and NMFS regarding the species at issue. *See Baley*, 942 F.3d at 1323–24. The BiOps concluded that planned Klamath Project operations were likely to jeopardize the continued existence of the suckers and the SONCC coho salmon and then identified reasonable and prudent alternatives to maintain minimum water levels in Upper Klamath Lake and in the Klamath River downstream to preserve the species.[2] *Id.* at 1324–25.

Since 2001, the Bureau of Reclamation has periodically revised Klamath Project operations to respond to changed circumstances and new information. As relevant here, in 2019, the Bureau of Reclamation completed an ESA consultation with FWS and NMFS for proposed Klamath Project operations through 2024 in response to consecutive years of drought and to incidental take of the SONCC coho salmon, and the Bureau of Reclamation developed a Klamath Project Operating Procedures Plan as a result of this consultation. This plan aimed to: (1) maintain Upper Klamath Lake water levels necessary to protect sucker habitat, (2) release Upper Klamath Lake water providing downstream flows necessary to protect salmon spawning habitat in the Klamath River, and (3) maximize irrigation water deliveries to Klamath Project users.

---

[2] When this determination was challenged by the Klamath Project users as a "taking" of Klamath Project water rights, the Federal Circuit found that no taking had occurred because the Project rights are subordinate to the Tribal rights that are "at least equal" in amount to the water "needed to satisfy the Bureau of Reclamation's ESA obligations." *Baley*, 942 F.3d at 1337–42.

**D**

This case has a complicated procedural history. The Yurok Tribe, the Pacific Coast Federation of Fishermen's Associations, and the Institute for Fisheries Resources (collectively, the "Yurok Plaintiffs") brought the initial lawsuit in 2019 in the Northern District of California, after the Bureau of Reclamation completed its 2019 ESA consultation. The Yurok Plaintiffs challenged the 2019 plan and assessment, contending that the consultations were arbitrary, capricious, and contrary to the ESA. KWUA and KID subsequently intervened. In March 2020, at the parties' request, the district court stayed the case, and the Bureau of Reclamation operated the Klamath Project under an Interim Plan to which the parties stipulated.

While the initial case was underway, KID brought several suits in state and federal courts, three of which are relevant to the current appeal. *First*, in March 2019, KID sued the Bureau of Reclamation in the United States District Court for the District of Oregon, seeking declaratory and injunctive relief. KID contended that the Bureau of Reclamation's operation of the Klamath Project pursuant to the 2019 plan was contrary to law because the plan permitted releases from Upper Klamath Lake to enhance Klamath River flows for ESA compliance purposes, without previously-decreed instream water rights for ESA compliance purposes. *See KID II*, 48 F.4th at 942. The district court dismissed that case for failure to join a required party based on the Tribes' sovereign immunity, and we affirmed. *See id.*

*Second*, in 2021, KID moved in Klamath County Circuit Court[3] for a preliminary injunction against the Bureau of Reclamation's management of water in Upper Klamath Lake, asking the court to enjoin the non-irrigation water releases from Upper Klamath Lake that were being released for ESA purposes. The United States removed the action to federal district court for the District of Oregon. *See In re Klamath Irrigation Dist.*, 69 F.4th at 937. KID petitioned our Court for a writ of mandamus to compel the district court to remand KID's motion for a preliminary injunction back to the Klamath County Circuit Court. We denied that petition. *See id.* at 940–42.

*Third*, in 2020, KID filed suit in Marion County Circuit Court to compel OWRD to "take charge" of the water in Upper Klamath Lake under Oregon law and enjoin the Bureau of Reclamation's release of stored water for non-irrigation purposes. *See Klamath Irrigation Dist. v. Oregon Water Res. Dep't*, 518 P.3d 970, 974–95 (Or. Ct. App. 2022). In response to this lawsuit, OWRD issued an order on April 6, 2021, directing the Bureau of Reclamation to immediately stop the distribution of water in Upper Klamath Lake for ESA compliance purposes.

In response to the OWRD order, in June 2021, Federal Appellees moved to lift the stay in the original proceeding in the Northern District of California for the limited purpose of litigating a crossclaim by the United States and a supplemental complaint by the Yurok Plaintiffs against KID and KWUA. The district court lifted the stay on September 30, 2021 for this purpose. The crossclaim sought declaratory relief that the OWRD order was contrary to the ESA and was

---

[3] The Klamath County Circuit Court is the state court that is currently deciding the Klamath Basin Adjudication of water rights.

preempted under the Supremacy Clause.  Federal Appellees also sought a permanent injunction against enforcement of the OWRD order.  Alternatively, the crossclaim sought declaratory relief that the OWRD order was contrary to the federally-reserved senior water rights to support the Tribal fisheries of the Yurok and Hoopa Valley Tribes and was preempted by the Supremacy Clause and the Indian Commerce Clause.

The district court bifurcated the proceedings into two phases: phase one resolved only the ESA-related crossclaim; and phase two would then determine the extent of Tribal water rights.  In February 2023, the district court granted summary judgment for the United States and the Yurok Plaintiffs on the ESA-related claim in phase one, which is the subject of this appeal.  *See Yurok Tribe v. U.S. Bureau of Reclamation*, 654 F. Supp. 3d 941, 949 (N.D. Cal. 2023).  On the merits, the district court held that because the ESA applied to the Bureau of Reclamation's operation of the Klamath Project, OWRD's order was preempted, and the district court enjoined OWRD from attempting to enforce it. *Id*. at 964–69.  KWUA and KID timely appealed to our Court in April 2023.[4]

Before oral argument, we asked the parties to address the question of mootness because the OWRD order at issue in the original litigation had been withdrawn, and thus the only remaining relief sought was declaratory relief about whether

---

[4] OWRD subsequently withdrew its order, and KWUA moved in the district court under Federal Rule of Civil Procedure 54(b) for the entry of a final judgment on the declaratory relief granted in phase one.  The district court entered final judgment on the declaratory relief on August 15, 2023.  OWRD does not dispute on appeal that its order was preempted to the extent it conflicted with the ESA.

the ESA applies to the Bureau of Reclamation's operation of the Klamath Project.  At oral argument before us in June 2024, KID urged us to certify questions to the Oregon Supreme Court regarding the Bureau of Reclamation's authority to use and control the water under Oregon law and subsequently filed a motion for certification of questions about Oregon water law to the Oregon Supreme Court.

In March 2025, at the Federal Appellees' request, we held the case in abeyance for 90 days to permit the Department of the Interior to update its federal guidance on the operation of the Klamath Project in relation to the ESA due to the change in Presidential Administrations.  In May 2025, after the Department of the Interior issued new guidance and Federal Appellees withdrew their earlier legal position, Federal Appellees moved to dismiss the appeal for lack of jurisdiction because of mootness and moved to vacate the district court's judgment.  Alternatively, Federal Appellees moved for a continued stay to enable the district court to consider a motion for voluntary dismissal.  KID and KWUA also moved to dismiss the case and vacate the district court's judgment.

After briefing on mootness from the parties, we denied the motions to dismiss and the motion for a continued stay, concluding that the declaratory relief on whether the ESA applies to the Klamath Project would give the parties "meaningful relief," and presented a live controversy for us to decide.  *Ctr. for Biological Diversity v. Lohn*, 511 F.3d 960, 964 (9th Cir. 2007).  We have jurisdiction under 28 U.S.C. § 1291.  We now hold that the ESA applies to the Bureau of Reclamation's operation of the Klamath Project.

## II.  STANDARD OF REVIEW

We review *de novo* a grant of summary judgment.  *Lolli v. Cnty. of Orange*, 351 F.3d 410, 414 (9th Cir. 2003).  A district court's construction or interpretation of a federal law, including the ESA, is a question of law that we review *de novo*.  *Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 555 (9th Cir. 2016).

## III.  DISCUSSION

### A

We first address whether the Bureau of Reclamation has the authority to act in its operation of the Klamath Project to benefit protected species under the ESA.  We hold that it does.  The dissent concedes that the answer to this question must be "yes," yet it attempts to evade what it describes as a "truism" by misreading our precedent.  Dissenting Op. at 42.  The dissent misconstrues the direct issue on appeal here, which is whether the district court erred by granting declaratory relief on the question whether "[the Bureau of] Reclamation's operation of the Klamath Project, including the exercise of its rights to store water in [Upper Klamath Lake] for irrigation use, is subject to compliance with the ESA."          Our case law supports that the answer to this question must be "yes."

### 1

We have recognized that Section 7 is the "heart of the ESA."  *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1019–20 (9th Cir. 2012) (en banc) (quoting *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011)).  Section 7(a)(2) of the ESA requires all federal agencies to engage in consultation to "insure that any action authorized, funded, or carried out by such agency ( . . . an

'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species."  16 U.S.C. § 1536(a)(2).

It would be hard to overstate the importance of this ESA prohibition.  As the Supreme Court has recognized, "[w]hen Congress passed the [ESA] in 1973, it was not legislating on a clean slate."  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978).  Indeed, the ESA was born out of the environmental law movements of the 1960s and 1970s, and Congress had passed earlier, narrower, and less effective versions of the ESA in 1966 and 1969.  *See id.* at 175–76.  However, by 1973, Congress recognized that these prior Acts did not go far enough to protect endangered species and to stem hazards of extinction.  *See id.* at 177 ("The dominant theme pervading all Congressional discussion of the proposed [Endangered Species Act of 1973] was the overriding need *to devote whatever effort and resources were necessary* to avoid further diminution of national and worldwide wildlife resources." (quoting Coggins, Conserving Wildlife Resources: An Overview of the Endangered Species Act of 1973, 51 N.D.L.Rev. 315, 321 (1975))).  Greatly troubled by the "unknown uses that endangered species might have" and "the unforeseeable place such creatures may have in the chain of life on this planet," Congress in 1973 passed the ESA as we know it today with its broad and clear purpose of ensuring the conservation of endangered and threatened species, regardless of the cost.  *Id.* at 178–80.

Section 7 is "a particularly good gauge of congressional intent" because the language of Section 7 changed from the earlier 1966 version, which had qualified the obligation of federal agencies to seek to preserve endangered species only

"insofar as is practicable and consistent with [the agencies'] primary purposes." *Id*. at 181. By contrast, the current version of the ESA mandates that all federal agencies must ensure that their actions will not detrimentally affect an endangered or threatened species, without reservation. *Id.* at 181–82. The broad applicability of Section 7 reflects "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Id.* at 185; *see also O'Neill v. United States*, 50 F.3d 677, 681 (9th Cir. 1995) ("[The] ESA was enacted in 1973 to 'halt and reverse the trend toward species extinction, whatever the cost.'" (quoting *Tenn. Valley*, 437 U.S. at 184)).

With this background in mind,[5] we turn to the ESA question before us now: whether Section 7(a)(2) of the ESA applies to the Bureau of Reclamation's operation of the Klamath Project. We hold that it does.

We have previously held that that the "ESA generally applies to" the Bureau of Reclamation's water contracts for water management within the Klamath Project. *See Patterson*, 204 F.3d at 1213. Although KID and KWUA urge us to conclude that *Patterson* is neither controlling nor good law, we disagree. *Patterson* continues to govern the

---

[5] If the dissent is contending that this portion of *Tennessee Valley Authority* is no longer good law, *see* Dissenting Op. at 46–47, *Home Builders* did not dispute or invalidate the legislative history of the ESA. *See* 551 U.S. at 670–71. Instead, this portion of *Home Builders* recognized that there was no contrary mandatory obligation from Congress on Tennessee Valley Authority that would implicitly repeal the ESA. *Id.* The *Home Builders* Court held that because there was no mandatory "statutory command" in the facts of *Tennessee Valley Authority*, the case supported the majority's conclusion that it involved a discretionary agency action. *Id.*.

ESA's applicability to the Klamath Project, and we discern no reason to deviate from that holding.

*Patterson* involved a dispute between Klamath Basin irrigators, the Bureau of Reclamation, and PacifiCorp over a contract governing the management of the Link River Dam within the Klamath Project. *Id*. at 1209. In *Patterson*, we addressed two primary issues: First, and irrelevant to this appeal, we determined whether the Klamath Basin irrigators (there, the plaintiffs) were third-party beneficiaries of the contract between the Bureau of Reclamation and PacifiCorp. *Id.* at 1210–12. Second, and relevant here, we affirmed the district court's grant of declaratory relief in favor of PacifiCorp when the district court held that the Bureau of Reclamation had the authority to direct Dam operations to comply with the ESA. *Id.* at 1213. We recognized that "when an agency, such as [the Bureau of] Reclamation, decides to take action, the ESA generally applies to the contract" and explicitly "h[e]ld that . . . [the Bureau of] Reclamation has the authority to direct Dam operations to comply with the ESA." *Id.*

Although KID and KWUA contend that this part of the *Patterson* opinion is mere dicta, we disagree. We devoted a separate section in the *Patterson* opinion to resolving the dispute as to whether the district court's *holding* that "the [i]rrigators' rights to water are subservient to the ESA" was correct and whether the ESA applied to the contracts. *Id.* Our language in *Patterson* explicitly said that we intended to make a holding of law. After careful examination of the issues and relevant precedent, we "h[e]ld" that the Bureau of Reclamation has authority over the Klamath Project and we repeatedly made unequivocal and binding statements that the Bureau Reclamation must comply with the ESA in operating the Link River Dam. *Id*.; *see also id.* at 1209 ("Operation

of the dam is also subject to the requirements of federal statutes, such as the Endangered Species Act."); *id.* at 1213 ("Because Reclamation retains authority to manage the Dam, and because it remains the owner in fee simple of the Dam, it has responsibilities under the ESA as a federal agency."); *id.* ("[M]eet[ing] the requirements of the ESA. . . override the water rights of the [i]rrigators.").  This reasoning was integral to the decision in *Patterson* and cannot be considered to be mere dicta.  *See United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (per curiam) ("[W]here a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense.").  The format and content of the *Patterson* opinion persuade us that our holding that ESA applied to the Bureau of Reclamation's authority over the Link River Dam is not dicta and continues to bind our decisions, and we reaffirm that decision here.

After *Patterson*, we and other Circuits have continued to recognize that the ESA applies to the Bureau of Reclamation's operation of the Klamath Project, and that the rights of Klamath Project water users are subject to the requirements of the ESA.  *See, e.g.*, *In re Klamath Irrigation Dist.*, 69 F.4th at 938 ("[U]nder the Endangered Species Act . . . , Reclamation must maintain specific water levels in Upper Klamath Lake and instream flows in the Klamath River."); *KID II*, 48 F.4th at 940 ("Reclamation is also responsible for managing the Klamath Project in a manner consistent with its obligations under the ESA."); *Baley*, 942 F.3d at 1323 ("As noted, the Klamath Project is subject to the requirements of the ESA.  In addition, . . . the Ninth Circuit has declared the rights of Klamath Project water

users to be subservient to the requirements of the ESA."); *Klamath Irrigation Dist.*, 635 F.3d at 508 ("In light of its dual purposes of serving agricultural uses and providing for the needs of wildlife, the Klamath Project is subject to the requirements of the Endangered Species Act.").     Thus, *Patterson* is still good law, and its holding continues to serve as controlling precedent for Klamath Basin litigation.

2

Section 7(a)(2) of the ESA applies to "agency actions." The ESA defines agency action as "any action authorized, funded, or carried out by [a federal] agency." 16 U.S.C. § 1536(a)(2). The implementing regulations limit Section 7's application to only actions "in which there is discretionary Federal involvement or control" to benefit a protected species. 50 C.F.R. § 402.03; *see also Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 977 (9th Cir. 2003).

Contending that the Bureau of Reclamation does not retain "discretion" to act for the benefit of protected species in this case, KWUA and KID urge us to conclude that *Patterson* is no longer controlling precedent based on two more recent cases: one from the Supreme Court (*Nat. Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007)) and one from our Circuit (*Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045 (9th Cir. 2024)). We disagree with KWUA's and KID's interpretation of these cases, as well as the dissent's interpretation of these cases, and are not persuaded that either case affects *Patterson's* square holding that the ESA applies to the Klamath Project.

First, in *Home Builders*, the Supreme Court held that Section 7(a)(2) of the ESA applies only to discretionary agency actions and does not apply to actions that an agency

is required to undertake by a conflicting federal statute. 551 U.S. at 666–67. But, in *Home Builders*, the issue was whether Section 7(a)(2) of the ESA applied to the Environmental Protection Agency's ("EPA's") decision under Section 402(b) of the Clean Water Act to approve a state National Pollution Discharge Elimination System ("NPDES") permitting program. *Id.* Although the Supreme Court recognized that Section 7(a)(2) would apply to the decision because the NPDES approval decision was an "agency action," the Court also noted that complying with Section 7(a)(2) of the ESA would effectively amend or repeal Section 402(b) of the Clean Water Act because it would add an additional criterion to an otherwise "exclusive list." *Id.* at 662–64. Thus, the Court held that the non-discretionary "transfer of NPDES permitting authority" under Section 402(b) of the Clean Water Act was not subject to Section 7(a)(2) of the ESA. *Id.* at 673.

Even in *Home Builders*, the baseline assumption was that Section 7(a)(2) applies to an "agency action." But, *Home Builders* recognized a narrow exception to this rule: When another federal *statute* mandates an action that cannot be harmonized with the consultation requirement in Section 7(a)(2) of the ESA, then the federal agency has no discretion to consider the protection of listed species in carrying out the other incompatible *statutory* mandate. *See id*. at 666, 673. After *Home Builders*, "the real question . . . is what counts as a non-discretionary action, to which [Section] 7(a)(2) does not apply." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 639 (9th Cir. 2014).

In several cases arising after *Home Builders*, we have distinguished *Home Builders* and required compliance with the ESA's consultation provision when another federal statute did not require action that conflicted with the

consultation provision of the ESA.  *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 928 (9th Cir. 2008) (distinguishing *Home Builders* from circumstances of "broad mandates which do not direct agencies to perform any specific nondiscretionary actions, but rather, are better characterized as directing the agencies to achieve particular goals"); *see also Jewell*, 747 F.3d at 640 (distinguishing *Home Builders* and concluding that there was no "statutory obligation that Congress has imposed on [the Bureau of] Reclamation that is both mandatory and inconsistent with its obligations under the ESA"); *Karuk Tribe*, 681 F.3d at 1024 ("[T]o avoid the consultation obligation, an agency's competing *statutory* mandate must require that it perform specific non[-]discretionary acts rather than achieve broad goals." (emphasis added)).

We have thus held, after *Home Builders*, that an agency retains discretion and the duty to comply with Section 7(a)(2) of the ESA unless the enabling legislation for the agency's action is both "*mandatory* and *inconsistent* with [the agency's] obligations under the ESA." *Jewell*, 747 F.3d at 640 (emphasis added).  And even when a statute compels a certain action, we have held that the ESA still applies if the statute can be construed in harmony with the ESA's language.  *See, e.g., San Luis Obispo Coastkeeper v. Santa Maria Valley Water Conservation Dist.*, 49 F.4th 1242, 1247 (9th Cir. 2022); *see also Karuk Tribe*, 681 F.3d at 1024 ("An agency 'cannot escape its obligation to comply with the ESA merely because it is bound to comply with another statute that has consistent, complementary objectives' . . . The competing statutory objective need only leave the agency 'some discretion.'" (internal citation omitted)).  By contrast, when a statute imposes a "broad mandate," the agency's actions are "discretionary" for purposes of Section 7(a)(2) of

the ESA because the agency retains at least some discretion to act for the benefit of listed species. *Nat'l Wildlife Fed'n*, 524 F.3d at 929; *see also Jewell*, 747 F.3d at 640; *Home Builders*, 551 U.S. at 665 (action is discretionary unless the enabling statute specifically prohibits the agency from considering "extrastatutory factors").

Here, there is no such conflict as was present in *Home Builders* because there is no statutory mandate in the Reclamation Act that imposes a specific and non-discretionary action conflicting with the ESA. The Reclamation Act authorizes and directs the construction of "irrigation works," but does not otherwise specify any mandates. *See* 43 U.S.C. § 411. Instead, the Reclamation Act gives the Secretary of the Interior a broad authority to "perform any and all acts and to make such rules and regulations as may be necessary and proper for the purpose of carrying out the provisions of [the Reclamation Act] into full force and effect." 43 U.S.C. § 373. Nothing in the Reclamation Act requires the Bureau of Reclamation to perform any specific non-discretionary activities in direct conflict with the ESA. Instead, the directives of the Reclamation Act are "better characterized" as provisions "directing [the Bureau of Reclamation] to achieve particular goals." *Nat'l Wildlife Fed'n*, 524 F.3d at 928. We conclude that the facts of this case are unlike those in *Home Builders*, and nothing in *Home Builders* affects our holding in *Patterson* that the ESA applies to the Klamath Project or renders that holding inapplicable to this case.

3

Next, KID and KWUA contend that our recent holding in *Haaland* confirms that the Bureau of Reclamation does not have "discretion" under the water contracts to release

water from Upper Klamath Lake to benefit endangered species.  This contention is unpersuasive and misconstrues *Haaland*.  *Haaland* did not retreat from this court's case law that the Bureau of Reclamation must comply with the ESA when operating the Klamath Project.

a

The relevant portion of *Haaland* involved three claims about the Bureau of Reclamation's renewal of "settlement contracts," or contracts that determined water delivery for users that had senior water rights pre-dating the United States' water rights on the Sacramento River within California's Central Valley Project.  102 F.4th at 1056.  The "agency action" to which the consultation duty under Section 7(a)(2) of the ESA applied in that case was the Bureau of Reclamation's *execution* of the renewed settlement contracts.  *Id*. at 1057.  Two of the plaintiff's claims in *Haaland* argued that the Bureau of Reclamation violated its consultation duty under Section 7(a)(2) of the ESA when it renewed the contracts because it relied on later-invalidated BiOps and did not conduct a proper consultation. *Id.* at 1066–72.  We upheld the renewal.  *Id*.

In the third claim (described in the opinion as the fifth), which relates to the part of the opinion on which KID and KWUA rely, the plaintiff contended that the Bureau of Reclamation violated the ESA by *implementing* the settlement contracts because it did not reinitiate consultation in light of the new information about endangered or threatened species that was discovered after the Bureau of Reclamation had previously renewed the contracts.  *Id*. at 1062.    This factual distinction between execution and implementation matters in two ways.

First, under the ESA, the duty to reinitiate consultation arises *after* the agency has already engaged in formal or informal consultation under Section 7(a)(2). An agency must reinitiate consultation with the relevant wildlife agencies "where discretionary Federal involvement or control over the action has been retained or is authorized by law and . . . new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(a)(2). Stated another way, new relevant information may require reevaluation of the agency's position, but this assumes that the agency has already engaged in consultation under Section 7(a)(2) of the ESA.

Second, in making its claim based on the agency's failure to reinitiate consultation, the plaintiff in *Haaland* explicitly pled that the Bureau of Reclamation "retain[ed] discretionary federal involvement and control over the implementation of the [settlement] contracts," and that discretion created its duty to reinitiate consultation after learning of new evidence of impact on threatened or endangered species. Whether the Bureau of Reclamation had a discretionary duty to reinitiate consultation in implementing the settlement contracts *necessarily* turned on the terms of those contracts. *Id.* at 1075–77.

In reviewing the district court's ruling that the plaintiff did not state a claim upon which relief could be granted as to the reinitiation claim, the panel majority held that the contract provisions at issue did not give the Bureau of Reclamation discretion to take measures to benefit the endangered salmon species at issue. *Id.* at 1077; *but see id.* at 1081–83 (Gould, J. dissenting in part) (interpreting two contract provisions as giving the Bureau of Reclamation sufficient discretion to reinitiate consultation).

But there, the question at issue was explicitly framed under the terms of the contracts because we were determining whether the Bureau of Reclamation retained discretion under specific contract provisions to reinitiate consultation under the ESA in *implementing* the renewed settlement contracts after the original Section 7 consultation duty had previously been applied to the *execution* of the renewed contracts. *Id.* at 1058. In our holding, we relied on Ninth Circuit cases holding that when an agency no longer has federal control over a private action, there is no "discretion" to trigger duties under Section 7(a)(2) of the ESA. For example, in *Sierra Club v. Babbitt*, we held that Section 7(a)(2) did not apply to project action undertaken by a private party pursuant to a Right-of-Way ("ROW") that had been granted before the ESA was enacted because the federal agency no longer had discretion to impact the private party's execution of the project for the benefit of a protected species. 65 F.3d 1502, 1511–12 (9th Cir. 1995). Instead, the federal agency's involvement in the project ended when it issued the ROW. *Id.* at 1508–12. Similarly, in *Environmental Protection Information Center v. Simpson Timber Co.* ("*EPIC*"), we held that FWS did not retain sufficient discretionary control over an incidental take permit it had issued to a private company to compel FWS to reinitiate consultation for the benefit of species beyond the species specifically mentioned in the permit. 255 F.3d 1073, 1079–83 (9th Cir. 2001). There again, we looked at the terms of the specific agreements at issue to determine the scope of the agency's discretion. *Id*.

In contrast, the question here is broader than the question of reinitiation of consultation at issue in *Haaland*: In this case, we must decide whether the ESA applies to the Bureau of Reclamation's operation of the Klamath Project to

manage water levels within Upper Klamath Lake and releases to the Klamath River to protect endangered and threatened species.     There is no issue of contract interpretation here.

In *Haaland*, there was no dispute that Section 7(a)(2) of the ESA applied to the Bureau of Reclamation's operation of the Central Valley Project.  Nor could there have been. We recognized in *Haaland* that Congress enacted legislation stating explicitly that the Bureau of Reclamation must comply with federal law, including the ESA, when operating the Central Valley Project and the Bureau of Reclamation had long complied with the ESA in its operation of the Central Valley Project.  *See* 102 F.4th at 1057 ("In 1992, Congress enacted the Central Valley Project Improvement Act (CVPIA) . . . , which required that the Secretary of the Interior operate the CVP in compliance with federal and state law."); *see also id.* at 1056 (recognizing the Bureau of Reclamation's "decades-long history of obtaining the necessary environmental approvals" to operate the Central Valley Project).

Moreover, two of the plaintiff's claims in *Haaland* were predicated on the assumption that the ESA applies to the Central Valley Project.  The first of these claims contended that FWS acted arbitrarily and capriciously and violated its obligations under the ESA when it relied on a particular BiOp and did not correctly analyze the effects of the contract renewals on endangered species.  *Id.* at 1065.  We rejected that argument, not because the ESA did not apply to federal water management of the Central Valley Project, but because we determined on the merits that "FWS's consultation on the renewal of the Settlement Contracts considered the full scope of the proposed action before

determining that renewal of those Contracts would not likely adversely affect the delta smelt." *Id.* at 1071.

Similarly, the plaintiff's second claim was that the Bureau of Reclamation violated its duties under the ESA by relying on what the Bureau of Reclamation should have known was an inadequate consultation with FWS. *Id.* at 1071–73. We rejected that argument, again not because the ESA was inapplicable to the Central Valley Project, but because we determined on the merits that the consultation was adequate under the ESA. *Id.* And, although the dissent contends that these claims were the plaintiff's APA claims, and not its ESA claim, *see* Dissenting Op. at 48, this is a "distinction without a difference," *see* Dissenting Op. at 47, because all of the plaintiff's claims were premised on alleged violations of the ESA and the assumption that the ESA applied to the Central Valley Project. *See id.* at 1054. There is no meaningful difference as to whether the plaintiff alleged that the ESA was violated because the Bureau of Reclamation made conclusions the plaintiff contended were contrary to the ESA and therefore arbitrary under the APA, or because the plaintiff contended directly that the ESA required reinitiation of consultation duties; all these claims assumed that the ESA applied.

In sum, nothing in *Haaland* suggests that Section 7(a)(2) of the ESA does not apply to the Klamath Project.

b

Furthermore, under the parties' contracts in this case, the Bureau of Reclamation retains discretion because the vast majority of contracts here are premised on water availability; only one contract guaranteed a specific quantity of water to a particular water user; and the Bureau of Reclamation has

an ongoing obligation to determine water availability for Project users in the Klamath Project.[6]

Under these contracts, unavailability of water can be a result of either physical unavailability caused by an inadequate water flow, or by legal unavailability as, for example, when a legal obligation requires use of water for other purposes. *See O'Neill*, 50 F.3d at 682–84 (holding that "unavailability of water resulting from the mandates of valid [post-contract] legislation"—including the ESA—unambiguously "constitute[d] a shortage by reason of 'any other causes'" and excused contract performance); *see also Baley*, 134 Fed. Cl. at 627; *Nat. Res. Def. Council v. Houston*, 146 F.3d 1118, 1126 (9th Cir. 1998) (recognizing that an agency "can deliver less than a contractually agreed upon amount of water in order to comply with subsequently enacted federal law").

Our reasoning in *Haaland* that similar shortage provisions were not, in circumstances there, a source of discretion requiring reinitiation of consultation is specific to the nature of the contracts in *Haaland*, and the distinction from our case matters in important ways. In *Haaland*, the contracts at issue were settlement contracts resolving disputes between the Bureau of Reclamation and Sacramento River water users who had preexisting water rights pre-dating the federal Reclamation statutes and were senior to the rights held by the United States for the Central

---

[6] That the Bureau of Reclamation has non-discretionary duties in one contract to the Van Brimmer Ditch Company, which had preexisting rights, does not allow the Bureau of Reclamation to "ignore potential jeopardy risks" for endangered or threatened species within the entire Klamath Project. *Nat. Wildlife Fed'n*, 524 F.3d at 928; *see also Jewell*, 747 F.3d at 638–39.

Valley Project.    102 F.4th at 1056.    Those contracts specifically "quantifie[d] the total amount of water that could be diverted annually" by the senior rights holders, and they contained shortage provisions for periods of reduced water supply. *Id.* at 1058.  When those contracts were about to expire, the Bureau of Reclamation renewed the contracts. *Id.*

In seeking to dismiss the plaintiff's claim that the Bureau of Reclamation had to reinitiate consultation on the effect of the continued implementation of the renewed settlement contracts, the Bureau of Reclamation contended that these liability provisions did not give it the authority to alter the terms of the executed renewed settlement contracts on the stipulated diversions of water for the senior water rights holders. *Id.* at 1075–76.  We agreed with that contention because the terms of the contracts did not give the Bureau of Reclamation discretion, *after the contracts had been executed*, to take *additional* measures that would benefit the endangered species. *Id.*

But here, as explained, most contracts in the Klamath Project are water supply contracts under which the Bureau of Reclamation has ongoing obligations to apportion water equitably.  In cases with similar circumstances, we have held that shortage provisions unambiguously excuse the Bureau of Reclamation's obligations to furnish water when it is unavailable due to "the mandates of valid legislation" or other causes. *O'Neill*, 50 F.3d at 683–84; *see also Patterson*, 204 F.3d at 1213 (following *O'Neill* in construing Klamath Project contracts for purposes of whether the ESA applied). Finally, even in *Haaland*, we recognized that in the underlying agency action—the renewal of the settlement contracts—the Bureau of Reclamation "was obliged 'to engage in Section 7(a)(2) consultation prior to renewing the

[s]ettlement [c]ontracts.'" *Haaland*, 102 F.4th at 1061 (quoting *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 785 (9th Cir. 2014)).

*Haaland's* holding that the terms of the contracts at issue in that case did not give the Bureau of Reclamation sufficient discretion to require reinitiation of consultation when implementing the renewed settlement contracts does not bear on the question before us today, which is whether the ESA applies to the Klamath Project. Nothing in *Haaland* suggests that we should reevaluate *Patterson*, which held that that ESA applied retroactively to the Bureau of Reclamation's water contracts in the Klamath Project. Nor are we persuaded that recent case law compels a conclusion that the Bureau of Reclamation has no discretion to comply with the ESA in operating the Klamath Project. Indeed, precedent suggests, to the contrary: that the Bureau of Reclamation must comply with the ESA when operating the Klamath Project.[7]

**B**

Beyond the issue of whether the ESA applies to the Klamath Project, KID contends that the district court's ruling that the ESA preempts OWRD's order was a "judicial taking" of KID's property interests in its water rights. We disagree.

Four justices of the Supreme Court have recognized that a state court might cause a "judicial taking," if, as a matter

---

[7] Because the ESA applies to the Bureau of Reclamation's operation of the Klamath Project under existing case law, we do not consider the parties' alternative arguments as to Tribal water rights. We also decline to conclude that there was error in the district court's ruling striking KWUA's arguments about Tribal rights, because the district court explicitly reserved that issue for phase two of the litigation.

of adjudicating state-law property rights, it "declares that what was once an established right of private property no longer exists." *Stop the Beach Renourishment, Inc. v. Florida Dep't of Env't Prot.*, 560 U.S. 702, 715 (2010) (plurality opinion). Because such a claim has not been recognized by a majority of Justices on the United States Supreme Court, we question its availability. *Id.* at 733–45. But, even if such a claim was clearly recognized, it would not apply here. In deciding whether the ESA applies to the Bureau of Reclamation's operation of the Klamath Project, neither we nor the district court have adjudicated any water rights. No party has sought, nor have we or the district court ruled on any Tribal rights applicable here or on any other property rights beyond the question of the ESA's applicability. Our answer to the ESA question before us today does not adjudicate property rights. *See Patterson*, 204 F.3d at 1214 n.3 ("Our decision in this case and that of that district court relate only to questions involving the Bureau[] [of Reclamation's] operation and management of the Project, and not to the relative rights of others not before the court to the use of the waters of the Basin.").

## C

Finally, KID's jurisdictional arguments that the federal courts are barred from deciding the crossclaim under the doctrines of prior exclusive jurisdiction and *Colorado River* abstention are without merit for the reasons stated below.

### 1

First, KID contends that the state court hearing the Klamath Basin Adjudication has "prior exclusive jurisdiction" that bars federal courts from deciding the Federal Appellees' crossclaim on the ESA's applicability to the Klamath Project. KID emphasizes that if "a state or

federal court has taken possession of property, or by its procedure has obtained jurisdiction over the same, then the property under that court's jurisdiction is withdrawn from the jurisdiction of the courts of the other authority as effectually as if the property had been entirely removed to the territory of another sovereign." *Sexton v. NDEX West, LLC*, 713 F.3d 533, 536 (9th Cir. 2013) (internal quotation marks and citations omitted).

We have previously rejected that argument. In its 2021 lawsuit, KID sought a preliminary injunction in state court to prevent the Bureau of Reclamation from releasing water from Upper Klamath Lake to comply with the ESA. After the United States removed the action to federal district court for the District of Oregon, KID petitioned our Court for a writ of mandamus seeking to remand the issue back to the state court because KID contended that the state court had prior exclusive jurisdiction. *See In re Klamath Irrigation Dist.*, 69 F.4th at 940. We rejected that argument and denied the writ of mandamus, holding that KID mischaracterized its lawsuit by claiming it was an administration of the Klamath Basin Adjudication. *Id.* at 944–45; *see also KID II*, 48 F.4th at 946–47 (recognizing that KID's lawsuit was properly understood to be a challenge under the Administrative Procedure Act to the Bureau of Reclamation's ESA authority). Although *In re Klamath Basin Irrigation District* does not bind us because it was decided under the more deferential "clear error" standard of review used for review of a petition for a writ of mandamus, we conclude that its reasoning is persuasive in resolving this case. *See In re Klamath Irrigation Dist.*, 69 F.4th at 941–44.

The doctrine of prior exclusive jurisdiction does not apply here because the question before us today—whether the Bureau of Reclamation's obligations under the ESA

apply to the Klamath Project—does not involve the adjudication or administration of any provisionally-determined water rights. In complying with the ESA, the Bureau of Reclamation is not claiming water rights, and the Klamath Basin Adjudication did not adjudicate the Bureau of Reclamation's ESA obligations.

The United States is participating in the Klamath Basin Adjudication pursuant to the McCarran Amendment, 43 U.S.C. § 666(a), which "waives the United States' sovereign immunity for the limited purpose of allowing the Government to be joined as a defendant in a state adjudication [or administration] of water rights." *United States v. Adair*, 723 F.2d 1394, 1400 n.2 (9th Cir. 1983). But the McCarran Amendment does not "authorize private suits to decide priorities between the United States and particular claimants[.]" *In re Klamath Irrigation Dist.*, 69 F.4th at 942 (citation omitted).

There is no dispute that the state court has jurisdiction to adjudicate the United States' water-rights claims against other claimants in Oregon and that the provisionally-determined rights decided in ACFFOD are enforceable under Oregon law, pending judicial review. *See Oregon*, 44 F.3d at 765–70; OR. REV. STAT. §§ 539.130(4), 539.170; *Hawkins*, 991 F.3d at 222. But, OWRD in the ACFFOD did not determine the Bureau of Reclamation's ESA obligations because those obligations are not governed by Oregon law. The state court reviewing the Klamath Basin Adjudication has no jurisdiction over the federal question whether the ESA applies or in determining the scope of the Bureau of Reclamation's obligations under federal law.

Because this case does not present an adjudication of water rights and because the doctrine of prior exclusive

jurisdiction cannot expand the subject matter jurisdiction of a state court to adjudicate issues beyond its jurisdiction, we hold that the doctrine of prior exclusive jurisdiction does not apply.

2

Second, KID contends that the district court abused its discretion when it denied KID's motion to stay based on the doctrine of *Colorado River* abstention. We conclude that this argument is without merit. Under the doctrine of *Colorado River* abstention, a federal court may decline to adjudicate federal water rights claims as against other claimants, where relative rights in a common source are being comprehensively adjudicated in a state-court McCarran Amendment proceeding. *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 809–21 (1976). The question before us today and that was presented by the United States' crossclaim is whether and how the ESA applies to the Klamath Project. That question does not involve the establishment or adjudication of a federal water rights claim, and the ESA issue was not adjudicated in the Klamath Basin Adjudication. *See In re Klamath Irrigation Dist.*, 69 F.4th at 941. We hold that there is no reason for the district court to have abstained.[8]

## IV. CONCLUSION

Following Ninth Circuit precedent in *Patterson* and its progeny, we affirm the district court's holding that the ESA

[8] We deny KID's motion to take judicial notice (Dkt. No. 25) because the documents on which judicial notice is requested are either duplicative of those already in the record or are irrelevant to our analysis. We also deny KID's motion to certify questions of law to the Oregon Supreme Court (Dkt. Nos. 116 & 117) because no questions of state law remain relevant to the appeal.

42          YUROK TRIBE V. KLAMATH WATER USERS ASS'N

applies to the Bureau of Reclamation's operation of the Klamath Project.  We therefore affirm the district court's ruling in phase one.  We also hold that the district court's ruling did not constitute a "judicial taking" and that the district court had jurisdiction to decide the crossclaim.

**AFFIRMED.**

---

R. NELSON, Circuit Judge, dissenting:

I agree with the majority's analysis of the judicial taking and *Colorado River* abstention issues.  But its answer to whether § 7 of the ESA applies here fails to reckon with Supreme Court and circuit precedent.  The majority repeatedly asks whether the ESA applies to the Klamath Project.  As a general matter, that is a truism.  But the specific question—after *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007), and *Natural Resources Defense Council v. Haaland*, 102 F.4th 1045 (9th Cir. 2024)—is whether the contracts allow the Bureau of Reclamation any non-discretionary duty. *Haaland*, which issued after briefing was complete, clarified how we are supposed to approach this analysis.  It foreclosed finding discretion in contractual provisions that limit liability in the event of breach because of legal unavailability—nearly the majority's entire argument.

The majority fails to grapple with the terms of those contracts.  And it acknowledges that one of these contracts does have non-discretionary duties.  Maj. Op. at 35 n.6. Under a proper analysis of the contracts, which *Haaland* compels, a non-discretionary contractual duty imposes no ESA obligation.  And since these contracts impose non-

discretionary duties, I would largely reverse the district court and remand for a proper analysis consistent with *Haaland*. As a result, I respectfully dissent.

## I

## A

Section 7(a)(2) of the ESA mandates that all federal agencies "'insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence' of any endangered or threatened species or result in the destruction of critical habitat." *Env't Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1075 (9th Cir. 2001) (quoting 16 U.S.C. § 1536(a)(2)). Over two decades ago, we held that because Reclamation "retain[ed] some measure of control" over the operation of the Link River Dam, "the ESA generally applies to" contracts like those here. *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1213 (9th Cir. 1999). The *Patterson* holding that the ESA applies relied solely on the facts that "Reclamation retain[ed] authority to manage the Dam" and remained "the owner in fee simple of the Dam." *Id.*

But eight years later, the Supreme Court adopted a new legal framework to determine whether the ESA applies to agency action. In *Home Builders*, the Court explained that ESA § 7 "covers only discretionary agency actions and does not attach to actions . . . that an agency is *required* by statute to undertake once certain specified triggering events have occurred." 551 U.S. at 669. Heeding *Home Builders*, we have held that ESA § 7(a)(2) "is triggered so long as a federal agency retains 'some discretion' to take action for the benefit of a protected species." *Nat. Res. Def. Council v.*

*Jewell*, 749 F.3d 776, 784 (9th Cir. 2014) (quotation omitted) (*Jewell I*).

A year after the district court's order below, we also clarified that "once the agency has entered into a legally binding agreement, it has such discretion only to the extent permitted by the agreement's terms." *Haaland*, 102 F.4th at 1074. By reviewing the contractual terms of those binding agreements, we decided the agencies had no discretion. *Id.* In *Haaland*, environmental groups argued that contractual provisions limiting Reclamation's liability because of legal unavailability of water gave Reclamation discretion to act on behalf of endangered species. *Id.* We rejected that argument because acting in compliance with legal unavailability is not discretionary. Rather, "[t]he duty to comply with mandatory legal obligations is not a source of discretion." *Id.* at 1075–76 (citing *Home Builders*, 551 U.S. at 669). *Haaland*'s holding that legal obligations such as ESA § 7 do not equate to discretion undermines the majority's reasoning.

B

The majority argues that *Home Builders* and *Haaland* are inapplicable and relies instead on *Patterson*'s general holding that the ESA applies broadly to Reclamation's operation of the Klamath Project. That position is untenable. After *Home Builders* and *Haaland*, *Patterson* is clearly irreconcilable for the generalized proposition that Reclamation's control triggers ESA § 7 obligations in all circumstances relating to the Klamath Project.

In *Patterson*, among other things, the irrigators argued that Reclamation did not control the Link River Dam and the ESA did not apply to its operation. 204 F.3d at 1212–13. We held that Reclamation's operation of the dam constituted

agency action and so "the ESA generally applies to the contract." *Id.* at 1213.

Yurok and Federal Appellees focus on this conclusion in *Patterson* to argue that the ESA must apply to Reclamation's operation of the dam. But when "an intervening Supreme Court decision undermines an existing precedent" and "both cases are clearly on point," then "a three judge panel of this court may reexamine our precedent to determine its continuing authority." *Landreth v. C.I.R.*, 859 F.2d 643, 648 (9th Cir. 1988).

The general conclusion reached in *Patterson* and relied on by the majority does not account for intervening precedent in *Home Builders* and its progeny. In *Patterson*, we held "that the district court did not err in concluding that Reclamation has the authority to direct [Link River] Dam operations," the same dam here, "to comply with the ESA." 204 F.3d at 1213. But *Patterson* did not discuss the agency's discretion, only its ownership of and authority over the Dam. *Id.* And *Home Builders* compels us to determine whether the agency has sufficient discretion to act on behalf of endangered or threatened species despite Congressionally mandated action—here the congressionally authorized and approved contracts. *See Home Builders*, 551 U.S. at 669; *see also San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 639 (9th Cir. 2014) (*Jewell II*); *Haaland*, 102 F.4th at 1076 ("The duty to comply with mandatory legal obligations is not a source of discretion." (citing *Home Builders*, 551 U.S. at 669)). Because *Patterson* generally held that all Klamath Project operations are subject to ESA § 7 without discussion of the agency's specific discretion, we must revisit that portion of *Patterson* discussing the ESA's applicability considering *Home Builders*. To the extent that "[t]he reasoning or theory of" *Patterson* is

"clearly irreconcilable with the reasoning or theory" of *Home Builders*, that portion of *Patterson* is no longer good law. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003).

The majority emphasizes that *Home Builders* dealt with statutory mandates. Maj. Op. at 27 ("When another federal *statute* mandates an action . . . then the federal agency has no discretion to consider the protection of listed species in carrying out the other incompatible *statutory* mandate.") (emphasis in original). But whether the mandate is statutory or contractual is not the primary question. "The real question after *Home Builders* is what counts as a non-discretionary action, to which § 7(a)(2) does not apply." *Jewell II*, 747 F.3d at 639. "The agency lacks discretion only if another *legal* obligation makes it impossible for the agency to exercise discretion for the protected species' benefit," not just statutory obligations like the Reclamation Act. *Jewell I*, 749 F.3d at 784 (emphasis added). *Patterson* does not connect its holding that the ESA applies to the Link River Dam to any discussion of agency discretion as subsequently required by *Home Builders*. Under *Patterson*'s reasoning, mere control of the dam was enough to trigger ESA § 7. 204 F.3d at 1213; *see also* Maj. Op. at 24–26. In this sense, *Patterson*'s reasoning is "clearly irreconcilable with" the Supreme Court's reasoning in *Home Builders*. *Miller*, 335 F.3d at 893.

The problem is that in *Patterson* we generally concluded that the ESA applied to Link River Dam operations only because the ESA was enacted to "halt and reverse the trend toward species extinction, whatever the cost." 204 F.3d at 1213 (quoting *O'Neill v. United States*, 50 F.3d 677, 686 (9th Cir. 1997)). *Patterson* relied on *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184 (1979), for this holding. But the majority fails to note that *Patterson*'s broad reliance on

*Tennessee Valley Authority* was disclaimed by the Supreme Court in *Home Builders*.  551 U.S. at 669–70.  The Court noted that *Tennessee Valley Authority* "had no occasion to answer the question" whether the ESA applied after new ESA regulations were adopted.  Since *Tennessee Valley Authority*, the EPA had adopted a regulation clarifying that ESA § 7 only applies to discretionary agency action.  Plus, the agency action at issue in *Tennessee Valley Authority*, "while expensive, was also discretionary."  *Id.* at 670.  Thus, since *Home Builders*, application of ESA § 7(a)(2) hinges on the agency's discretion.  And *Haaland* leaves no doubt that this framework applies that framework to contractual language.

The majority argues that *Haaland* is distinguishable because the agency action is different; in *Haaland* the action was Reclamation's "*execution* of the renewed settlement contracts" and here, the action is to calculate the sums to be released.  Maj. Op. at 30–33.  That is a distinction without a difference.  Just as in *Haaland*, Reclamation "entered into a legally binding agreement," namely, the "executed contract[s.]"   102 F.4th at 1074.   Therefore, Federal Appellees need to show agency discretion independent of legal unavailability in its calculation of who is to receive what amount of water.  *See id.* at 1076 (finding contractual provisions do not "give Reclamation discretion *to take measures* that would *inure to the benefit*" of the protected species (emphases added)).  Just like in *Haaland*, "whether the Bureau of Reclamation [has] a discretionary duty . . . *necessarily* turn[s] on the terms of [these] contracts."  Maj. Op. at 31.  And just as in *Haaland*, the majority "fails to explain how such compliance with mandatory legal obligations can be a source of discretion."  102 F.4th at 1076 n.12.

The majority casts *Haaland* as irrelevant because "there was no dispute that Section 7(a)(2) of the ESA applied to the Bureau of Reclamation's operation of the Central Valley Project." Maj. Op. at 33. It suggests that we rejected the plaintiff's claims in *Haaland* "because we determined on the merits that FWS's consultation on the renewal of the Settlement Contracts considered the full scope of the proposed action." *Id.* (quotation omitted). What the majority neglects to recognize is that this language comes from *Haaland*'s discussion of the plaintiff's APA claim, not its ESA claim. We rejected the ESA claim in *Haaland* because "the renewed Settlement Contracts [did] not give Reclamation the discretion to take measures that would benefit the" endangered species. 102 F.4th at 1077. The majority's suggested difference is unrelated to the question *Haaland* demands we answer (and which the majority thinks has no relevance here): whether the legally enforceable contracts give Reclamation discretion. *See id.* at 1074. Whether ESA § 7 is implicated at the contract renewal phase provides no guidance on whether § 7 is implicated under extant operative contracts.

The majority contends that "nothing in *Haaland* suggests that Section 7(a)(2) of the ESA does not apply to the Klamath Project." Maj. Op. at 34. But *Haaland* does suggest that "we must determine whether Reclamation retained some discretion to take measures that would inure to the benefit of a protected species," before deciding whether § 7's requirements apply based on case law pre-dating *Home Builders*. 102 F.4th at 1074. And the majority fails to conduct that analysis.

II

The majority argues that "[t]here is no issue of contract interpretation here." Maj. Op. at 33. But as even the dissent noted in *Haaland*, "[w]e look to the terms of the contract to determine whether the agency retains the power under the contract to impose measures to protect the species in question." 102 F.4th at 1082 (Gould, J., concurring in part and dissenting in part) (cleaned up). And these contracts do not provide the agency discretion.

A

The primary argument is that contractual provisions disclaiming liability during shortages give Reclamation discretion to act for the benefit of the suckers and salmon. These are best described as force majeure clauses. *See Haaland*, 102 F.4th at 1075. For instance, KID's 1954 contract explains that "[o]n account of drought or other causes, there may occur at times a shortage in the quantity of water available in Project reservoirs." In that circumstance, "in no event shall any liability accrue against the United States." Tulelake Immigration District's (TID) 1956 contract contains the same shortage provision to KID's. So too with the later-entered Warren Act contracts, which all disclaim liability for water shortages caused by drought or any "other cause."

These clauses, it is argued, trigger the ESA because they grant discretion to limit water-flow in the event of "legal unavailability." These provisions likely do disclaim *liability* for legal unavailability. *See O'Neill*, 50 F.3d at 684. But our precedent forecloses that disclaimers of liability based on shortages are sources of *discretion*.

In *Haaland*, 102 F.4th at 1075, we rejected this exact argument. We concluded that two materially identical contractual provisions did not create discretionary authority triggering review under ESA § 7(a)(2). First, "if there is a shortage of Project Water because of actions taken by the Contracting Officer to meet legal obligations," then "no liability shall accrue against the United States." *Id.* And second, "[t]he United States assumes no responsibility . . . for or on account of . . . [a]ny damage . . . caused by a shortage of water" due to "errors in operation, drought, or unavoidable causes." *Id.* at 1076 (cleaned up).

We held that those provisions do "not give Reclamation discretion to alter the Settlement Contract to benefit a listed species." *Id.* at 1075. Instead, they address circumstances in which, because of an unavoidable shortage, Reclamation has "*no* discretion to act" at all. *Id.* at 1076.

As we explained, these provisions were "force majeure" clauses "that limit[] Reclamation's liability for damages in the event legal obligations are imposed on Reclamation that require it to breach the Settlement Contracts by reducing the diversion of water." *Id.* "[N]othing about" similar "provision[s] require[] the Bureau [of Reclamation] to take actions to protect" endangered species. *Jewell I*, 749 F.3d at 783; *see also Haaland*, 102 F.4th at 1075–76 (discussing the "similar shortage provision[s]" from *Jewell I*, 749 F.3d at 783). These provisions are "permissive" and "merely absolve the United States of liability if there is a water shortage." *Haaland*, 102 F.4th at 1075–76 (quoting *Jewell I*, 749 F.3d at 783). Under that same reasoning, these provisions do not provide Federal Appellees discretionary authority.

Nor does the majority's discussion of *O'Neill* support the proposition that these force majeure clauses give Reclamation discretion to act on behalf of the suckers and salmon.  There is no friction between *Haaland* and *O'Neill*. In *O'Neill*, we answered whether a water service contract provision "which absolves the government of liability for water shortages due to drought or 'any other causes,' excuses the government from supplying the full contractual amount." 50 F.3d at 682.  We held that "the contract's liability limitation is unambiguous and that an unavailability of water resulting from the mandates of valid legislation constitutes a shortage by reason of 'any other causes.'" *Id.* at 684.

Our decision in *Haaland* did not disturb *O'Neill*'s conclusion—we agreed that the government faces no liability under similar terms when there is a shortage because of legal unavailability.  And *Haaland* confirms that the limitation-of-liability clauses do not grant discretion sufficient to trigger the ESA.

The *O'Neill* court construed the contracts before it.  We did not answer "whether the district court should have decided if environmental statutes did, in fact, mandate the reduction in water." *Id.* at 682; *see also id.* at 687–89 (it was not an abuse of discretion to "decline[] to evaluate the merits of the Bureau's compliance with ESA").[1]  Unlike *O'Neill*, we are tasked with answering the merits of ESA obligations. And the lack of liability for compliance with environmental

---

[1]  Even if *O'Neill* had addressed the merits of the environmental claims when the district court did not, it would be distinguishable because the Central Valley Project Improvement Act was amended in 1992 to "elevate[] 'mitigation, protection, and restoration of fish and wildlife' to Project purposes on par with irrigation." *San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676, 683 (9th Cir. 2012) (quotation omitted).

law does not equate to discretion sufficient to trigger ESA obligations.

The majority's discussion of these contracts does all it can to distinguish them from those in *Haaland* except look at the text of the contracts.  Maj. Op. at 34–37.  In *Haaland*, we held that contracts which provided that "if there is a shortage of Project Water because of actions taken by the Contracting Officer to meet legal obligations," then "no liability shall accrue against the United States" did "not give Reclamation discretion to alter the Settlement Contract to benefit a listed species."  102 F.4th at 1075.  Compare that with the language of these contracts, which provide that if there is "a shortage in the quantity of water available in Project reservoirs," then, "in no event shall any liability accrue against the United States."  The contract provisions mirror those in *Haaland*.  The majority's failure to address the striking similarities between these contracts' plain text, while coming to a different conclusion than *Haaland*, undermines our precedent.

B

Beyond those with force majeure clauses, the other contracts fare little better.  For example, Klamath Water Users Association highlights Reclamation's contract with the Van Brimmer Ditch Company.  Even the majority recognizes this contract triggers non-discretionary duties.  Maj. Op. at 35 n.6.  Likewise, the Klamath Basin Irrigation District's Warren Act contract does not provide discretion when it allows Reclamation to "apportion the available surplus water supply among the District and others entitled, under existing and future contracts . . . to receive water from the Klamath Project."  All that provision means is that, if there is a shortage, Reclamation can use available surplus

according to other contracts.    It grants no discretion sufficient to trigger the ESA.

As for the equitable issue in the Klamath Drainage District contract, the Secretary still has no discretion to act in a way that would "inure to the benefit" of the suckers or salmon. *Haaland*, 102 F.4th at 1074. All the water prorated in times of shortage "shall" be prorated "between the district and others supplied therefrom." The Secretary can decide how to release the water, but the water releases must still only go to those supplied. No one could suggest that the suckers and salmon are "supplied therefrom" as contemplated by the contract. So the Secretary has no discretion under this provision to release water for the benefit of the suckers and salmon. The same is true for the 1956 TID agreement, which provides that "[i]n the event [of] a shortage of water" from the Klamath Project "as a result of drought or other unavoidable causes," the United States "may apportion the available supply" among those in TID or with equal priority rights. That apportionment between TID or those with equal priority rights is not discretionary in a way that would "inure to the benefit" of the suckers or salmon. *Haaland*, 102 F.4th at 1074.

The closest call on this issue are Reclamation's contracts with homesteaders.    Federal Appellees explain that Reclamation's initial contracts with KID and TID started as "'Form A' agreements for homesteaders" which require that "in times of 'shortage,' Reclamation would furnish an 'equitable proportionate share' of available water." But Form A is not in the record. Instead, the parties point to a

case from the Federal Court of Claims, which purports to quote Form A:

> The quantity of water to be furnished hereunder shall be that quantity which may be applied beneficially in accordance with good usage in the irrigation of the land described in paragraph 2: *Provided*, That *in case of a shortage at any time the amount to be furnished shall be an equitable proportionate share*, as nearly as practical operations will permit, of the water actually available at the time for all of the area being watered from the same source of supply, such proportionate share to be determined by the project manager.

*Id.* (second emphasis added).

Even if we accept that this language is in Form A, it is unclear whether these contracts are current or enforceable. According to Federal Appellees, "Form A" is "supplement[ed]" by later agreements, including Reclamation's 1954 contracts (discussed above) with the Irrigation Districts. But Federal Appellees do not specify if the Form A agreements were incorporated into Reclamation's later contracts. And the Court of Federal Claims has concluded that the Form A agreements were "supplanted" by later contracts. *Baley v. United States*, 134 Fed. Cl. 619, 629 (2017), *aff'd*, 942 F.3d 1312 (Fed. Cir. 2019).

All this to say, whether the equitable language identified by Federal Appellees in Form A from *Baley* is current or enforceable is unclear. Accordingly, we should have, at

most, remanded to the district court to determine whether Form A is enforceable, what any current terms of Form A may be, whether Form A may affect Reclamation's other contracts, and whether Form A gives Reclamation discretion that implicates the ESA.

In the end, the majority has not shown that Reclamation "retains some discretion to take action for the benefit of a protected species." *Jewell I*, 749 F.3d at 784 (cleaned up). Thus, ESA § 7 obligations are not triggered by these contractual obligations, and we should have remanded if uncertain.

## III

Under *Home Builders* and *Haaland*, the generalized holding in *Patterson* that the ESA applies to the Klamath Project is no longer good law. Under the proper legal analysis, no statutory provision or contract provides agency discretion sufficient to trigger the ESA. Because the majority misreads our precedent, I respectfully dissent.